No. 24-2638

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD,
Plaintiffs-Appellants,

v.

UBER TECHNOLOGIES, INC., and GEGEN, LLC
Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 2:16-cv-00573-MMB

## BRIEF FOR PLAINTIFFS-APPELLANTS

Shannon Liss-Riordan
Thomas Fowler
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

Jeremy E. Abay
LICHTEN & LISS-RIORDAN, P.C.
76 E. Euclid Avenue, Suite 101
Haddonfield, NJ 08033
(856) 509-5346

*Counsel for Plaintiffs-Appellants*

**T**ABLE OF **C**ONTENTS

Jurisdictional Statement ........................................................................1

Statement of Issues................................................................................1

Statement of Related Cases ...................................................................2

Statement of the Case............................................................................2

     I.     Factual Background.................................................................3

          A.     Uber's Business...........................................................3

          B.     Uber's Operations .......................................................4

          C.     Uber's Pay Structure...................................................5

          D.     Plaintiffs' Work with Uber .........................................6

     II.     Procedural History...................................................................7

          A.     Early Motion Practice .................................................7

          B.     Summary Judgment and Prior Appeal ........................7

          C.     First Jury Trial............................................................8

          D.     Second Jury Trial ......................................................11

          E.     Post-Trial Rulings After the Second Jury Trial ........12

Summary of Argument ........................................................................14

Argument..............................................................................................16

     I.     The Pennsylvania Supreme Court should decide what standards govern employment status under the PMWA and WPCL. .................16

          A.     Standard of Review...................................................16

          B.     The Pennsylvania Supreme Court continues to reject federal standards. ...................................................18

          C.     The ABC test aligns with the PMWA and WPCL's purpose...19

i

II.     The District Court erred in dismissing Plaintiffs' claims as futile......21

    A.     Standard of Review....................................................................21

    B.     No improper conduct warranted dismissal. .............................21

    C.     Plaintiffs' claims are not futile.................................................22

    D.     Dismissal was not a reasonable response to the impasse. ........24

III.    Plaintiffs, not Uber, are entitled to judgment under Rule 50(b). ........27

    A.     Standard of Review....................................................................27

    B.     Economic Realities Test ...........................................................28

    C.     First Factor: Uber had the right to control, and did control, Plaintiffs' services.....................................................................30

    D.     Second Factor: Plaintiffs had limited control over earnings. ...43

    E.     Third Factor: Uber's investment dwarfed Plaintiffs'...............47

    F.     Fourth Factor: Driving a black car requires no special skill.....47

    G.     Fifth Factor: Plaintiffs worked long hours over many years. ...48

    H.     Sixth Factor: Plaintiffs' services were integral to Uber's business. ...................................................................................49

    I.     Uber willfully misclassified Plaintiffs. ....................................51

    J.     Plaintiffs were Uber's employees under the FLSA. .................52

    K.     *Jani-King* Factors....................................................................52

IV.     The FLSA requires Uber to prove that Plaintiffs were independent contractors. ...................................................................................54

Conclusion .........................................................................................55

Certificate of Compliance .......................................................................58

Certificate of Service ...............................................................................59

CASES

*Acosta v. Jani-King of Oklahoma, Inc.*,
905 F.3d 1156 (10th Cir. 2018) ....................................................52

*Argix Direct, Inc. & Loc. 11*,
343 NLRB 1017 (2004) ................................................................55

*Baker v. Flint Eng'g & Const. Co.*,
137 F.3d 1436 (10th Cir. 1998) ....................................................47

*Bayada Nurses, Inc. v. Com., Dep't of Lab. & Indus.*,
8 A.3d 866 (Pa. 2010) ..................................................................16

*Carpenter v. Pepperidge Farm, Inc.*,
2024 WL 2103257 (3d Cir. May 10, 2024)...................................26

*Chevalier v. Gen. Nutrition Ctrs., Inc.*,
220 A.3d 1038 (Pa. 2019)..............................................................16

*Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*,
988 F.2d 414 (3d Cir. 1993) ................................................... 48, 49

*Cummings v. Cenergy Intl. Services, LLC*,
2017 WL 4180972 (E.D. Cal. Sept. 20, 2017) .............................52

*Dep't of Labor & Indus. v. Stuber*,
822 A.2d 870 (Pa. Commw. Ct. 2003), *aff'd*,
859 A.2d 1253 (Pa. 2004)..............................................................18

*Dietz v. Bouldin.*,
579 U.S. 40 (2016)................................................................ 21, 24

*Donovan v. DialAmerica Mktg., Inc.*,
757 F.2d 1376 (3d Cir. 1985) ............................................. passim

*Drexel v. Union Prescription Centers, Inc.*,
582 F.2d 781 (3d Cir. 1978) ........................................................32

*Dynamex Operations W. v. Superior Ct.*,
416 P.3d 1 (Cal. 2018)....................................................... 9, 14, 20

*Eisenberry v. Shaw Bros.*,
   2010 WL 3191845 (M.D. Pa. Aug. 11, 2010), *aff'd*,
   421 F. App'x 239 (3d Cir. 2011) ....................................................28

*Fitzgerald v. First E. Seventh St. Tenants Corp.*,
   221 F.3d 362 (2d Cir. 2000) ..........................................................22

*Flores v. Velocity Express, LLC*,
   250 F. Supp. 3d 468 (N.D. Cal. 2017).....................................32, 47

*Galena v. Leone*,
   638 F.3d 186 (3d Cir. 2011) ...........................................................27

*Garrison v. Mollers N. Am., Inc.*,
   820 F. Supp. 814 (D. Del. 1993) ....................................................27

*Goldberg v. Whitaker House Coop.*,
   366 U.S. 28 (1961)...........................................................30, 31, 32

*Gonzalez-Gonzalez v. United States*,
   257 F.3d 31 (1st Cir. 2001).............................................................22

*Goodman v. Pennsylvania Tpk. Com'n*,
   293 F.3d 655 (3d Cir. 2002) ...........................................................27

*Hargrove v. Sleepy's LLC*,
   612 F. App'x 116 (3d Cir. 2015) ..............................................14, 17

*Hargrove v. Sleepy's, LLC*,
   106 A.3d 449 (N.J. 2015) ...........................................9, 14, 17, 20

*Hritz v. Woma Corp.*,
   732 F.2d 1178 (3d Cir. 1984) .........................................................24

*Idaho Sheet Metal Works, Inc. v. Wirtz*,
   383 U.S. 190 (1966).................................................................15, 54

*In re Amazon.com, Inc.*,
   255 A.3d 191 (Pa. 2021).................................................14, 16, 18

*Jackson v. U.S. Bankr. Ct.*,
   350 F. App'x 621 (3d Cir. 2009) .....................................................22

iv

*Keith v. Truck Stops Corp. of Am.*,
909 F.2d 743 (3d Cir. 1990) ..........................................................................28

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*,
26 F.3d 375 (3d Cir. 1994) ...........................................................................48

*Lee v. Krieg*,
227 F. App'x 146 (3d Cir. 2007) ..................................................................13

*Link v. Wabash R. Co.*,
370 U.S. 626 (1962)............................................................................... 21, 22

*Lowman v. Unemployment Comp. Bd. of Rev.*,
235 A.3d 278 (Pa. 2020)...................................................................... 9, 14, 19

*Maranzano v. S-L Distribution Co.*,
*2020* WL 7974332 (M.D. Pa. Dec. 18, 2020) .............................................51

*Martin v. Selker Bros.*,
949 F.2d 1286 (3d Cir. 1991) .......................................................................25

*McDermott Int'l, Inc. v. Wilander*,
498 U.S. 337 (1991)......................................................................................27

*McFeely v. Jackson St. Ent., LLC*,
825 F.3d 235 (4th Cir. 2016) .......................................................................44

*Morin v. Brassington*,
871 A.2d 844 (Pa. Sup. Ct. 2005)................................................................18

*N.L.R.B. v. Igramo Enter., Inc.*,
310 F. App'x 452 (2d Cir. 2009) ..................................................................55

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
427 U.S. 639 (1976)......................................................................................24

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992)......................................................................................29

*Neitzke v. Williams*,
490 U.S. 319 (1989)......................................................................................22

*O'Connor v. Uber Techs., Inc.*,
    82 F. Supp. 3d 1133 (N.D. Cal. 2015)...........................................49

*Patel v. Quality Inn S.*,
    846 F.2d 700 (11th Cir. 1988) .......................................................55

*People v. Uber Techs., Inc.*,
    270 Cal. Rptr. 3d 290 (Cal. Ct. App. 2020)........................... 21, 49

*Poulis v. State Farm Fire & Cas. Co.*,
    747 F.2d 863 (3d Cir. 1984) ............................................... 22, 24

*Raiczyk v. Ocean Cnty. Veterinary Hosp.*,
    377 F.3d 266 (3d Cir. 2004) .........................................................27

*Razak v. Uber Techs., Inc.*,
    2016 WL 3960556 (E.D. Pa. July 21, 2016) ..................................7

*Razak v. Uber Techs., Inc.*,
    2016 WL 5874822 (E.D. Pa. Oct. 7, 2016) ...................................7

*Razak v. Uber Techs., Inc.*,
    2017 WL 4052417 (E.D. Pa. Sept. 13, 2017) ................................7

*Razak v. Uber Techs., Inc.*,
    2018 WL 1744467 (E.D. Pa. Apr. 11, 2018)....................... passim

*Razak v. Uber Techs., Inc.*,
    951 F.3d 137 (3d Cir.), *amended*,
    979 F.3d 192 (3d Cir. 2020) .............................................. passim

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000).....................................................................28

*Reich v. Circle C. Investments, Inc.*,
    998 F.2d 324 (5th Cir. 1993) .......................................................44

*Rivera v. La Porte*,
    896 F.2d 691 (2d Cir. 1990) .......................................................23

*Rogers v. Lyft, Inc.*,
    452 F. Supp. 3d 904 (N.D. Cal. 2020).........................................50

*Rutherford Food Corp. v. McComb*,
 331 U.S. 722 (1947)............................................................... 29, 55

*Safarian v. Am. DG Energy Inc.*,
 622 F. App'x 149 (3d Cir. 2015) .................................................29

*Scantland v. Jeffry Knight, Inc.*,
 721 F.3d 1308 (11th Cir. 2013) ............................................ 37, 44

*Schultz v. Mistletoe Express Serv., Inc.*,
 434 F.2d 1267 (10th Cir. 1970) ..................................................37

*Uber Techs., Inc. v. Razak*,
 141 S. Ct. 2629 (2021).................................................................8

*United States v. Wright*,
 913 F.3d 364 (3d Cir. 2019) ............................................ 21, 22, 24

*Verma v. 3001 Castor, Inc.*,
 937 F.3d 221 (3d Cir. 2019) .................................... 26, 44, 47, 48

*Williams v. Jani-King of Phila. Inc.*,
 837 F.3d 314 (3d Cir. 2016) ............................................... passim

*Yeager v. United States*,
 557 U.S. 110 (2009)............................................................. 23, 24

**STATUTES**

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1367 ........................................................................1

28 U.S.C. § 1915 ......................................................................22

29 U.S.C. § 213 ........................................................................54

29. U.S.C. § 203 .......................................................................54

43 P.S. § 333.101 .....................................................................19

## RULES

3d Cir. L.A.R. 110.1 (2011) .............................................................3, 16

Fed. R. Civ. P. 50 ...........................................................................27

Fed. R. Civ. P. 52 ...........................................................................26

Fed. R. Civ. P. 58 ...........................................................................25

Pa. R. App. P. 3341 .........................................................................17

## TREATISES

9B Fed. Prac. & Proc. Civ. § 2524 (3d ed.) .............................................28

## REGULATIONS

210 Pa. Code § 63.8 ........................................................................17

The District Court had subject matter jurisdiction over the Plaintiffs' Fair Labor Standards Act claims under 28 U.S.C. § 1331 because those claims arise under federal law. The District Court had supplemental jurisdiction over the Plaintiffs' state law claims under 28 U.S.C. § 1367 because those claims are based on the same facts as the federal claim. This Court has appellate jurisdiction over this case under 28 U.S.C. § 1291 because the District Court's July 30, 2024, order disposed of all claims.

**STATEMENT OF ISSUES**

1.      Whether a different classification standard applies under the Pennsylvania Minimum Wage Act ("PMWA") and the Pennsylvania Wage Payment and Collection Law ("WPCL") compared to the federal Fair Labor Standards Act ("FLSA") in determining whether a worker is an employee or an independent contractor—an issue that Plaintiffs contend should be certified to the Pennsylvania Supreme Court.

2.      Whether the District Court erred in dismissing Plaintiffs' claims simply because two juries could not reach a unanimous verdict.

3.      Whether the District Court erred in denying Plaintiffs' motion for judgment as a matter of law under Rule 50(b) while granting judgment as a matter of law for Defendants under Rule 50(b).

4.     Whether the District Court erred in holding that Plaintiffs carried the burden of proving their employee status, when it was Uber who claimed an exemption from the FLSA.

**STATEMENT OF RELATED CASES**

This case was previously before this Court as Case No. 18-1944.  *See Razak v. Uber Techs., Inc.*, 951 F.3d 137 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020).  Plaintiffs are unaware of any related cases.

**STATEMENT OF THE CASE**

Plaintiffs brought this action on behalf of all drivers who provided limousine services, formerly known as UberBLACK, for Defendant Uber Technologies, Inc. in the Philadelphia area between 2013 and 2018.[1]  Plaintiffs claim that Uber violated the FLSA, 29 U.S.C. §§ 201–219, PMWA, 43 P.S. §§ 333.101–333.115, and WPCL, 43 P.S. §§ 260.1–260.45, by misclassifying UberBLACK drivers as independent contractors rather than employees.

The District Court originally granted summary judgment for Uber, finding as a matter of law that Plaintiffs were independent contractors.  This Court reversed.

Following remand, there were two jury trials on the sole issue of whether the named Plaintiffs were misclassified as independent contractors.  Both juries

---

[1]     Defendants include Uber and its wholly owned subsidiary Gegen, LLC, collectively referred to as "Uber."

deadlocked.  The District Court then dismissed the case as futile, reasoning that Plaintiffs had not met their burden of proving misclassification, and granted Uber's motion for judgment as a matter of law, while denying Plaintiffs' motion.  The District Court committed four reversible errors, leading to this appeal.

First, the District Court should have instructed the jury that the PMWA and WPCL apply a different standard than the FLSA in determining whether workers are misclassified as independent contractors.  If there is any doubt that a different standard applies to Pennsylvania's wage laws, then this issue should be certified to the Pennsylvania Supreme Court under Local Appellate Rule 110.1.  Second, the District Court erred in dismissing this case as futile after two juries deadlocked.  Third, the District Court should have granted Plaintiffs' motion for judgment as a matter of law, and not Uber's motion.  Fourth, the District Court should have recognized that Uber bears the burden of proving an exemption from the FLSA—that is, whether the Plaintiffs were independent contractors.

## I.  Factual Background

### A.  Uber's Business

Uber has spent billions of dollars building and operating its on-demand transportation business.  App. 1456–57.  Customers who want rides use Uber's "app"—mobile phone software—to request a ride from Uber.  App. 1616–17.  To buy rides from Uber, customers first download the app, create an account, and

enter their credit card information.  App. 1104.  Between 2013 and 2018, Plaintiffs provided limousine services, known then as "UberBLACK," to Uber's customers in the Philadelphia area.  App. 2133–47.

## B.    Uber's Operations

To provide UberBLACK services, Plaintiffs and other drivers had to agree to terms and conditions memorializing Uber's right to terminate them for substandard service and other reasons.  *See* App. 1082–214.

After every trip, Uber invited riders to rate their driver on a five-star scale.  App. 1471.  Drivers had to maintain a minimum average set by Uber, initially 4.6 then 4.7 stars, to keep from being terminated, or, as Uber calls it, "deactivated."  App. 1093, 1267.

Uber's "quality control system" kept drivers "engaged in their rating."  App 1240.  For example, Uber "warn[ed]/deactivate[d] bad drivers often (daily, at least weekly)."  App. 1239; *see also* 1272–73, 1489.  Uber's system "[p]ut the burden on the driver to get certified, get back online."  App. 1239.  This "ongoing process" regularly engaged drivers who needed "encouragement, or training, and either encourage[d] them to improve, or manage[d] them out of the fleet."  App. 1239.

Uber's Driver Deactivation Policy warned drivers that they would be deactivated for exceeding their city's "maximum cancellation rate," which was based on "the average cancellation rate of drivers in that area."  App. 1597.

4

Drivers were also obligated to accept "at least 80% of the Customer Requests . . . provided to [a driver] in a thirty (30) day period, provided that Gegen [had] presented at least 60 Customer Requests . . . in that same period." App. 1093.

Uber also had the discretion to terminated drivers for committing "infractions." Of Uber's 63 infractions (listed in Section III.C.4 below), only 21 overlapped with Philadelphia Parking Authority regulations. *Compare* App. 1476, 1596–607 *with* App. 1649–70. Uber also had its own vehicle requirements and dress code. App. 920 (6/12 Trial Tr. 226:8–24), 1345, 1363.

### C. Uber's Pay Structure

Uber determined the fare structure, and thus dictated how much drivers could earn. App. 988 (6/13 Trial Tr. 212:8–18); *see also* App. 1127. For instance, Uber unilaterally decided how much to charge customers. *See, e.g.*, App. 1127. Drivers could not negotiate fares with customers or the share of the fares they would receive. *See, e.g.*, App. 1192–93.

Uber paid Plaintiffs and other drivers weekly. *See, e.g.*, App. 1420–38. Uber deducted money from Plaintiffs' weekly earnings to cover business expenses like liability insurance, Parking Authority fees, and vehicle finance payments. *See, e.g.*, App. 1426, 1430. If drivers failed to earn enough income from fares to cover these deductions, they would go into debt with Uber, requiring them to work more

to pay down the debt.  App. 807 (6/10 Trial Tr. 179:1–13), 842 (6/11 Trial Tr. 103:7–23), 892 (6/12 Trial Tr. 113:5–10).

Because Uber controlled trip assignments, drivers could not choose their riders or attempt to be hired by more profitable riders by providing higher quality service, as customers could not select a particular driver through the Uber App. App. 851 (6/11 Trial Tr. 137:1–138:7).  Only the driver that Uber assigned to a fare could complete the trip, so riders and drivers could not delegate trips to other drivers.  App. 850 (6/11 Trial Tr. 134:17–19), 1310, 1476.  Uber also exercised control over where drivers worked by blocking drivers from working in certain areas.  App. 875 (6/12 Trial Tr. 48:25–49:11), 1389, 1395–96.

### D.    Plaintiffs' Work with Uber

Plaintiffs Kenan Sabani and Khaldoun Cherdoud began working for Uber in December 2013, and Plaintiff Ali Razak started in July 2014.  App. 1439–49. Over the period at issue, 2013 to 2018, which comprises less than 1,500 potential workdays, Razak completed 5,602 trips, Sabani completed 4,854 trips, and Cherdoud completed 6,518 trips.  App. 2137, 2142, 2147.  During that period, other than for brief breaks, Plaintiffs worked almost every week and logged at least 40 hours online most weeks.  App. 1640–42.

## II.    Procedural History

### A.    Early Motion Practice

Plaintiffs filed this case in the Court of Common Pleas of Philadelphia County in January 2016. After Uber removed the action to the Eastern District of Pennsylvania, the District Court denied Uber's attempt to compel Plaintiffs' claims to arbitration. *Razak v. Uber Techs., Inc.*, 2016 WL 3960556 (E.D. Pa. July 21, 2016). The District Court concluded that Plaintiffs had effectively opted out of arbitration. *Id.*

The District Court then denied Uber's motion for judgment on the pleadings, recognizing that Plaintiffs alleged sufficient facts to show they were employees rather than independent contractors. *Razak v. Uber Techs., Inc.*, 2016 WL 5874822 (E.D. Pa. Oct. 7, 2016). The Court also denied Uber's motion for summary judgment on the issue of what constituted compensable work. *Razak v. Uber Techs., Inc.*, 2017 WL 4052417, at *15 (E.D. Pa. Sept. 13, 2017).

### B.    Summary Judgment and Prior Appeal

Following discovery, Uber moved for summary judgment on whether Plaintiffs were employees or independent contractors. Applying the six-factor balancing test from *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985), the District Court granted Uber's motion, finding that the special skills and integrality factors weighed in favor of employee status while the other factors

supported independent contractor status. *Razak v. Uber Techs., Inc.*, 2018 WL 1744467 (E.D. Pa. Apr. 11, 2018).

On appeal, this Court vacated the District Court's summary judgment order. This Court agreed that the special skills factor "certainly weighs in favor of finding that Plaintiffs are employees." *Razak*, 951 F.3d at 147. Regarding integrality, this Court, like the District Court, acknowledged that "it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function." *Id.* at n.12. As to the other factors, this Court held that "genuine disputes of material facts" precluded summary judgment. *Id.* at 148. This Court did "not opine on whether the disputed facts should be resolved by a jury or the District Court through a Rule 52 proceeding, as was the case in *DialAmerica*." *Id.* Uber petitioned for certiorari, but the Supreme Court denied review. *Uber Techs., Inc. v. Razak*, 141 S. Ct. 2629 (2021).

### C. First Jury Trial

The first jury trial was held in March 2024. App. 212–523. By agreement, the trial was limited to the issue of whether the named Plaintiffs were employees or independent contractors between 2013 and 2018. App. 133–34. Before trial, the parties submitted competing jury instructions on what standards governed Plaintiffs' employment status under the PMWA, WPCL, and FLSA. App. 160–69, 173–203.

Plaintiffs contended that Uber carried the burden of proving it was exempt from federal and state wage laws on the ground that Plaintiffs were independent contractors. App. 193, 313. Plaintiffs also argued that while Pennsylvania Supreme Court has not yet addressed which classification test applies under the PMWA or WPCL, it was likely to follow the New Jersey and California Supreme Courts in adopting a more employee-friendly test than the federal test under the FLSA. App. 173–75, 192. Plaintiffs noted that the New Jersey and California Supreme Courts have in recent years adopted an "ABC" test, which places the burden on the alleged employer to prove three strict prongs, to provide stronger protection for employee status under state law than federal law. *See* App. 192, 207 (citing *Hargrove v. Sleepy's, LLC*, 106 A.3d 449 (N.J. 2015); *Dynamex Operations W. v. Superior Ct.*, 416 P.3d 1, 34 (Cal. 2018). Plaintiffs also pointed out that the Pennsylvania Supreme Court had recently adopted a modified AC test to determine whether a worker is an independent contractor in the unemployment context. *See* App. 207 (citing *Lowman v. Unemployment Comp. Bd. of Rev.*, 235 A.3d 278, 300 (Pa. 2020) (determining that an Uber driver was an employee for unemployment purposes)).

As *amicus curiae*, the Pennsylvania Attorney General supported Plaintiffs' position that the PMWA and WPCL warranted separate jury instructions because they afford "greater protection than the FLSA." App. 135–58. The Attorney

General explained that, while the Pennsylvania Supreme Court has never endorsed a specific classification test for the PMWA or WPCL, it has repeatedly rejected the notion that these statutes use the same standards as the FLSA despite their similar language.  App. 152.

The District Court rejected Plaintiffs' arguments and held that the PMWA would apply the same standard as the FLSA.  App. 490 (3/8 Trial Tr. 93:5–22), 704–07, 1048 (6/17 Trial Tr. 109:12–24).  For the WPCL, the District Court based its instructions on the ten factors discussed in *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314 (3d Cir. 2016), despite the Pennsylvania Supreme Court never having adopted those factors.  App. 712–14.  The District Court instructed the jury that Plaintiffs had the burden of proving their employment status under both federal and state law.  App. 490 (3/8 Trial Tr. 92:4–8), 1047 (6/17 Trial Tr. 108:7–11).

After a five-day trial, the jury failed to reach a unanimous verdict.  *See* App. 530.  The District Court then submitted its own questions to the jury based on the six *DialAmerica* factors and ten *Jani-King* factors.  App. 524–529.  The results of this polling also failed to produce a verdict.

After the first trial, the District Court denied the parties' opposing Rule 50(b) motions.  App. 691.  In the District Court's view, "the trial record [was] replete with a definite 'hybrid' of facts that cut in both directions for most, if not all, of the economic reality and WPCL factors."  App. 717.  "This fissure," the

District Court reasoned, precluded judgment as a matter of law for either party. App. 717.

### D. Second Jury Trial

Before the second trial, held in June 2024, the District Court ordered the parties to submit proposed jury interrogatories. App. 530–32, 693. Plaintiffs did so, but Uber did not. App. 651–59.

The second trial proceeded much like the first trial, with mostly the same witnesses, same exhibits, and the Court providing the jury with similar instructions to those provided in the first trial. App. 763–1073. Again, the jury failed to reach a unanimous verdict. *See* App. 8, 1074–80.

After the jury reported its deadlock, the District Court again polled the jury using a new supplemental verdict form it had drafted. App. 1074–80. Plaintiffs objected to the form of questions and urged the District Court to use their proposed jury interrogatories, which the Court declined to do. App. 1060 (6/17 Trial Tr. 158:3–11).

The supplemental verdict form asked the jury to decide, for each Plaintiff, whether each *DialAmerica* and *Jani-King* factor: (1) strongly favored independent contractor status; (2) somewhat favored independent contractor status; (3) was neutral; (4) somewhat favored employee status; or (5) strongly favored employee status. App. 1074–80. The Supplemental Verdict Form also asked the jury to

answer unanimously "yes" or "no" to whether each Plaintiff had proven that he was Uber's employee under the FLSA, PMWA, and WPCL.  App. 1074–80.

The jury could not unanimously decide whether any Plaintiff had proven his employee status under the FLSA, PMWA, or WPCL.  App. 1074–80.  The jury unanimously decided only a handful of the *DialAmerica* and *Jani-King* factors, but the results were inconclusive and contradictory.  For example, although the parties did not dispute that each Plaintiff rendered the same service for Uber, the jury reached different conclusions for each Plaintiff regarding whether the job required a special skill.[2]  App. 1074, 1076, 1078 (finding that this factor somewhat favored employee status for Cherdoud, somewhat favored independent contractor status for Razak, and was inconclusive for Sabani).

### E.    Post-Trial Rulings After the Second Jury Trial

After the second trial, Plaintiffs moved for judgment as a matter of law under Rule 50(b).  App. 9.  Plaintiffs alternatively moved the District Court to enter judgment in their favor by adopting their proposed findings of fact and conclusions of law under Rule 52(a)(1).  App. 9.  Plaintiffs also asked for a new trial if the District Court declined to enter judgment in their favor.  App. 10.  The District Court denied Plaintiffs' motions.  App. 4.

---

[2]    This Court's prior opinion also recognized that "the FLSA analysis would remain the same" for all three Plaintiffs.  *Razak*, 951 F.3d at 139, n.2.

Uber's post-trial motion urged the District Court to dismiss this action with prejudice "pursuant to its inherent authority to manage its docket." App. 9. Uber alternatively moved for judgment as a matter of law under Rule 50(b). App. 8. The District Court granted both of Uber's requests. App. 4.

In dismissing the action, the District Court speculated that a "third jury trial would do nothing more than waste precious judicial resources while—in all likelihood—leaving the Parties precisely where we began so many years ago." App. 5. The District Court concluded that "the best course of action [was] to dismiss this case 'pursuant to its inherent authority to manage its docket.'" App. 5 (quoting *Lee v. Krieg*, 227 F. App'x 146, 148 (3d Cir. 2007).

The District Court acknowledged that its "futility" dismissal might "not withstand scrutiny on appeal" because "existing futility jurisprudence focuses on the frivolousness of a complaint, rather than the impasse" below. App. 15. So, to hedge against reversal, the District Court "alternatively conclude[d] that Defendants [were] entitled to relief under Rule 50(b)," despite previously finding that "a diverse set of reasonable inferences and conclusions" precluded such relief and despite this Court's prior rebuke of the District Court's summary judgment dismissal. App. 23–24, 717. Plaintiffs timely appealed these rulings. App. 1.

In addition to presenting the first opportunity for a federal court to determine whether Uber drivers are employees under the FLSA, this appeal raises critical questions about the standards governing employee classification under Pennsylvania law. While the Pennsylvania Supreme Court held an Uber driver to be an employee for unemployment purposes in *Lowman*, 235 A.3d at 308, and pointedly rejected applying standards developed under the FLSA to Pennsylvania's wage statutes in *In re Amazon.com, Inc.*, 255 A.3d 191 (Pa. 2021), it has yet to announce what employee classification test applies under the PMWA and WPCL. Thus, Plaintiffs urge this Court to certify this extremely important issue of state law to the Pennsylvania Supreme Court.

Similar circumstances led this Court to certify the same question to the New Jersey Supreme Court in *Hargrove v. Sleepy's LLC*, 612 F. App'x 116, 118 (3d Cir. 2015). That certification resulted in the New Jersey Supreme Court adopting an ABC test for worker classification under New Jersey law. *Hargrove*, 106 A.3d at 465. More recently, the California Supreme Court reached the same result in *Dynamex*, 416 P.3d at 35, eschewing the federal FLSA standard and adopting an ABC test under California law. The Pennsylvania Supreme Court should likewise have an opportunity to decide this critical issue of state law.

But even under the federal standard applied below, the trial record compels

one conclusion: Plaintiffs were Uber's employees, not independent contractors. Uber's failure to genuinely dispute the facts that are actually material to Plaintiffs' employment status confirms this conclusion. What prevented the jury from reaching a unanimous decision was not indecision over the facts, but confusion regarding how to apply a multifactor balancing test to those facts. So, rather than dismiss this case as futile and grant judgment as a matter of law to Uber, if the District Court were going to enter judgment for either party, it should have entered judgment for Plaintiffs.

The District Court also erred by placing the burden of proof on Plaintiffs. By claiming that Plaintiffs are independent contractors, Uber sought an exemption from the FLSA, and "the burden of establishing the facts requisite to an exemption" rests with the alleged employer. *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966). Uber failed to meet that burden at trial, entitling Plaintiffs to judgment as a matter of law.

This Court should vacate dismissal and enter judgment for Plaintiffs under federal and state law, or this Court should certify to the Pennsylvania Supreme Court the question of what standard applies for employment classification under the PMWA and WPCL.

I.  **The Pennsylvania Supreme Court should decide what standards govern employment status under the PMWA and WPCL.**

The Pennsylvania Supreme Court has repeatedly rejected efforts to apply federal standards to the PMWA and WPCL. *See, e.g.*, *Bayada Nurses, Inc. v. Com., Dep't of Lab. & Indus.*, 8 A.3d 866 (Pa. 2010) (enforcing PMWA's more narrow exemption for domestic service employees than federal exemption); *Chevalier v. Gen. Nutrition Ctrs., Inc.*, 220 A.3d 1038, 1055 (Pa. 2019) (rejecting the federally approved fluctuating workweek method for calculating overtime). And, more recently, Pennsylvania's high court instructed against construing "the PMWA and the federal FLSA in a parallel fashion." *In re Amazon.com*, 255 A.3d at 202 n.11.

Still, there is no explicit authority from the Pennsylvania Supreme Court on which classification test applies to the PMWA and WPCL. Nor has the Pennsylvania Supreme Court addressed which party bears the burden of proving a plaintiff's employment status under the PMWA and WPCL. Rather than speculate how the Pennsylvania Supreme Court would resolve these critical questions, this Court should certify this issue of state law to Pennsylvania's high court.

A.  **Standard of Review**

Local Appellate Rule 110.1 allows this Court to certify a question of state law to the state's highest court under two conditions. 3d Cir. L.A.R. 110.1 (2011).

First, the question arises "under the laws of that state which will control the outcome of [the] case." *Id.* Second, the state's highest court has a procedure for accepting certified questions from this Court. *Id.* Both conditions are met here.

Pennsylvania Rule of Appellate Procedure 3341 allows the Pennsylvania Supreme Court to accept questions from this Court. Pa. R. App. P. 3341(a); *see also* 210 Pa. Code § 63.8. Such questions may concern "an unsettled issue of" statutory interpretation. Pa. R. App. P. 3341(c). Such questions may also include "one of first impression" that "is of such substantial public importance[.]" *Id.*

The PMWA and WPCL control whether Plaintiffs were Uber's employees or independent contractors under Pennsylvania law. The questions of who bears the burden of proof and which classification test applies to these statutes are unsettled and of significant public importance. In fact, these issues are so significant that the Pennsylvania Attorney General took the rare step of filing an amicus brief with the District Court, urging against applying the FLSA standard to the state law claims.

This Court certified the same question about New Jersey's wage statutes to the New Jersey Supreme Court in *Hargrove v. Sleepy's LLC*, 612 F. App'x at 118. In turn, the New Jersey Supreme Court adopted the ABC test and a presumption of employment. *Hargrove*, 106 A.3d at 465. The Pennsylvania Supreme Court deserves the same opportunity.

**B.      The Pennsylvania Supreme Court continues to reject federal standards.**

In *Donovan v. DialAmerica Mktg., Inc.*, this Court adopted a six-factor balancing test—known as the "economic realities" test—for determining whether a worker is an employee or independent contractor under the FLSA.  757 F.2d at 1383.  Applying this federal common law test to Plaintiffs' PMWA claims, this Court previously stated that "Pennsylvania state courts have looked to federal law regarding the FLSA for guidance in applying the PMWA."[3]  *Razak*, 951 F.3d at 142 (citing *Dep't of Labor & Indus. v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004)).  But much has changed since this Court's prior decision.

In 2021, the Pennsylvania Supreme Court explicitly rejected the notion that federal standards govern claims under the PMWA.  *See In re Amazon.com*, 255 A.3d at 202.  In fact, Pennsylvania's high court "disavow[ed]" reading its *per curiam* affirmance of *Stuber,* 859 A.2d 1253, as endorsing "the principle that the PMWA and federal FLSA mirror each other in all respects and must always be

---

[3]      Although this Court did not explicitly address what standard applies to Plaintiffs' WPCL claims, it has "predict[ed]" that Pennsylvania's high court would employ a ten-factor test that parallels the economic realities test.  *Jani-King*, 837 at 321.  This Court, in *dicta*, based that prediction on a Pennsylvania trial court having grafted these workers' compensation factors onto the WPCL.  *See id.* at 320 (citing *Morin v. Brassington*, 871 A.2d 844, 850 (Pa. Sup. Ct. 2005)).

interpreted similarly." *Id.* at 202 n.11. In other words, the Pennsylvania Supreme Court expressly rejected the approach taken by this Court in its prior ruling.

Besides rejecting federal standards, the Pennsylvania Supreme Court has also adopted a more employee-friendly test for unemployment claims (namely, an "AC" test). *See Lowman*, 235 A.3d at 295–307. Under that test's first prong, Pennsylvania's high court found that Uber exerted enough control over a driver to make him an employee. *Id.* at 303–06. There is no reason a different result should have been reached here.[4]

### C. The ABC test aligns with the PMWA and WPCL's purpose.

In enacting the PMWA, the General Assembly did not mince words, declaring that the "[t]he evils of unreasonable and unfair wages" had proliferated "[i]n the absence of effective" laws. 43 P.S. § 333.101. Indeed, the General Assembly enacted the PMWA because it believed the FLSA failed to adequately protect employees.

In this vein, other state supreme courts have rejected the federal economic realities test as failing to protect workers as their legislatures intended. For instance, the California Supreme Court has recognized that a multifactor balancing

---

[4] If anything, the control at issue in this case, involving UberBLACK black car drivers earlier in Uber's existence, was more pervasive than the control at issue in *Lowman* involving an UberX "rideshare" driver.

test "affords a hiring business greater opportunity to evade its fundamental responsibilities under a wage and hour law[.]" *Dynamex*, 416 P.3d at 34. The New Jersey Supreme Court has similarly described the economic realities test as "a qualitative rather than a quantitative analysis," prone to yielding "a different result from case to case." *Hargrove*, 106 A.3d at 464.

The ABC test, by contrast, affords greater protection to workers, as the Pennsylvania General Assembly intended. The test presumes the worker is an employee unless the alleged employer can make three showings. *See id.* at 458. Under prong A, the employer must prove that the worker is free from control, "both under his contract of service and in fact." *Id.* Prong B requires the employer to prove that the worker's services are outside the employer's usual course of business. *Id.* Prong C requires the employer to prove that the worker "is customarily engaged in an independently established trade, occupation, profession or business." *Id.*

"Requiring each identified factor to be satisfied to permit classification as an independent contractor, the 'ABC' test fosters the provision of greater income security for workers, which is the express purpose of both the" PMWA and WPCL. *Id.* at 314–15 (discussing New Jersey's wage statutes). For this reason, Plaintiffs

believe that the Pennsylvania Supreme Court will likely adopt the ABC test, or another more protective test than the FLSA economic realities test.[5]

## II.  The District Court erred in dismissing Plaintiffs' claims as futile.

Before this case, no federal court had ever dismissed claims as futile because two juries deadlocked.  In fact, no precedent holds, or even suggests, that a district court may dismiss a case merely to avoid a third trial.  To the contrary, precedent from this Court and the Supreme Court limits a district court's inherent dismissal authority to instances of improper conduct or completely baseless claims.  Neither basis exists here, so the District Court's dismissal order should be vacated.

### A.  Standard of Review

Whether the District Court properly exercised its inherent authority to dismiss this case as futile is subject to an abuse-of-discretion review.  *See Link v. Wabash R. Co.*, 370 U.S. 626, 633 (1962); *United States v. Wright*, 913 F.3d 364, 369 (3d Cir. 2019).

### B.  No improper conduct warranted dismissal.

"[D]istrict courts have the inherent authority to manage their dockets" towards "the efficient and expedient resolution of cases."  *Dietz v. Bouldin.*, 579 U.S. 40, 47 (2016).  For example, a district court may dismiss a case for failure to

---

[5]    The ABC test has led to a finding that Uber drivers are likely employees. *See People v. Uber Techs., Inc.*, 270 Cal. Rptr. 3d 290 (Cal. Ct. App. 2020).

21

prosecute. *Link*, 370 U.S. at 631–32; *see also Jackson v. U.S. Bankr. Ct.*, 350 F. App'x 621, 623 (3d Cir. 2009). The First Circuit has construed this authority as allowing "courts to dismiss a frivolous or malicious action." *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000).

But a court's inherent authority to manage litigation is not limitless. "[A] court may exercise its inherent authority only when it is necessary to address *improper conduct* and ensure respect for the proceedings." *Wright*, 913 F.3d at 371 (emphasis added)*; see also Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984). The District Court violated this principle by dismissing this case without finding any improper conduct. *Accord* App. 15 (commending Plaintiffs' efforts). This point alone warrants reversal.

### C. Plaintiffs' claims are not futile.

In any event, the District Court's labelling Plaintiffs' claims futile was an abuse of discretion. As the District Court acknowledged, dismissal on futility grounds is appropriate only if it is "crystal clear that the plaintiff cannot prevail[.]" App. 16 (citing *Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 37 (1st Cir. 2001)); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (explaining that dismissal under 28 U.S.C. § 1915 is warranted only if a complaint is "based on an indisputably meritless legal theory" or is "clearly baseless"). As the trial record, the District Court's first Rule 50(b) opinion, this Court's prior decision, and the

22

lack of a unanimous verdict for the defense reflect, it is not "crystal clear" that Plaintiffs cannot prevail. The District Court reached the opposite conclusion by erroneously drawing a negative inference from the two hung juries.

Before this case, no court had ever dismissed claims as futile because two juries deadlocked, and for good reason. The Supreme Court has instructed against drawing a "negative implication" from a jury deadlock because "there is no way to decipher what a hung count represents." *Yeager v. United States*, 557 U.S. 110, 121 (2009); *see also Rivera v. La Porte*, 896 F.2d 691, 693 (2d Cir. 1990) ("A jury's inability to reach a verdict cannot be taken as a finding against a plaintiff."). Indeed, a "host of reasons" outside Plaintiffs' control may have contributed to the hung juries here, including "sharp disagreement, confusion about the issues, [and] exhaustion after a long trial[.]" *Yeager*, 557 U.S. at 121.

Here, for example, the results of the Supplemental Verdict Forms the District Court used to poll each jury revealed that the economic realities test was confusing for laypersons. For example, the second jury reached different conclusions for each Plaintiff on "[w]hether the service rendered by Plaintiffs required a special skill," even though all three Plaintiffs rendered the same service. App. 1074, 1076, 1079. Similarly, the jury was unable to reach a unanimous decision on "[w]hether the service rendered by Plaintiffs [was] an integral part of Defendants' business," App. 1074, 1076, 1079, even though the District Court had

held that it was "beyond dispute" that this factor favored Plaintiffs. *Razak*, 2018 WL 1744467, at *19.

At any rate, "[t]o ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room." *Yeager*, 557 U.S. at 121. "Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing" how to proceed here. *Id*. at 122; *see also* Fed. R. Evid. 606(b) (barring most inquiries into jury deliberations). The District Court thus erred in concluding that the hung juries rendered Plaintiffs' claims futile.

### D. Dismissal was not a reasonable response to the impasse.

The exercise of authority must also "be a reasonable response to the problems and needs confronting the court's fair administration of justice." *Wright*, 913 F.3d at 371 (quoting *Dietz*, 579 U.S. at 45). This Court has "said on numerous occasions" that "dismissals with prejudice or defaults are drastic sanctions, termed 'extreme' by the Supreme Court[.]" *Poulis*, 747 F.2d at 867–68 (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)). Similarly, this Court has "repeatedly stated [its] preference that cases be disposed of on the merits." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984).

The District Court had at least two options other than dismissal, making dismissal improper. First, the District Court could have simply held a third trial. Second, the District Court could have determined Plaintiffs' employment status

"through a Rule 52 proceeding, as was the case in *DialAmerica*." *Razak*, 951 F.3d at 148.

In *DialAmerica*, the district court granted judgment after holding a two-day evidentiary hearing with 17 witnesses. 757 F.2d at 1381. This Court held that the district court had mislabeled its judgment as "summary judgment" but had taken the correct "course of action" by holding an evidentiary hearing "to find the relevant facts." *Id.* So, in the end, this Court treated the district "court's letter opinions as the findings of fact and conclusions of law required by [Rule] 52, and its orders as judgments entered after trial pursuant to [Rule] 58." *Id.* at 1381–82.

*DialAmerica* thus contemplates a three-step process for courts—not jurors—to decide whether a worker is an employee or independent contractor under the FLSA.  First, the court holds an evidentiary hearing to establish a record and resolve factual disputes.  Second, "the court must find the facts specially and state its conclusions of law separately" under Rule 52(a)(1).  Finally, the court enters judgment under Rule 58.

This Court has also recognized that a worker's "employment status" was a "legal determination" warranting plenary review. *Martin v. Selker Bros.*, 949 F.2d 1286, 1292 (3d Cir. 1991).  "However, the district court's findings of fact and the reasonable inferences in which it engaged are subject to the clearly erroneous standard." *Id.*  For these dual standards to apply, the District Court would have to

25

"find the facts specially," then separately "state its conclusions of law" regarding the worker's employment status.  Fed. R. Civ. P. 52(a)(1).

In *Verma v. 3001 Castor, Inc.*, this Court clarified that "[w]hether a worker is an employee or an independent contractor under the FLSA or PMWA is [also] a mixed question of fact and law."  937 F.3d 221, 229 (3d Cir. 2019).  "The fact component is the combination of disputed and undisputed facts that comprise the economic relations between the worker and the alleged employer." *Id.*  "The law component is the conclusion of whether those facts make a worker an 'employee' or 'independent contractor.'" *Id.*

More recently, this Court held that judges, not jurors, should decide a worker's employment status under the WPCL:

> The factual component addresses the underlying facts reflecting "economic relations" between the parties, while the legal component addresses whether those facts make a worker an employee or independent contractor. The court then considers the legal question as applied to this factual record.

*Carpenter v. Pepperidge Farm, Inc.*, 2024 WL 2103257, *2 (3d Cir. May 10, 2024) (internal quotation marks and citation omitted).

In sum, forty years of precedent provided the District Court with an alternative to dismissal.  Having already developed a trial record, the District Court should have adopted Plaintiffs' proposed findings of fact and conclusions of law, then enter judgment for Plaintiffs under Rule 58.  *See* Fed. R. Civ. P. 52(a)(1).

## III. Plaintiffs, not Uber, are entitled to judgment under Rule 50(b).

Even under the *DialAmerica* and *Jani-King* standards applied below, the trial record supports only one conclusion: Plaintiffs were Uber's employees under the FLSA, PMWA, and WPCL. Thus, regardless of whether a different standard should apply under Pennsylvania law, Plaintiffs should have received judgment as a matter of law under Rule 50(b).

### A. Standard of Review

This Court's review of the District Court's grant of judgment of law under Rule 50(b)**Error! Bookmark not defined.** is plenary. *Raiczyk v. Ocean Cnty. Veterinary Hosp.*, 377 F.3d 266, 269 (3d Cir. 2004). Such judgment is appropriate when there is no "legally sufficient evidentiary basis" to rule for the non-moving party. *Goodman v. Pennsylvania Tpk. Com'n*, 293 F.3d 655, 665 (3d Cir. 2002); *see also* Fed. R. Civ. P. 50(a)(1). A "scintilla of evidence" supporting the non-moving party's case is not enough to survive judgment as a matter of law. *Galena v. Leone*, 638 F.3d 186, 206 (3d Cir. 2011). Instead, "a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Id.* at 196 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)).

Courts apply the same legal standard to post-verdict motions under Rule 50(b) as pre-verdict motions under Rule 50(a). *Garrison v. Mollers N. Am., Inc.*,

820 F. Supp. 814, 818 n.3 (D. Del. 1993) (citing *Keith v. Truck Stops Corp. of Am.*, 909 F.2d 743, 744–45 (3d Cir. 1990)). "As such, in ruling on a post-trial motion, the court should not base its conclusions, in whole or in part, on the jury's determinations or attempt to apply or refute particular findings of the jury." *Eisenberry v. Shaw Bros.*, 2010 WL 3191845 (M.D. Pa. Aug. 11, 2010), *aff'd*, 421 F. App'x 239 (3d Cir. 2011); 9B Fed. Prac. & Proc. Civ. § 2524 (3d ed.). Rather, the Court should conduct its own review of the trial record, placing special emphasis on "uncontradicted and unimpeached" evidence and testimony from "disinterested witnesses." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). Applying this standard to the trial record confirms that Plaintiffs were Uber's employees under the FLSA, PMWA, and WPCL.

## B. Economic Realities Test

As discussed above, this Court already addressed the six *DialAmerica* factors when looking at the summary judgment record. *Razak*, 951 F.3d at 142–43. Those factors are:

1) the degree of Uber's right to control the manner in which the Plaintiffs performed services as Uber drivers;

2) Plaintiffs' opportunity for profit or loss when rendering services on behalf of Uber depending upon their managerial skill;

3) Plaintiffs' investment in equipment or materials required for being Uber drivers, as compared to Uber's investment;

4)   whether the service Plaintiffs rendered required a special skill;

5)   the degree of permanence of the working relationship between Plaintiffs and Uber; and

6)   whether services rendered by Plaintiffs were an integral part of Uber's business.

*Id.*

The Court emphasized that "neither the presence nor absence of any particular factor is dispositive." *Id.* at 143 (internal citation and quotation marks omitted).  With that in mind, this Court examined the "circumstances of the whole activity" to determine whether, "as a matter of economic reality," Plaintiffs depended on Uber.  *Id.*

As a guiding principle, this Court has underscored "that, of all the acts of social legislation, the Fair Labor Standards Act has the broadest definition of 'employee.'"  *DialAmerica*, 757 F.2d at 1382; *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (describing the FLSA's definition of "employee" as strikingly broad, covering "some parties who might not qualify as such a strict application of traditional agency law principles.").  This inquiry "is not governed by the 'label' put on the relationship . . . or the contract controlling that relationship[.]"  *Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149, 152 (3d Cir. 2015) (internal citation and quotation marks omitted); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).

This Court has already decided that driving a black car does not involve a special skill. *Razak*, 951 F.3d at 147. And the District Court had held that "Uber drivers are an essential part of Uber's business as a transportation company." *Razak*, 2018 WL 1744467, at *19. Thus, two of the six factors were already decided in Plaintiffs' favor as a matter of law. As discussed below, the other four factors—control, opportunity for profit and loss, relative investment, and degree of permanence of the relationship—also weigh heavily in Plaintiffs' favor.

### C. First Factor: Uber had the right to control, and did control, Plaintiffs' services.

The first economic realities factor considers "the degree of the alleged employer's right to control the manner in which the work is to be performed." *DialAmerica*, 757 F.2d at 1382. While not dispositive, this factor is highly relevant to the FLSA analysis. *Razak*, 951 F.3d at 145. In this case, this Court clarified that "[a]ctual control of the manner of work is not essential; rather, it is the right to control which is determinative." *Id.*

While the District Court may have been influenced by the fact that Plaintiffs could decide when to work, the Supreme Court has recognized that a worker who decides when, where, and for how long to work may be an employee under the FLSA. For example, in *Goldberg v. Whitaker House Coop.*, the Supreme Court held that members of a cooperative who made knitted goods at home for piece-rate pay were employees under the FLSA:

> The members are not self-employed; nor are they
> independent, selling their products on the market for
> whatever price they can command. They are regimented
> under one organization, manufacturing what the
> organization desires and receiving the compensation the
> organization dictates. Apart from formal differences, they
> are engaged in the same work they would be doing
> whatever the outlet for their products. The management
> fixes the piece rates at which they work; the management
> can expel them for substandard work or for failure to
> obey the regulations. The management, in other words,
> can hire or fire the homeworkers.

366 U.S. 28, 30–32 (1961).

Similar facts in *DialAmerica* led this Court to conclude that home researchers who could "work any time and for as many hours as they desired" were also employees. 757 F.2d at 1385–86. This Court reasoned that the researchers "worked on a continuous basis with DialAmerica and were able to work only when and if DialAmerica was in need of their services." *Id.* Nor were the researchers "in a position to offer their services to many different businesses and organizations." *Id.* The same was true for Plaintiffs.

Like the knitters in *Goldberg* and the researchers in *DialAmerica*, Plaintiffs and other UberBLACK drivers were regimented under one organization—Gegen, Uber's wholly owned subsidiary. App. 1256, 1258. Plaintiffs worked for Uber only when and if their services were needed. App. 1083 ("The frequency in which the Company offers Requests to you . . . shall be in the sole discretion of the

Company.").  And like the employers in *Goldberg* and *DialAmerica*, Uber could expel drivers for substandard work.  App. 1458, 1466–1500, 1596–1600.

### 1. Uber could terminate Plaintiffs for substandard service.

Courts have recognized that the right to terminate is strong evidence of control.  *See, e.g.*, *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789 (3d Cir. 1978) ("the right to terminate the relationship for breach of any [contract] provision . . . can very effectively control the day to day operation"); *Razak*, 951 F.3d at 146; *Goldberg*, 366 U.S. at 32–33; *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 485 (N.D. Cal. 2017).

Uber's contracts with Plaintiffs memorialized the company's right to terminate them for substandard service.  App. 1082–1213; *see also* App. 1239–40. After receiving a customer complaint, Uber would, in its sole discretion, decide whether to deactivate a driver.  App. 990 (6/13 Trial Tr. 217:23–218:8).  Uber's Deactivation Policy also reflected Uber's right to terminate Plaintiffs based on their "driver ratings."  App. 1574–76, 1596–97.

### 2. Uber's rating system demanded near perfection from drivers.

After every trip, Uber invited riders to rate their driver on a five-star scale. *See* App. 1596.  But Uber, not riders, had the right to terminate Plaintiffs for failing to maintain a minimum average driver rating. App. 1244, 1596–97.  And Uber, not riders, set the minimum average driver rating for black car drivers in Philadelphia

at 4.6, later increased to 4.7 to "help grow demand for UberBLACK." App. 1267. In other words, Uber required near perfection from Plaintiffs to help grow Uber's business.

Drivers who fell below this threshold received multiple warnings that they would soon be deactivated unless they improved their performance. App. 1240–41. If a driver failed to improve, Uber would use its "judgment in deciding whether to take the partner offline." App. 1244. After deactivating a driver for poor performance, Uber reserved the right to reactivate (rehire) the driver if the driver completed a "quality training course." App. 1245, 1604 ("We *may* allow you to regain access to your account") (emphasis added). These quality training courses were offered by "exemplary Uber partners." App. 1245.

### 3. *Uber warned and deactivated drivers with low ratings.*

Uber's internal "Philly Quality Playbook" explained that "bad drivers . . . make Uber look bad" and "also cost Uber money." App. 1239. For this reason, Uber "warn[ed]/deactivate[d] bad drivers often (daily, at least weekly)." App. 1239; *see also* App. 1523, 1527. Uber's quality control system "[p]ut the burden on the driver to get certified, get back online." App. 1239. Uber's quality control system also "flex[ed] thresholds up over time (i.e. from min driver rating of 4.4 to 4.7)." App. 1239. This "ongoing process" regularly engaged drivers who needed

"encouragement, or training, and either encourage[d] them to improve, or manage[d] them out of the fleet."  App. 1239.

In "weekly summary reports," Uber notified drivers of their average rating over the last week.  App. 1522, 1526.  These reports praised drivers for being "above average."  App. 1526.  These reports also instructed drivers on how to improve their ratings.  App. 1526; *see also* App. 1300.

Uber's quality control system had its intended effect on drivers.  According to Tara Murray, who managed UberBLACK in Philadelphia during the relevant period, Plaintiffs and other drivers considered driving for Uber to be their "full-time" job.  App. 856 (6/11 Trial Tr. 157:4–11).  To avoid losing that job and going into debt with Uber (because of weekly pay deductions), Plaintiffs worked hard to ensure that their driver ratings never fell below the threshold that Uber unilaterally set, increased, and increased again.  App. 860 (6/11 Trial Tr. 175:3–23).

### 4. Uber terminated drivers for more than 60 infractions, 42 of which exceeded local regulations.

Uber also had the right to terminate drivers for committing "infractions" that were specific to Uber's platform and required conduct that exceeded local limousine regulations.  These infractions that could lead to deactivation of a driver included:

1. Accepting a tip.
2. Refusing a trip based on the end destination.
3. Calling riders in advance to ask for their destination.

4.     Giving out personal business cards to riders.
5.     Accepting a trip outside the app from an Uber customer.
6.     Talking too much.
7.     Talking too little.
8.     Asking for a rating.
9.     Failing to tap the begin trip button.
10.    Failing to tap the end trip button.
11.    Cancelling on a rider.
12.    Not answering the phone.
13.    Tapping the "arriving now" button too soon.
14.    Calling a customer too often.
15.    Not having a toll pass.
16.    Soliciting payment outside the Uber system.
17.    Soliciting trips outside the app.
18.    Manipulating surge pricing.
19.    Not wearing a suit and tie.
20.    Too much cologne.
21.    Generally smelly.
22.    Wrong driver (not the driver that Uber assigned).
23.    Wrong vehicle (not the vehicle that Uber assigned).
24.    Disparaging Uber during rides.
25.    Inactivity on Uber App.
26.    Uber profile missing documents.
27.    Accepting trips without the intention of completing them.
28.    Provoking riders to cancel a trip.
29.    Carrying firearms of any kind.
30.    Taking a trip using vehicle not approved by Uber.
31.    Providing inaccurate information to Uber.
32.    Refusing Uber's background checks.
33.    Accepting street hails.
34.    Harming Uber's business or brand.
35.    Leaving one's phone in the airport zone.
36.    Serious feedback from customers to Uber.
37.    Repeated negative feedback from customers to Uber.
38.    Falling below Uber's minimum average driver rating.
39.    Exceeding Uber's maximum cancellation rate.
40.    Getting into an accident during a trip.
41.    Trouble with picking up customers.
42.    Allowing another driver to drive under your account.

App. 1298, 1310, 1345, 1363, 1374, 1476, 1524, 1564–65, 1566–70, 1622, 1596–1607, 1608–12.

Uber's list of infractions also included a number that overlapped with local limousine regulations, including:

1. Altercations.
2. Attitude complaints.
3. Taking a bad route.
4. Lacking city knowledge.
5. Not opening the door.
6. Inappropriate behavior.
7. Mistiming a trip.
8. Poor communication.
9. Poor driving.
10. Having a "smelly" car.
11. Smelling of cigarettes.
12. Body odor.
13. Poor personal hygiene.
14. Unprofessional attire.
15. Poor vehicle appearance.
16. Mechanical issues.
17. Unwanted contact.
18. Abusive language.
19. Violent behavior.
20. Denying a service animal.
21. Increasing the time or distance of a trip.

*Compare* App. 1476, 1596–607 *with* App. 1649–70.

That 21 of Uber's 63 infractions overlapped with Philadelphia Parking Authority regulations should be irrelevant to the analysis of whether drivers are employees or independent contractors. As the Eleventh Circuit has explained, the "economic reality inquiry requires us to examine the nature and degree of the

alleged employer's control, not why the alleged employer exercised such control."

*Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316 (11th Cir. 2013) (rejecting argument that defendant's imposition of rules did not show control because those rules were required by governmental regulation). If "the nature of a business requires a company to exert control over workers to the extent that [the employer] has allegedly done, then that company must hire employees, not independent contractors." *Id.*; *see also Schultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1271 (10th Cir. 1970) ("arguments that an independent contractor relationship is shown by . . . the need to comply with the regulations of federal and state agencies do not persuade us"). The District Court's erroneous interpretation of this precedent tainted its instructions and Rule 50(b) analysis.

Consistent with *Scantland* and its progeny, the District Court correctly instructed the first jury that it "may consider any requirements that Defendants imposed on workers, even if Defendants did so for the purpose of complying with applicable laws or regulations." App. 491 (3/8 Trial Trans. 95:13–16). But at the second trial, the District Court changed course and instructed the jury that "[a]ctions taken by defendants for the sole purpose of complying with specific, applicable federal, state, tribal or local law or regulation are *not* indicative of control." App. 1048 (6/17 Trial Trans. 112:12–15) (emphasis added). No legal precedent supports the District Court's changed instruction at the second trial.

The mistaken belief that Uber's need to comply with local regulations negates a finding that it exercised control over drivers also appeared to be the primary reason the District Court granted judgment for Uber after the second trial. In its opinion granting judgment, the District Court explained that "it may have underestimated the import of those PPA requirements during (and following) the first trial." App. 20. The District Court explained that it was "now hard-pressed to find an example of a requirement imposed by Uber that was not already required by the PPA in some form." App. 21. This reasoning is wrong legally and misconstrues the trial record.

The Eleventh Circuit got it right when (supported by an amicus brief from the Department of Labor) it held in Scantland that the presence of governmental regulation is irrelevant to the control inquiry. 721 F.3d at 1316. Moreover, as discussed above, only 21 out of 63 of Uber's driver infractions overlapped with Philadelphia Parking Authority regulations. Nor was there any evidence that Uber designed or enforced its rules to ensure compliance with local regulations. Uber also failed to present evidence that it reported driver infractions to the Parking Authority. It was clear that Uber enforced its rules for its own benefit and not merely to ensure compliance with local regulations.

### 5.     Uber logged infractions in personnel files.

Like a traditional employer, Uber kept personnel files on each driver.  *See, e.g.*, App. 1508–09.  If a driver committed one of the foregoing infractions, Uber's representatives would log that infraction in the driver's personnel file.  App. 1478–79.  For example, if a driver took a bad route, Uber would tag the driver's file with "driver_quality_bad_route_city_knowledge."  App. 1479.

Uber also included other notes and information about drivers in their personnel files.  App. 1479, 1509.  For example, Uber tagged drivers who had "a low opinion of driving with Uber" as a "Driver detractor."  App. 875 (6/12 Trial Tr. 48:20–24), 1396. Uber likewise tagged drivers that Uber favored as "VIP drivers."  App. 875 (6/12 Trial Tr. 48:13–19), 1396.

### 6.     Uber surveilled Plaintiffs.

Uber's manager testified that Uber tracked drivers by logging "every moment, every touch, everything in the app[.]"  App. 277 (3/5 Trial Tr. at 190:7–9).  This surveillance allowed Uber to amass troves of driver data that Uber used to monitor performance.  App. 1439–49, 1512, 1532–35.

Using this data, Uber unilaterally decided when to turn on "surge pricing," which temporarily increased the price of fares in certain areas.  *See, e.g.*, App. 1291–93.  Uber used "surge pricing" to lure drivers into these areas.  But drivers who went to these areas did not always receive higher fares.  App. 1291.

Uber also used its surveillance system for disciplinary purposes. For instance, the Philadelphia manager, Tara Murray, testified that Uber had tracked 17 drivers who had jumped the airport queue by locking their location in the App. 276–77 (3/5 Trial Tr. 189:25–191:20). Uber deactivated these drivers without warning. App. 277 (3/5 Trial Tr. 191:19–192:1).

### 7. Uber controlled where drivers could work.

Uber also had the ability to block drivers from working in certain areas. For example, Murray testified that "drivers could be blocked from receiving airport requests" and from receiving fares in Philadelphia County. App. 876 (6/12 Trial Tr. 49:4–11); *see also* App. 1395–96. In other words, Uber placed geographical limitations on where drivers could receive fares. *See* App. 961 (6/13 Trial Tr. 102:7–18), 1326.

### 8. Drivers could not exceed Uber's maximum cancellation rate.

According to Uber's "Driver Deactivation Policy," each city had a "maximum cancellation rate" based on "the average cancellation rate of drivers in that area." (PX-302). Uber's Policy warned drivers that they would be deactivated for exceeding their city's "maximum cancellation rate." App. 1597, 974 (6/13 Trial Tr. 155:12–21). Uber would "alert [drivers] multiple times if [their] cancellation rate [was] much higher or if [they were] consistently cancelling more

often than other drivers." App. 1597. If a driver's cancellation rate continued to "exceed the maximum limit," their "account would be deactivated." *Id.*

Drivers were also contractually obligated to "fully complete a Request after acceptance," unless cancelled by Uber or the rider. App. 1083. Uber's contracts, for example, gave the company the right to terminate a driver for refusing "to fully complete a trip after acceptance of a trip." App. 1120.

### 9. *Drivers had to accept a minimum number of trips.*

During the relevant period, drivers were contractually obligated to accept "at least 80% of the Customer Requests/Requests Gegen . . . provided to [a driver] in a thirty (30) day period, provided that Gegen [had] presented at least 60 Customer Requests . . . in that same period." App. 1093. Failure to adhere to Uber's minimum acceptance rate was a "material breach" of a driver's contract, and thus subjected drivers to termination. App. 1092–93.

Uber later modified its acceptance rate policy so that if a driver was "consistently not accepting trip requests" or "declining more trips than other drivers," the driver would be suspended for "a short period of time." App. 1597. Still, drivers had to agree "to only make [themselves] available to receive Requests during such times [so that they would be] generally able to accept Requests that [were] offered." App. 1083.

### 10. *Uber's vehicle requirements exceeded local regulations.*

Both Uber and the Parking Authority maintained a list of acceptable vehicles for black car services in Philadelphia. But Uber's vehicle criteria were more restrictive than the Parking Authority's. For example, Uber's vehicle age limit was eight years, while the Parking Authority's was ten years, and Uber did not allow use of all the types of cars that the Parking Authority allowed. App. 79, 920 (6/12 Trial Tr. 226:8–24).

### 11. *Uber used its own background checks.*

Uber subjected drivers to its own background checks, in addition to the background check that the Philadelphia Parking Authority conducted. App. 1257. Uber told drivers that its "background check [was] more thorough and [was] a requirement to remain an active driver with Uber." App. 1257. Uber explained that, because of its more thorough background check, riders were "more likely to use Uber again, and again." App. 1257.

Uber also subjected drivers to multiple background checks. For example, Ali Razak testified that, in one year, Uber conducted about ten background checks on him. (Trial Tr. 216, June 12, 2024). Razak also testified that he was not able to work as an UberBLACK driver while his background checks with Uber were pending. App. 917 (6/11 Trial Tr. 217:5–15).

### 12. Uber had its own dress code.

Uber imposed its own dress code on UberBLACK drivers. "Uber Black required attire calls for all drivers to be wearing a suit and tie at all times when operating on the Uber system." App. 1345, 1363. Uber told drivers, "Customers appreciate this, and it helps differentiate Uber from taxis." App. 1345. Uber also claimed that "[d]rivers not dressed properly are hurting the Uber system and hurting 5-star drivers who always dress properly before driving." App. 1345.

### 13. Uber controlled Plaintiffs' business expenses.

Uber deducted pay from the drivers' weekly earnings to cover business expenses, including Gegen's liability insurance, Philadelphia Parking Authority stickers, and vehicle finance payments. *See, e.g.*, App. 1426, 1433. For this reason, drivers could not decide when and whether to pay for these expenses. If drivers failed to earn enough income from fares to cover these deductions, they would go into debt with Uber. App. 807 (6/10 Trial Tr. 179:1–13), 842 (6/11 Trial Tr. 103:7–23), 892 (6/12 Trial Tr. 113:5–10). The evidence showed that this debt trap compelled drivers to provide five-star service over longer hours. *See, e.g.*, App. 1640–42, 2133–47.

### D. Second Factor: Plaintiffs had limited control over earnings.

The second economic realities factor considers Plaintiffs' control over their profit or loss as UberBLACK drivers. As Murray testified, the opportunity the drivers had to make more money was simply to work more hours. App. 294 (3/5

Trial Tr. 260:4–13). But courts have uniformly rejected that a worker's ability to "hustle" or work more equates to an actual opportunity for profit or loss. *See, e.g.*, *McFeely v. Jackson St. Ent., LLC*, 825 F.3d 235, 243 (4th Cir. 2016); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993); *Scantland*, 721 F.3d at 1316. Where, as here, a defendant controls prices, operations, and advertising, a worker has little opportunity for profit or loss based on managerial skill. *Verma.*, 937 F.3d at 231.

### 1. *Uber unilaterally set fares and rates and decided when and whether to charge customers.*

Uber determined how much drivers earned for each trip. App. 988 (6/13 Trial Tr. 212:8–18) (admitting that "Uber set the fare structure, yes."). For example, Uber controlled how much to charge customers. *See, e.g.*, App. 1127, 1192. Drivers could not negotiate fares. *See, e.g.*, App. 1192. Nor could drivers negotiate Uber's commission on each fare. *See, e.g.*, App. 1193.

Uber also decided when to charge for disputed fares. For instance, if a customer used a stolen credit card or chargebacks to avoid paying for a ride, Uber would decide whether to still pay the driver. App. 989 (6/13 Trial Tr. 214:3–18).

Similarly, whether to charge a customer a cancellation fee was in Uber's sole discretion. App. 990 (6/13 Trial Tr. 717:16–22). Uber likewise decided whether to charge a cleaning fee to a customer for damaging a driver's vehicle.

App. 853 (6/11 Trial Tr. 147:3–25).  Uber also decided whether to pay a driver during App outages.  *See* App. 1386–87.

There were also times when Uber paid black car drivers a guaranteed wage. *See, e.g.*, App. 1326, 1349, 1361.  To qualify for these guaranteed wages, a driver would have to have a certain acceptance rate or at times drive in a certain area at a certain time.  *See, e.g.*, App. 1326, 1349.

### 2. *Uber controlled trip assignments and, therefore, Plaintiffs' earnings.*

Uber controlled trip assignments through its proprietary algorithm.  App. 851 (6/11 Trial Tr. 137:1–138:7).  For this reason, customers could not select a particular driver through the Uber App.  And so drivers could not attract more profitable riders by providing higher-quality service.  Nor could Plaintiffs delegate less profitable trip assignments to other drivers.  *See* App. 1310, 1476.

Uber also barred drivers from contacting customers after a ride to solicit additional business.  App. 866–87 (6/12 Trial Tr. 12:24–13:9).  Uber likewise prohibited drivers from giving out their personal business cards.  App. 1298. There were "no exceptions to this policy and drivers [would] be deactivated permanently if . . . caught doing this even once."  App. 1298.

Uber also made it impossible for Plaintiffs to select trip assignments based on their anticipated profitability.  Chad Dobbs, Uber's witness and regional manager, testified that, after receiving an alert, drivers had "roughly 15 seconds to

accept or reject" the incoming trip request. App. 982 (6/13 Trial Tr. 186:17–24).

Besides providing a prohibitively short amount of time to make an informed

decision about whether to accept the ride, Uber withheld the rider's destination

until after the driver accepted and started the trip (thus preventing drivers from

deciding what types of trips to accept). App. 869 (6/12 Trial Tr. 21:4–16), 1331,

1616. Uber likewise barred drivers from calling riders to ask for their destination

before picking them up. App 1331. And, regardless, Uber prohibited drivers from

rejecting a trip based on the end destination. App 1331.

### 3. *Uber unilaterally introduced UberX, a cheaper service, decimating Plaintiffs' earnings.*

It is undisputed that Uber's introduction of UberX, a cheaper service, into

the Philadelphia market undercut Plaintiffs' earnings. On the effects of UberX,

Murray testified that drivers "were not making as much money as they were

before. . . . They couldn't make those car payments. They were working longer

hours, more hours. And essentially they just weren't able to pay their bills and

survive." App. 877 (6/12 Trial Tr. 56:6–10).

Murray also confirmed that Plaintiffs and other UberBLACK drivers had no

"say over UberX being introduced in Philadelphia." App. 877 (6/12 Trial Tr.

56:10–13). When asked whether there was "anything that Uber Black drivers

could do about Uber advertising a new service that was lower [cost]," Murray

answered, "No." App. 877 (6/12 Trial Tr. 56:14–17).

Indeed, Uber controlled every aspect of the business. Plaintiffs had no say over what services Uber offered or promoted. So, in the end, Uber unilaterally cannibalized its premium black car service over the objections of Plaintiffs and other UberBLACK drivers. The drivers were clearly not in control.

**E.     Third Factor: Uber's investment dwarfed Plaintiffs'.**

The third economic realities factor considers the relative investment that Plaintiffs made compared to Uber's investment in building and operating its business. *Verma*, 937 F.3d at 231 ("a dancer's investment is minor when compared to the club's investment"); *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) ("it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation"); *Flores*, 250 F. Supp. at 488-89.

Uber has spent billions of dollars on its business, App. 1456–57, making its investment exponentially greater than Plaintiffs' business expenses. The parties' relative investment clearly supports an employment relationship.

**F.     Fourth Factor: Driving a black car requires no special skill.**

The fourth economic realities factor considers whether the services that Plaintiffs rendered for Uber required a special skill. This Court has already decided that driving a black car does not involve a special skill. *Razak*, 951 F.3d at 147 ("Although there may be a distinction between 'driving' and 'replicat[ing] the

limousine experience,' . . . this is not enough to overcome the presumption that driving is not a special skill."); *see also Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) ("FedEx drivers need no experience to get the job in the first place and [the] only required skill is the ability to drive."). This factor supports Plaintiffs.[6]

### G.    Fifth Factor: Plaintiffs worked long hours over many years.

The fifth economic realities factor is the degree of permanency of Plaintiffs' relationship with Uber. This factor considers whether Plaintiffs' relationship with Uber was "a transitory one." *DialAmerica*, 757 F.2d at 1384-85; *but see Verma*, 937 F.3d at 231 (finding an employment relationship even though "the average dancer in the class worked for the Club in only 14 of the 109 workweeks"). Here, the record establishes a continuous and intense working relationship between Plaintiffs and Uber, reflecting an employment relationship.

The three named Plaintiffs worked nearly continuously for Uber from 2013 or 2014 through the end of the relevant period in 2018. App. 1439–49. During

---

[6]    Nor should this factor be in dispute. The District Court previously held that the "special skills" factor weighs in favor Plaintiffs' employee status under federal and state law. *Razak*, 2018 WL 1744467, at *18. This Court affirmed that ruling, *Razak*, 951 F.3d at 147, so the District Court's determination that the special skill factor supports an employment relationship is law of the case. *See Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 988 F.2d 414, 429 (3d Cir. 1993); *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 396 (3d Cir. 1994).

that time (which included less than 1,500 potential workdays for all three Plaintiffs), Razak completed 5,602 Uber trips, Sabani completed 4,854 trips, and Cherdoud completed 6,518 trips. App. 2137, 2142, 2147. Plaintiffs worked almost every week and logged at least 40 hours online in each week they worked. App. 1640–42. The intensity and permanence of the parties' relationship supports Plaintiffs' employee status.

**H.     Sixth Factor: Plaintiffs' services were integral to Uber's business.**

The sixth economic realities factor considers whether Plaintiffs' services were integral to Uber's business. To that end, the District Court had held that "Uber drivers are an essential part of Uber's business as a transportation company." *Razak*, 2018 WL 1744467, at *19 ("Indeed, it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function.").[7] Other courts have reached the same conclusion. *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1142 (N.D. Cal. 2015) ("Uber simply would not be a viable business entity without its drivers."); *People*, 270 Cal. Rptr. 3d at 311 ("[a] number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business of creating technological platforms, not of transporting

---

[7]     This Court did not reverse this holding, *Razak*, 951 F.3d at 147, n.12,  so the District Court's ruling that drivers are integral to Uber's business should be law the case. *Coca-Cola*, 988 F.2d at 429.

passengers, and have dismissed them out of hand"); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 911 (N.D. Cal. 2020).

Uber's business could not function without drivers. Uber's own statements—at least those outside the courtroom—confirm this. For example, Uber told Plaintiffs and other drivers that they deserved a better "driving . . . experience, because simply put, Uber wouldn't exist without [them]." (PX-216-001). In another email to Plaintiffs, Uber said it was "focus[ing] on providing awesome resources to help [drivers] grow ***our*** business." App. 1613 (emphasis added). And when Uber dealt with regulatory agencies, it called itself a "limousine company." App. 1256, 1258. In fact, Uber used the trademark to describe itself as "everyone's private driver." App. 1367.

Uber also understood that its reputation turned on the quality of its drivers. App. 1470 ("Deactivating the accounts of the partners who provide consistently poor experiences ensures that Uber continues to be known for quality."). In the same vein, Uber attributed its revenue to drivers. App. 1613 ("We've had a great 2013 in Philadelphia thanks to you, our Uber Partners."). Uber's own head of operations in the United States summed up its relationship with drivers as symbiotic: "Drivers are at the center of the Uber experience, and the app they use to go online and earn money is at the center of theirs." App. 1417.

Simply put, drivers depended on Uber, and Uber depended on drivers. And with billions of dollars invested into its business, App. 1452, Uber, as matter of economic reality, needed to control its drivers. This last factor strongly supports an employer-employee relationship.

## I. Uber willfully misclassified Plaintiffs.

Not only did the trial record show that Uber misclassified Plaintiffs and other drivers, but it also showed that it did so knowingly and willfully. Indeed, Uber's Philly Quality Playbook, for example, joked, "**Hello, Legal!**," when referencing how its representatives should refer to drivers, App. 1245, and it studiously trained its representatives to avoid language suggesting an employment relationship. App. 1482, 1499.

Uber also failed to explain why it required Plaintiffs and other black car drivers to form their own business entities. *See* App. 792 (6/10 Trial Tr. 120:25–119:13). Nor did Uber explain why it referred Plaintiffs to the same accountant to create their business entities. *See* App. 839 (6/11 Trial Tr. 89:18–91:7), 1767, 1959, 1990. The Court should thus infer that Uber imposed this requirement to try to give itself a defense to wage claims. *See, e.g.*, *Maranzano v. S-L Distribution Co., 2020* WL 7974332, at *4 (M.D. Pa. Dec. 18, 2020) ("Indeed, if any business could avoid [wage and hour laws] by simply classifying their workers as independent contractors and compensating them through corporations rather than

paying them directly, [wage laws] would be rendered useless."); *Cummings v. Cenergy Intl. Services, LLC*, 2017 WL 4180972, at *6 (E.D. Cal. Sept. 20, 2017) (inferring that the plaintiffs' corporate entities were created to benefit the defendant "as a corporate fiction"); *see also Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018).

**J.     Plaintiffs were Uber's employees under the FLSA.**

It is beyond dispute that the relative investment, special skill, permanence, and integrality factors support a conclusion that Plaintiffs were Uber's employees. While Plaintiffs had some discretion over when they worked, Uber controlled every other aspect of Plaintiffs' services as UberBLACK drivers, including pricing, marketing, operations, service standards, trip assignments, attire, authorized work zones, and most business expenses. With respect to the opportunity for profit and loss, the record showed that Plaintiffs could make more money simply by working more hours (or focusing on the hours where pay was highest). Thus, all six *DialAmerica* factors weigh in favor of an employee-employer relationship.

**K.     *Jani-King* Factors**

As discussed above, the District Court applied a slightly different set of factors to the WPCL claims, including:

1)     Control of the manner that work is to be done;

2)     Responsibility for result only;

3)      Terms of agreement between the Parties;

4)      The nature of the work or occupation;

5)      The skill required for performance;

6)      Whether one employed is engaged in a distinct occupation or business;

7)      Which party supplies the tools;

8)      Whether payment is by the time or by the job;

9)      Whether the work is part of the regular business of the employer; and

10)     The right to terminate the employment at any time.

*See* App. 7 (citing *Jani-King*, 837 F.3d at 321).[8]

For reasons discussed above, the WPCL's first, second, third, fourth, fifth, sixth, seventh, ninth, and tenth factors favor an employment relationship between Plaintiffs and Uber.  And, at times, Plaintiffs were paid by the hour, supporting employee status under the WPCL's eighth factor.  *See, e.g.*, App. 1326, 1349. Thus, even under this test, every factor is in Plaintiffs' favor, meaning they were Uber's employees under the WPCL.

---

[8]     As discussed in footnote three, the Pennsylvania Supreme Court has never adopted these factors, so Plaintiffs do not agree they apply to the WPCL.

**IV.    The FLSA requires Uber to prove that Plaintiffs were independent contractors.**

The trial record entitles Plaintiffs to judgment as a matter of law, no matter which party carries the burden of proof.  That said, the burden of proving an exemption to the FLSA lies with the alleged employer.  Because an independent contractor classification acts as an exemption to the FLSA, the burden should have been on Uber to prove this defense.[9]

The FLSA defines "employee" to include "any individual employed by an employer."  29. U.S.C. § 203(e).  The term "employ" is broadly defined to mean "to suffer or permit to work."  29. U.S.C. § 203(g).  While the FLSA does not explicitly mention "independent contractors," Section 13 of the Act excludes certain workers from its wage and hour protections.  *See* 29 U.S.C. § 213 (e.g., bona fide executives, babysitters, and other specified categories).

The Supreme Court has held that "the burden of establishing the facts requisite to an exemption" rests with the alleged employer.  *Idaho Sheet Metal Works*, 383 U.S. at 206.  Because independent contractor classification allows an alleged employer to avoid the FLSA's wage and hour requirements, the burden of proving that defense should fall on the alleged employer.  Jurisprudence under the

---

[9]    To Plaintiffs' knowledge, no court has directly addressed this issue.  With two juries unable to reach an agreement, the burden of proof could be dispositive, so Plaintiffs urge the Court to address it.

National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–169, supports this conclusion.

"Congress enacted both the FLSA and the NLRA as part of the social legislation of the 1930's." *Patel v. Quality Inn S.*, 846 F.2d 700, 703 (11th Cir. 1988). Because "the two acts similarly define the term 'employee,' . . . courts frequently look to decisions under the NLRA when defining the FLSA's coverage." *Id.* (citing *Rutherford*, 331 U.S. at 723). And under the NLRA, the "burden is on the party asserting independent contractor status to show that the classifications in question are independent contractors." *Argix Direct, Inc. & Loc. 11*, 343 NLRB 1017, 1020 (2004); *N.L.R.B. v. Igramo Enter., Inc.*, 310 F. App'x 452, 453 (2d Cir. 2009). The same should be true under the NLRA's twin statute, the FLSA.

## CONCLUSION

This appeal raises key questions about worker classification under Pennsylvania law. While the Pennsylvania Supreme Court has repeatedly rejected the notion that federal FLSA standards apply to the PMWA and WPCL, it has yet to adopt a classification test for these statutes. Thus, Plaintiffs urge this Court to certify this unsettled issue of state law to the Pennsylvania Supreme Court.

However, even under the federal economic realities test, the trial record confirms that Plaintiffs were Uber's employees, not independent contractors.

What prevented the juries from reaching a verdict was not indecision over the facts, but confusion over how to apply a multifactor balancing test to those facts. So, rather than dismiss this case as futile and grant judgment as a matter of law to Uber, the District Court should have entered judgment for Plaintiffs—or at least allowed a third trial.

The District Court also erred by placing the burden of proof on Plaintiffs. Uber used the independent contractor label to exempt itself from the FLSA, so the burden of proving that exemption lies with Uber. Because Uber failed to meet that burden at trial, Plaintiffs are entitled to judgment as a matter of law.

For these reasons, this Court should vacate dismissal and enter judgment for Plaintiffs under federal and state law or direct that the case be tried again. In any event, this Court should certify to the Pennsylvania Supreme Court the question of what employment classification test applies to the PMWA and WPCL.

January 6, 2024                      Respectfully submitted,

                                     s/ Shannon Liss-Riordan
                                     Shannon Liss-Riordan
                                     Thomas Fowler
                                     LICHTEN & LISS-RIORDAN, P.C.
                                     729 Boylston Street, Suite 2000
                                     Boston, MA 02116
                                     (617) 994-5800

                                     Jeremy E. Abay (PA # 316730)
                                     LICHTEN & LISS-RIORDAN, P.C.
                                     76 E. Euclid Avenue, Suite 101

Haddonfield, NJ 08033
(856) 509-5346

*Counsel for Plaintiffs-Appellants*

CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure and 32(g) and Local Rule 31.1(c), the undersigned counsel for Plaintiffs-Appellants certifies that:

1.    I am a member of the bar of this Court.

2.    This brief complies with the type-volume limitation of Rule 29(a)(5) because the brief contains 12,620 words, excluding the parts of the brief exempted by Rule 32(f).

3.    This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because: the brief was drafted in Microsoft Word using 14-Point Times New Roman font.

4.    The text of the electronic brief is identical to the text in the paper copies.

5.    A virus detection program, Webroot, has been run on the file and no virus was detected.

So certified this 6th day of January, 2024.

<u>s/ Shannon Liss-Riordan</u><br>
Shannon Liss-Riordan<br>
LICHTEN & LISS-RIORDAN, P.C.<br>
729 Boylston Street, Suite 2000<br>
Boston, MA 02116<br>
(617) 994-5800<br><br>
<i>Counsel for Plaintiffs-Appellants</i>

**CERTIFICATE OF SERVICE**

I, Shannon Liss-Riordan, certify that on January 6, 2024, I electronically

filed this brief and the associated excerpts of record using the Court's CM/ECF

system, which effected service on all counsel of record. I will also cause to be sent

via courier the required number of paper copies of the brief and appendix to the

Court.

*s/ Shannon Liss-Riordan*
Shannon Liss-Riordan
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

*Counsel for Plaintiffs-Appellants*

No. 24-2638

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD,
Plaintiffs-Appellants,

v.

UBER TECHNOLOGIES, INC., and GEGEN, LLC
Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 2:16-cv-00573-MMB

## APPENDIX VOLUME I
## (Pages 1–25)

Shannon Liss-Riordan
Thomas Fowler
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

Jeremy E. Abay
LICHTEN & LISS-RIORDAN, P.C.
76 E. Euclid Avenue, Suite 101
Haddonfield, NJ 08033
(856) 509-5346

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**VOLUME I**

Plaintiffs' Notice of Appeal ............................................................. 1
(Dkt. 361, Aug. 29, 2024)

Order Granting Dismissal and Judgment ........................................ 4
(Dkt. 352, July 30, 2024)

Opinion Granting Dismissal and Judgment ..................................... 5
(Dkt. 351, July 30, 2024)

**VOLUME II**

District Court Docket Sheet .............................................................. 26
(Last Visited Dec. 27, 2024)

Opinion Granting Summary Judgment ............................................ 67
(Dkt. 124, Apr. 11, 2018)

Third Circuit Opinion Vacating Summary Judgment ...................... 105
(Dkt. 89, March 3, 2020)

Third Circuit Order Amending Opinion .......................................... 129
(Dkt. 93, Nov. 5, 2020)

Stipulation Limiting Issues at Trial ................................................. 131
(Dkt. 146, Oct. 3, 2023)

Order Limiting Issues at Trial .......................................................... 133
(Dkt. 148, Oct. 5, 2023)

Pennsylvania Attorney General Amicus Brief .................................. 135
(Dkt. 193, Feb. 7, 2024)

Defendants' Proposed Jury Instructions ........................................... 160
(Dkt. 234, Feb. 27, 2024)

Defendants' Proposed Verdict Form ............................................................ 170
(Dkt. 235, Feb. 27, 2024)

Plaintiffs' Proposed Jury Instructions ......................................................... 160
(Dkt. 238, Feb. 27, 2024)

Plaintiffs' Proposed Special Verdict Questions ............................................ 160
(Dkt. 238, Feb. 27, 2024)

Transcript of First Trial – Day 1 ................................................................. 212
(March 4, 2024)

Transcript of First Trial – Day 2 ................................................................. 229
(March 5, 2024)

Plaintiffs' Proposed Supplemental Jury Instruction ..................................... 313
(Dkt. 238, Feb. 27, 2024)

Transcript of First Trial – Day 3 ................................................................. 316
(March 6, 2024)

Transcript of First Trial – Day 4 ................................................................. 396
(March 7, 2024)

Transcript of First Trial – Day 5 ................................................................. 467
(March 8, 2024)

Transcript of First Trial – Day 6 ................................................................. 510
(March 11, 2024)

Supplemental Verdict Form From First Trial ............................................... 524
(Dkt. 269, March 11, 2024)

Order Regarding New Trial .......................................................................... 530
(Dkt. 294, May 1, 2024)

Plaintiffs' Second Amended Complaint ........................................................ 533
(Dkt. 299, May 15, 2024)

## VOLUME III

Defendants' Brief in Support of Proposed Jury Instructions ............................ 576
(Dkt. 300, May 22, 2024)

Exhibit C to Defendants' Brief in Support of Proposed Jury Instructions ....... 586
(Dkt. 300-3, May 22, 2024)

Exhibit D to Defendants' Brief in Support of Proposed Jury Instructions ....... 600
(Dkt. 300-4, May 22, 2024)

Exhibit E to Defendants' Brief in Support of Proposed Jury Instructions ....... 618
(Dkt. 300-5, May 22, 2024)

Defendants' Proposed Jury Verdict Form ........................................................ 636
(Dkt. 301-1, May 22, 2024)

Defendants' Alternative Proposed Jury Verdict Form ..................................... 639
(Dkt. 301-2, May 22, 2024)

Plaintiffs' Proposed Jury Interrogatories for Second Trial .............................. 651
(Dkt. 304, May 22, 2024)

Defendants' Proposed Jury Instructions for Second Trial ................................ 661
(Dkt. 305, May 22, 2024)

Opinion Regarding Motions for Judgment as a Matter of Law ........................ 691
(Dkt. 313, June 4, 2024)

Revised Opinion Regarding Motions for Judgment as a Matter of Law .......... 725
(Dkt. 314, June 4, 2024)

Plaintiffs' Proposed Supplemental Jury Instruction ........................................ 759
(Dkt. 316, June 5, 2024)

Transcript of Second Trial – Day 1 .................................................................. 763
(June 10, 2024)

Transcript of Second Trial – Day 2 .................................................................. 817
(June 11, 2024)

Transcript of Second Trial – Day 3 ................................................... 864
(June 12, 2024)

Transcript of Second Trial – Day 4 ................................................... 936
(June 13, 2024)

Transcript of Second Trial – Day 5 ................................................ 1,021
(June 17, 2024)

Transcript of Second Trial – Day 6 ................................................ 1,066
(June 18, 2024)

Supplemental Verdict Form From Second Trial ............................. 1,074
(Dkt. 338, June 18, 2024)

**VOLUME IV**

Joint Trial Exhibit 1: Owner/Operator Agreement ......................... 1,082
(March 2013)

Joint Trial Exhibit 2: Cherdoud Signature on Owner/Operator Agreement ..... 1,099
(June 18, 2024)

Joint Trial Exhibit 3: Software License and Online Services Agreement ........ 1,100
(Dec. 2013)

Joint Trial Exhibit 4: Driver Addendum ........................................ 1,111
(Dec. 2013)

Joint Trial Exhibit 5: Driver Addendum ........................................ 1,114
(June 20, 2014)

Joint Trial Exhibit 6: Driver Addendum ........................................ 1,118
(June 21, 2014)

Joint Trial Exhibit 7: Software License and Online Services Agreement ........ 1,122
(June 21, 2014)

Joint Trial Exhibit 8: Software License and Online Services Agreement ........ 1,139
(Nov. 10, 2014)

Joint Trial Exhibit 9: Driver Addendum ........................................................... 1,159
(Nov. 10, 2014)

Joint Trial Exhibit 10: Software License and Online Services Agreement ...... 1,165
(Apr. 3, 2015)

Joint Trial Exhibit 11:Technology Services Agreement .................................. 1,185
(Dec. 11, 2015)

Joint Trial Exhibit 12: Driver Addendum ......................................................... 1,208
(Dec. 11, 2015)

Joint Trial Exhibit 13: K. Cherdoud Record of Agreements ............................ 1,215

Joint Trial Exhibit 14: K. Cherdoud Vehicle Lease Agreement ....................... 1,216
(Dec. 30, 2013)

Joint Trial Exhibit 15: ZenDesk Communication with K. Cherdoud .............. 1,217
(Jan. 19, 2014)

Joint Trial Exhibit 16: ZenDesk Communication with K. Cherdoud .............. 1,218
(Apr. 2, 2016)

Joint Trial Exhibit 17: A. Razak Record of Agreements ................................. 1,221

Joint Trial Exhibit 18: Zendesk Communication with A. Razak .................... 1,222
(Jan. 15, 2016)

Joint Trial Exhibit 19: Zendesk Communication with A. Razak .................... 1,226
(March 1, 2016)

Joint Trial Exhibit 20: Zendesk Communication with A. Razak .................... 1,229
(Nov. 22, 2015)

Joint Trial Exhibit 21: K. Sabani Record of Agreements ................................. 1,232

Joint Trial Exhibit 22: Zendesk Communication with K. Sabani .................... 1,233
(Apr. 20, 2016)

Joint Trial Exhibit 23: Zendesk Communication with K. Sabani...................... 1,237
(Apr. 26, 2016)

Plaintiffs' Trial Exhibit 101: Uber Philly Quality Playbook ............................ 1,239

Plaintiffs' Trial Exhibit 108: Gegen Application as Limousine Service .......... 1,255
(Dec. 29, 2012)

Plaintiffs' Trial Exhibit 109: Gegen Certificate of Public Convenience .......... 1,256
(May 31, 2013)

Plaintiffs' Trial Exhibit 111: Background Check Email to A. Razak .............. 1,27
(July 14, 2014)

Plaintiffs' Trial Exhibit 120: Gegen Limousine Driver Certificate.................. 1,258
(Feb. 13, 2014)

Plaintiffs' Trial Exhibit 121: Gegen Certificate of Liability Insurance............ 1,259
(May 4, 2014)

Plaintiffs' Trial Exhibit 122: Gegen Insurance Card ...................................... 1,260
(March 27, 2015)

Plaintiffs' Trial Exhibit 129: Zendesk Communication with K. Cherdoud ..... 1,261
(Feb. 10, 2015)

Plaintiffs' Trial Exhibit 144: Zendesk Communication with A. Razak ........... 1,263
(Sept. 17, 2015)

Plaintiffs' Trial Exhibit 145: Zendesk Communication with K. Sabani .......... 1,266
(Jan. 18, 2015)

Plaintiffs' Trial Exhibit 150: Zendesk Communication with K. Sabani .......... 1,269
(Oct. 21, 2014)

Plaintiffs' Trial Exhibit 155: Zendesk Communication with K. Sabani .......... 1,272
(Sept. 2, 2015)

Plaintiffs' Trial Exhibit 158: Zendesk Communication with K. Sabani .......... 1,284
(Feb. 28, 2014)

Plaintiffs' Trial Exhibit 165: Zendesk Communication with K. Cherdoud ..... 1,288
(Apr. 2, 2016)

Plaintiffs' Trial Exhibit 170: Communication with A. Razak ......................... 1,291
(June 26, 2017)

Plaintiffs' Trial Exhibit 181: UberBLACK Info Session Email to A. Razak .. 1,294
(June 25, 2015)

Plaintiffs' Trial Exhibit 184: Uber Philly - Big Events & News Email ........... 1,296
(July 14, 2014)

Plaintiffs' Trial Exhibit 192: Uber Philly - Weekend Update Email ............... 1,303

Plaintiffs' Trial Exhibit 193: Uber Philly - Weekend Update Email ............... 1,316

Plaintiffs' Trial Exhibit 195: Uber Philly - Weekend Update Email ............... 1,325

Plaintiffs' Trial Exhibit 196: Uber Philly - Weekend Update Email ............... 1,339

Plaintiffs' Trial Exhibit 197: Uber Philly - Weekend Update Email ............... 1,348

Plaintiffs' Trial Exhibit 204: Uber Philly - Big Events & News Email ........... 1,359

Plaintiffs' Trial Exhibit 208: Uber Philly - Weekend Update Email ............... 1,367

Plaintiffs' Trial Exhibit 212: Disparaging Uber Email ..................................... 1,374

Plaintiffs' Trial Exhibit 216: Improving Driver Experience Email .................. 1,376

Plaintiffs' Trial Exhibit 217: Tipping Is Here Email ........................................ 1,380

Plaintiffs' Trial Exhibit 220: New Deactivation Policy Email ......................... 1,382

Plaintiffs' Trial Exhibit 224: Placards Email ................................................... 1,385

Plaintiffs' Trial Exhibit 225: Driver App Outage Email .................................. 1,386

Plaintiffs' Trial Exhibit 226: Geographical Limits and Driver Traits ............. 1,389

Plaintiffs' Trial Exhibit 227: Sample of Deactivated Driver Data ................... 1,397

Plaintiffs' Trial Exhibit 229: Remarks from Uber's Press Call ........................ 1,410
(March 17, 2017)

Plaintiffs' Trial Exhibit 230: A. Razak Pay Statement .................................... 1,420
(July 28, 2014)

Plaintiffs' Trial Exhibit 233: A. Razak Pay Statement .................................... 1,423
(June 5, 2017)

Plaintiffs' Trial Exhibit 237: K. Sabani Pay Statement ................................... 1,425
(March 21, 2016)

Plaintiffs' Trial Exhibit 240: K. Cherdoud Pay Statement .............................. 1,430
(March 21, 2015)

Plaintiffs' Trial Exhibit 242: K. Cherdoud Pay Statement .............................. 1,433
(March 21, 2017)

Plaintiffs' Trial Exhibit 243: Sample of A. Razak Trip Data .......................... 1,439

Plaintiffs' Trial Exhibit 244: Sample of K. Sabani Trip Data ......................... 1,443

Plaintiffs' Trial Exhibit 245: Sample of K. Cherdoud Trip Data .................... 1,447

Plaintiffs' Trial Exhibit 246: Uber SEC Form S-1 Registration Statement ..... 1,450
(Apr. 11, 2019)

Plaintiffs' Trial Exhibit 247: Uber SEC Form 10-K for FY 2019 ................... 1,453
(March 2, 2020)

Plaintiffs' Trial Exhibit 248: Account (De)Activation Guide .......................... 1,458

Plaintiffs' Trial Exhibit 250: Driver Deactivation - Quality Slides ................. 1,466

Plaintiffs' Trial Exhibit 251: Driver Account Waitlisting Slides .................... 1,501

Plaintiffs' Trial Exhibit 253: Quality Assurance & Deactivations Slides ........ 1,516

Plaintiffs' Trial Exhibit 288: Uber Fee Addendum - Philadelphia................... 1,550

Plaintiffs' Trial Exhibit 295: Important PHL Airport Policies Email .............. 1,551

Plaintiffs' Trial Exhibit 296: Airport and 30th St Station Pickup Updates ....... 1,555

Plaintiffs' Trial Exhibit 298: Empty Sleeper Policy Email ............................. 1,564

Plaintiffs' Trial Exhibit 299: Uber Code of Conduct ..................................... 1,566
(Jan. 11, 2016)

Plaintiffs' Trial Exhibit 301: Driver Deactivation Policy - US Only .............. 1,572
(June 20, 2016)

Plaintiffs' Trial Exhibit 302: Driver Deactivation Policy - US Only .............. 1,596
(July 26, 2016)

Plaintiffs' Trial Exhibit 304: Uber Community Guidelines ............................ 1,601
(Dec. 8, 2016)

Plaintiffs' Trial Exhibit 307: Phone Switching Policy Email........................... 1,608

Plaintiffs' Trial Exhibit 330: Uber Partner Policy Updates Email ................... 1,613

Plaintiffs' Trial Exhibit 333: Account (De)Activation Slides ......................... 1,620

Plaintiffs' Trial Exhibit 334: Graphs Showing Plaintiffs' Hours Online ......... 1,640

VOLUME V

Defendants' Trial Exhibit 401: Limousine Regulations Overview ................. 1,643

Defendants' Trial Exhibit 402: Limousine Driver Certification Handbook..... 1,649

Defendants' Trial Exhibit 403: Luxe Limousine Articles of Incorporation..... 1,671
(Oct. 26, 2012)

Defendants' Trial Exhibit 404: Luxe Limousine Official Tariff ..................... 1,673
(Aug. 28, 2015)

Defendants' Trial Exhibit 405: PUC Data Request and Reply......................... 1,677
(May 1, 2015)

Defendants' Trial Exhibit 406: Luxe Limousine Drivers................................ 1,680
(May 12, 2017)

Defendants' Trial Exhibit 407: Luxe Limousine Website............................... 1,682
(Nov. 8, 2017)

Defendants' Trial Exhibit 408: Luxe Limousine Facebook ............................ 1,691
(Nov. 8, 2017)

Defendants' Trial Exhibit 409: Luxe Limousine Twitter and Yelp ................. 1,703
(Nov. 8, 2017)

Defendants' Trial Exhibit 411: Luxe Limousine Email .................................. 1,713
(May 12, 2017)

Defendants' Trial Exhibit 412: Luxe Limousine Google Listing..................... 1,735

Defendants' Trial Exhibit 413: Luxe Limousine 2015 Tax Return.................. 1,736
(Nov. 6, 2017)

Defendants' Trial Exhibit 414: Luxe Limousine 2016 Tax Return.................. 1,767
(June 12, 2017)

Defendants' Trial Exhibit 416: Luxe Limousine 1099 Forms For 2016.......... 1,787
(Nov. 7, 2017)

Defendants' Trial Exhibit 417: A. Razak 1099 Corrected Form...................... 1,819

Defendants' Trial Exhibit 419: A. Razak 2015 Tax Return ........................... 1,820

Defendants' Trial Exhibit 420: A. Razak 2016 Tax Return ........................... 1,831

Defendants' Trial Exhibit 421: A. Razak 2017 Tax Return ........................... 1,842

Defendants' Trial Exhibit 424: A. Razak Candy Crush Data........................... 1,853

Defendants' Trial Exhibit 425: A. Razak Trip Data ....................................... 1,854

Defendants' Trial Exhibit 426: Blacklane Invoices to Luxe Limousine .......... 1,855

Defendants' Trial Exhibit 427: Blacklane Email............................................. 1,908
(Apr. 26, 2017)

Defendants' Trial Exhibit 428: Blacklane Email............................................. 1,910
(Aug. 24, 2016)

Defendants' Trial Exhibit 431: Uber Email to A. Razak................................. 1,911
(June 1, 2015)

Defendants' Trial Exhibit 433: Freemo Limo Certificate of Organization ...... 1,912
(Aug. 12, 2015)

Defendants' Trial Exhibit 434: Freemo Limo EIN Assignment Letter............ 1,914
(Aug. 10, 2015)

Defendants' Trial Exhibit 435: Freemo Limo PUC Certificate  ...................... 1,915
(May 31, 2016)

Defendants' Trial Exhibit 436: Freemo Limo Website ................................... 1,916

Defendants' Trial Exhibit 437: Freemo Limo Yelp ........................................ 1,925
(Nov. 6, 2017)

Defendants' Trial Exhibit 438: Freemo Limo Facebook................................. 1,928
(Nov. 8, 2017)

Defendants' Trial Exhibit 439: K. Sabani LinkedIn........................................ 1,936

Defendants' Trial Exhibit 441: Freemo Limo 1099 Forms For 2016 .............. 1,937
(Nov. 7, 2016)

Defendants' Trial Exhibit 442: Email from K. Sabani .................................... 1,941
(March 17, 2016)

Defendants' Trial Exhibit 443: Email from K. Sabani .................................... 1,943
(May 13, 2016)

Defendants' Trial Exhibit 444: Freemo Limo Square Sales Report ................. 1,946

Defendants' Trial Exhibit 445: K. Sabani 2014 Tax Return ............................ 1,947

Defendants' Trial Exhibit 446: K. Sabani 2015 Tax Return ............................ 1,959

Defendants' Trial Exhibit 447: K. Sabani 2016 Tax Return ............................ 1,969

Defendants' Trial Exhibit 449: K. Sabani Partnership Agreement .................. 1,982
(Dec. 15, 2013)

Defendants' Trial Exhibit 463: Milano Limo Corporate Registration ............. 1,985
(Jan. 6, 2014)

Defendants' Trial Exhibit 464: Milano Limo EIN Assignment Letter ............ 1,986
(Jan. 3, 2014)

Defendants' Trial Exhibit 465: Milano Limo Articles of Incorporation .......... 1,988
(Jan. 6, 2014)

Defendants' Trial Exhibit 466: Milano Limo 2014 Tax Return ....................... 1,990

Defendants' Trial Exhibit 467: Milano Limo 2015 Tax Return ....................... 2,016

Defendants' Trial Exhibit 468: Milano Limo 2016 Tax Return ....................... 2,072

Defendants' Trial Exhibit 470: Milano Limo 2017 Tax Return ....................... 2,095

Defendants' Trial Exhibit 471: K. Cherdoud Vehicle Purchase Order ............ 2,106
(Dec. 23, 2013)

Defendants' Trial Exhibit 472: K. Cherdoud Driver Exam Letter ................... 2,107
(Dec. 20, 2013)

Defendants' Trial Exhibit 476: K. Cherdoud 2016 Tax Return ....................... 2,108

Defendants' Trial Exhibit 477: K. Cherdoud 2017 Tax Return ....................... 2,122

Defendants' Trial Exhibit 478: K. Cherdoud Rejected Trip Requests Map ..... 2,132
(Dec. 31, 2013–Feb. 2, 2017)

Defendants' Trial Exhibit 500: A. Razak Trip Totals Chart ........................... 2,133

Defendants' Trial Exhibit 501: A. Razak Trip Totals Graph .......................... 2,137

Defendants' Trial Exhibit 502: K. Sabani Trip Totals Chart........................... 2,138

Defendants' Trial Exhibit 503: K. Sabani Trip Totals Graph ......................... 2,142

Defendants' Trial Exhibit 504: K. Cherdoud Trip Totals Chart....................... 2,143

Defendants' Trial Exhibit 505: K. Cherdoud Trip Totals Graph .................... 2,147

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALI RAZAK, KENAN SABANI, and
KHALDOUN CHERDOUD,

              Plaintiffs,

      v.

UBER TECHNOLOGIES, INC. and
GEGEN LLC,

              Defendants.

Case No. 2:16-cv-00573-MMB

Judge Michael M. Baylson

## PLAINTIFFS' NOTICE OF APPEAL

Notice is hereby given that Plaintiffs Ali Razak, Kenan Sabani, and Khaldoun Cherdoud appeal to the United States Court of Appeals for the Third Circuit from the July 30, 2024 Opinion (ECF No. 351) and Order (ECF No. 352) granting Defendants' motion for a declaration of a mistrial and to dismiss this action with prejudice, granting Defendants' motion for judgment as a matter of law, denying Plaintiffs' motion for judgment as a matter of law and assorted other relief, denying Plaintiffs' objection to the jury pool, and denying all other pending motions as moot. Plaintiffs also appeal from the June 17, 2024 jury instructions, oral decision overruling Plaintiffs' objections to those jury instructions, oral decision denying Plaintiffs' proposed jury instructions, and oral decision denying Plaintiffs' objections to the supplemental verdict form (Trial Trans. 103:24–177:14, June 17, 2024, ECF No. 358). Plaintiffs also appeal from the June 4, 2024 Opinion (ECF No. 313) and Order (ECF No. 314)  denying Plaintiffs' motion for judgment as a matter of law. Plaintiffs also appeal from the March 8, 2024 jury instructions, oral decision overruling Plaintiffs' objections to those jury instructions, oral decision denying Plaintiffs' proposed jury instructions, and oral decision denying Plaintiffs' objections to the

**App. 1**

supplemental verdict form. (Trial Trans. 168:9–170:22, 249:14–257:24, March 7, 2024, ECF No. 275; Trial Trans. 88:7–167:10, March 8, 2024, ECF No. 276).

Dated: August 29, 2024

*s/ Jeremy E. Abay*
Jeremy E. Abay (PA # 316730)
LICHTEN & LISS-RIORDAN, P.C.
76 E. Euclid Avenue, Suite 101
Haddonfield, NJ 08033
(856) 509-5346
jabay@llrlaw.com

Shannon Liss-Riordan (*pro hac vice*)
Thomas Fowler (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com
tfowler@llrlaw.com

Bret Stanley (*pro hac vice*)
THE STANLEY LAW FIRM, PLLC
1700 Richmond Avenue, Suite 1700
Houston, TX 77079
(832) 856-6486
bstanley@stanleypllc.com

*Attorneys for Plaintiffs*

2

**App. 2**

**<u>CERTIFICATE OF SERVICE</u>**

I, Jeremy E. Abay, certify that on August 29, 2024, a true and accurate copy of the foregoing document was served on counsel for Defendants by filing on the Court's CM/ECF system.

<u>*s/ Jeremy E. Abay*</u>
Jeremy E. Abay

**App. 3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALI RAZAK, et al.** | **CIVIL ACTION** |
| **v.** | **NO. 16-573** |
| **UBER TECHNOLOGIES, INC., et al.** | |

## ORDER RE: POST-TRIAL MOTIONS

**AND NOW**, this **30th day** of **July, 2024**, for the reasons stated in the accompanying memorandum, it is hereby **ORDERED**:

1. Defendants' motion for a declaration of a mistrial and to dismiss this action with prejudice (ECF 343) is **GRANTED**.[1]

2. In the alternative, Defendants' motion for judgment as a matter of law (ECF 342) is **GRANTED**.

3. Plaintiffs' motion for judgment as a matter of law and assorted other relief (344) is **DENIED.**

4. Plaintiffs' objection to the jury pool (ECF 329) is **DENIED**.

5. All other pending motions are **DENIED** as moot.

The Complaint is therefore **DISMISSED WITH PREJUDICE**.

**BY THE COURT:**

*s/ Michael M. Baylson*

_____
**MICHAEL M. BAYLSON**
**United States District Court Judge**

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 16\16-573 Razak v Uber Technologies\16cv573 - Order re Post-Trial Motions.docx

---

[1] In so granting, the Court notes that Defendants' motion to dismiss Plaintiffs' sixth cause of action for declaratory relief (ECF 308) is also **GRANTED**.

**App. 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALI RAZAK, et al. | CIVIL ACTION |
| v. | NO. 16-573 |
| UBER TECHNOLOGIES, INC., et al. | |

## MEMORANDUM RE: POST-TRIAL MOTIONS

Baylson, J.                                                          July 30, 2024

After nearly nine years of litigation—including this Court's grant of summary judgment, the Third Circuit's subsequent reversal, and two hung juries—this case is no closer to resolution than the day it was filed.  The question presented, whether UberBLACK drivers are properly characterized as employees or independent contractors under the Fair Labor Standards Act and its Pennsylvania law counterparts, is an intractable one.  It has become clear to the Court this "either-or" determination simply does not comport with the nature of the gig economy, at least as it pertains to UberBLACK.

At its core, this case pits the ability of UberBLACK drivers to work "when, where, and for how long" they want against Uber's control over those drivers while working.  While Plaintiffs have twice attempted to convince a jury the latter outweighs the former here, each attempt has led only to deadlock.

In this Court's humble view, providing Plaintiffs with a proverbial third "bite of the apple" would be futile.  A third jury trial would do nothing more than waste precious judicial resources while—in all likelihood—leaving the Parties precisely where we began so many years ago.  Thus, after having carefully considered all possible paths forward, this Court concludes the best course of action is to dismiss this case "pursuant to its inherent authority to manage its docket."  Lee v. Krieg, 227 F. App'x 146, 148 (3d Cir. 2007).

**App. 5**

## I.   BACKGROUND

The relevant background is well known to the Parties, so the Court recounts it only briefly.

Plaintiffs are three UberBLACK drivers that operated in the Philadelphia area between 2013 and 2018.  Plaintiffs allege that Uber "misclassified" Plaintiffs and other similarly situated drivers as independent contractors, rather than employees, thus precluding Plaintiffs from certain benefits and compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101-333.115, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1-260.45.  ECF 299 at ¶ 1.

In January 2016, Plaintiffs filed this case in the Court of Common Pleas of Philadelphia County.  ECF 1.  Defendants removed to this Court in February 2016, id., after which extensive discovery took place.  Following this Court's denial of a number of pretrial motions, see, e.g., ECF 94, Defendants filed a motion for summary judgment as of January 26, 2018, ECF 114.  In a thirty-eight-page memorandum dated April 11, 2018, this Court granted Defendants' motion.  ECF 124.

The Third Circuit reversed, vacated, and remanded the case, finding there were a number of material factual disputes that prevented summary judgment.  Razak v. Uber Techs., Inc., 951 F.3d 137, 145 (3d Cir.), amended, 979 F.3d 192 (3d Cir. 2020) ("[W]here there are genuine questions of material fact that need resolution, these questions must go to a fact-finder.  This case presents such genuine disputes of material facts").

Following what the Parties reported were extensive but unsuccessful settlement discussions, a trial took place in this Court beginning on March 4, 2024.  ECF 243.  As stipulated by the Parties, that trial was limited to "the threshold liability question of whether the three individual Plaintiffs were Defendants' employees under the FLSA, PMWA, and/or WPCL."  ECF

2

**App. 6**

146. Likewise, the Parties limited the relevant time period to "only events occurring ... prior to January 11, 2018." Id.

After a five-day trial, the jury could not unanimously agree on whether Plaintiffs had proved—by a preponderance of the evidence—that Plaintiffs were employees of Defendants. ECF 269. Following the jury's report of deadlock on this ultimate issue, the Court decided to submit specific questions to the jury on (1) the six "economic reality" factors that guide the "misclassification" determination under the FLSA and PMWA, as set forth by the Third Circuit in Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376 (3d Cir. 1985), and (2) the ten factors that guide a similar holistic analysis under Pennsylvania's WPCL, as endorsed by the Third Circuit in Williams v. Jani-King of Philadelphia Inc., 837 F.3d 314 (3d Cir. 2016). Id.

The poll showed that a majority of the jury, on a majority of the questions, favored Uber's position that Plaintiffs had failed to prove that Plaintiffs were employees. Id. Yet, two or more jurors concluded that essentially every factor weighed in favor of an employer-employee relationship. Id.

Both parties moved for post-trial relief under Rule 50. ECFs 280, 282. In a twenty-four-page opinion filed on June 4, 2024, this Court denied both motions, explaining that the "convoluted and disputed set of 'historical facts' presented [at trial], along with the extensive universe of possible 'reasonable inferences,' [] could support a reasonable jury finding for either Party here, thus precluding Rule 50 relief for both." Razak v. Uber Techs., Inc., 2024 WL 2831805, at *17 (E.D. Pa. June 4, 2024) (Baylson, J.) (citations omitted).

A second trial took place beginning on June 10, 2024. ECF 325. In all material respects, Plaintiffs' case-in-chief mirrored their efforts from the first trial. Defendants largely retread their initial strategy too, with one notable exception. At this second trial, Defendants significantly

increased their focus on the wide-ranging set of local regulations that governed black car drivers in Philadelphia.  See, e.g., ECF 330-3 at 47; ECF 330-4 at 135-145.

Nonetheless, after several days of deliberation, this second jury once again indicated it was deadlocked.  The Court provided the jury with a slightly revised "supplement verdict form," this time requiring juror unanimity as to whether a particular economic reality factor weighed in favor of independent contractor or employee status.  ECF 338.

This second supplemental verdict form proved even less fruitful than the first.  The jury left the vast majority of factors blank, agreeing on only a few.  Id.  Moreover, the factors the jury did mark differed from Plaintiff to Plaintiff, and largely consisted of the jury marking "neutral." Id.

## II.    PENDING MOTIONS AND CONTENTIONS

The Parties have each filed several post-trial motions, which are now pending before this Court.

### A.  Defendants' Outstanding Motions

Defendants move for judgment as a matter of law under Rule 50, arguing that "[n]o reasonable jury could find that Plaintiffs were 'employees' under the FLSA, PMWA, or WPCL, which was the sole issue presented at trial."  ECF 342-1 at 5-6.  In so arguing, Defendants direct this Court to portions of the second trial record indicating that Plaintiffs (1) had complete flexibility over their work schedules, and (2) were free to pursue profitable alternative transportation opportunities.  Id. at 8-14 (record citations omitted).  As noted, Defendants also highlight the various restrictions and requirements imposed on black car drivers by the Philadelphia Parking Authority ("PPA"), arguing that "[m]any of the rules imposed by Uber on Plaintiffs and other drivers were required by law, and thus could not constitute 'control' as a matter of law."  Id. at 10.

**App. 8**

Defendants have also separately moved for this Court to "declare a mistrial and, in the exercise of its inherent authority to manage its docket, dismiss this action with prejudice." ECF 343-1 at 2. As Defendants see it, "[n]ot only have Plaintiffs failed to persuade two different juries that they could meet their burden of proof, but they cannot demonstrate that they could do anything different in a third trial (or a fourth trial, or a fifth trial ...) that would result in a different outcome." Id. at 12. Within this separate motion, Defendants further request that the Court (1) "memorialize its [prior oral] decision in a written order granting [Defendants'] motion" to dismiss Plaintiffs' newly added claim for declaratory relief,[1] and (2) "disregard the supplemental verdict form and [] not attempt to 'mold' a verdict from the partial results." ECF 343-1 at 7.

### B. Plaintiffs' Outstanding Motions

Plaintiff similarly move for relief under Rule 50. ECF 344. However, they do so in an omnibus post-trial motion that requests several alternative forms of relief. Specifically, Plaintiffs request (1) judgment as a matter of law under Rule 50(b); (2) "[a]n order adopting Plaintiffs' [newly] Proposed Findings of Facts and Conclusions of Law [] under Rule 52(a)(1), along with judgment in Plaintiffs' favor under Rule 58";[2] (3) "[a]n order certifying this case [] for

---

[1] The Court notes that, following the first trial but prior to the Court actually issuing its June 4, 2024 opinion, the Court had indicated to the Parties it intended to deny both post-trial motions. Plaintiffs thus filed an intervening Amended Complaint on May 15, 2024. ECF 299. That Amended Complaint added a sixth cause of action requesting a declaratory judgment that Plaintiffs were employees. Id. at ¶¶ 153-157. During the second trial, the Court subsequently explained that "declaratory judgment[s] generally relate to future conduct, not past conduct," ECF 330-2 at 8, and ultimately stated it was "going to grant the defendants' motion to dismiss" because "Uber Black is no longer operative" in Philadelphia, ECF 343-2 at 10. But the Court never entered a written order to that effect. As the Court remains convinced that Plaintiffs do not "allege facts from which it appears there is a substantial likelihood that [they] will suffer injury in the future,'" Lattaker v. Rendell, 269 F. App'x. 230, 233 (3d Cir. 2008) (non-precedential) (citations omitted), this Court will dismiss Plaintiffs' newly added cause of action in the Court's Order accompanying this Memorandum.

[2] In addition to filing a response to Plaintiffs' motion, Defendants separately move this Court "to disregard and strike Plaintiffs' proposed findings of fact and conclusions of law" because

interlocutory appeal under 28 U.S.C. § 1292(b)"; or (4) "[a] new trial under Rule 59 . . . that protects Plaintiffs' right to a jury reflecting a fair cross section of this District and that limits the jury's role to determining only historical facts." <u>Id.</u> at 1.

Also pending is Plaintiffs' mid-trial objection to the second jury pool. ECF 329. Here, Plaintiffs contend that because only two potential jurors were from Philadelphia, "[t]he jury pool [was] not a fair or representative cross-section of the;" community within the District, especially when considering the larger population of Philadelphia and demographics as compared to the suburbs." <u>Id.</u> at 2-3.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) allows a district court to enter judgment as a matter of law, upon renewed motion after a hung jury, "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." <u>Trabal v. Wells Fargo Armored Serv. Corp.</u>, 269 F.3d 243, 249 (3d Cir. 2001); <u>see also</u> <u>Stewart v. Walbridge, Aldinger Co.</u>, 882 F. Supp. 1441, 1443 (D. Del. 1995); <u>Greco v. Nat'l R.R. Passenger Corp.</u>, 2005 WL 3591196, at *4 (E.D. Pa. Dec. 30, 2005).

This remedy is to be invoked "sparingly," <u>Marra v. Phila. Hous. Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007), as a district court may grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find

---

"[e]rroneous filings with no basis in the rules or precedent should be stricken." ECF 346 at 1 (citing to <u>Weitzner v. Sanofi Pasteur Inc.</u>, 909 F. 3d 604, 614 (3d Cir. 2018)). Defendants argue that (1) "Defendants' right to a jury trial is inviolate;" (2) "Rule 52 applies only in an action tried on the facts without a jury or with an advisory jury;" (3) "there is no Third Circuit precedent supporting Plaintiffs' request for relief under Rule 52;" and (4) "[t]he parties did not consent to an advisory jury in this action triable of right by a jury and <u>the parties agree</u> that the Supplemental Verdict Form should be disregarded." <u>Id.</u> at 2-3 (internal quotations and citations omitted).

liability," Le Page's, Inc. v. 3M, 324 F.3d 141, 145-46 (3d Cir. 2003) (citation and internal quotation marks omitted). In so doing, the court "may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury." Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691-92 (3d Cir. 1993), abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. Of Warrington, 316 F.3d 392 (3d Cir. 2003); see also LePage's, 324 F.3d at 146 ("[R]eview of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict."). Likewise, "conflicting evidence which could reasonably lead to inconsistent conclusions will not justify a judgment notwithstanding the verdict . . . . It is the function of the trier of fact alone . . . to evaluate contradictory evidence and to draw inferences therefrom." Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir. 1976), cert. denied, 429 U.S. 1053 (1977) (citations omitted). Thus, "[n]ormally, when the evidence is contradictory, a JNOV is inappropriate." Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 811 (3d Cir. 1984).

## IV. DISCUSSION

### A. This Court's "Inherent Authority" Enables it to Dismiss This Case

#### i. A District Court's Inherent Authority is Diverse and Far-Reaching

District courts possess an "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." Dietz v. Bouldin., 579 U.S. 40, 47 (2016).

Perhaps more importantly, nearly every Court of Appeals—including the Third Circuit—has extended this power to a district court's sua sponte dismissal of frivolous actions. See, e.g., Cintron-Lorenzo v. Departamento de Asuntos del Consumidor, 312 F.3d 522, 525-26 (1st Cir. 2002); Fitzgerald v. First E. Seventh St. Tenants Corp., 221 F.3d 362, 364 (2d Cir. 2000); R & C

7

**App. 11**

Oilfield Servs. LLC v. Am. Wind Transp. Grp. LLC, 45 F.4th 655, 661-62 (3d Cir. 2022); Gibbs v. SCDC, 2022 WL 1467707, at *1 (4th Cir. May 10, 2022); In re Deepwater Horizon, 988 F.3d 192, 197 (5th Cir. 2021); In re Prevot, 59 F.3d 556, 565-66 (6th Cir. 1995); Dorsey v. Varga, 55 F.4th 1094, 1104-05 (7th Cir. 2022); Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992); United States v. Schneider, 594 F.3d 1219, 1226 (10th Cir. 2010); Betty K Agencies, Ltd. v. M/V MONADA, 432 F.3d 1333, 1337-38 (11th Cir. 2005).

Most prominently, "a district court, as part of its inherent power to manage its own docket, may dismiss a case sua sponte for any of the reasons prescribed in Fed.R.Civ.P. 41(b)." Cintron-Lorenzo, 312 F.3d at 525-26.  Under the plain text of the rule, this power thus extends to a plaintiff's "lack of diligent prosecution," id. and his "failure to comply with a court order." Ferdik, 963 F.2d at 1260.

Importantly though, a district court's dismissal power stretches far beyond these two textual provisions.  As the Sixth Circuit has explained, this deeply rooted power flows from "ancient origin in law and equity," In re Prevot, 59 F.3d at 565 (citing to Link v. Wabash R.R. Co., 370 U.S. 626, 629-30 (1962)), existing specifically for the purpose of bringing "litigation to a just and equitable conclusion," Eash v. Riggins Trucking Inc., 757 F.2d 557, 561 (3d Cir. 1985) (citations omitted); but see id. (describing the outer boundaries of the power as "nebulous" and "shadowy").

Perhaps unsurprisingly then, the breadth and diversity of case law on this issue is significant, revealing the far-reaching scope of the power.  Indeed, while Rule 41(b) jurisprudence is undoubtedly the most prevalent, dismissals in other contexts abound.  For instance, a district court may use its inherent authority to sua sponte dismiss an action "under the ancient doctrine of forum non conveniens."  In re Prevot, 59 F.3d at 566; see also Fintech Fund, F.L.P. v. Horne, 836

**App. 12**

F. App'x 215, 222-23 (5th Cir. 2020).  A district court may also do so "for lack of jurisdiction," In re Prevot, 59 F.3d at 566, see also United States v. Wright, 913 F.3d 364, 381 (3d Cir. 2019) (Nygaard, J., dissenting), and when a court determines that an action is plainly "frivolous" or "malicious."  Hepburn v. United States, 2024 WL 3287252, at *1-2 (10th Cir. July 3, 2024).

      ii.    District Courts Must Use Caution When Exercising This Power

To be sure, district courts must only exercise this power in "extreme circumstances."  Oliva v. Sullivan, 958 F.2d 272, 274 (9th Cir. 1992).  For instance, in the Rule 41(b) context, a district court may exercise its inherent authority to sua sponte dismiss a case "only after [weighing] several factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions."  Thompson v. Hous. Auth. of City of Los Angeles, 782 F.2d 829, 831 (9th Cir. 1986).

Likewise, dismissals for frivolousness—without prior notice—are only appropriate where it is "crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile." Green v. Concord Baptist Church, 313 F. App'x 335, 336 (1st Cir. 2009) (citing Gonzalez–Gonzalez v. United States, 257 F.3d 31, 37 (1st Cir.2001)); see also Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 7 (1st Cir. 2007).

      iii.    The Power Extends to Cases Where, as Here, Further Proceedings are Futile

Ultimately though, nothing about these types of limitations undermine the existence or overall sweep of a district court's inherent power.  To the contrary, the case law makes clear that a district court may dismiss an action where further proceedings are "futile" and where it is "beyond all hope" that a plaintiff might eventually succeed.  Green, 313 F. App'x at 336; see also

Jackson v. U.S. Bankr. Ct., 350 F. App'x 621, 624 (3d Cir. 2009); Campbell v. Wilkinson, 988 F.3d 798, 802 (5th Cir. 2021).

Accordingly, the question becomes whether a district court's inherent authority to dismiss extends to the situation this Court now faces. More precisely, this Court must ask whether a district court has the inherent authority to dismiss an action where, as here, futility flows not from the frivolousness of the core allegations in the complaint or a plaintiff's failure to prosecute, but instead from an obvious stalemate.

After due consideration, the Court concludes its inherent power so extends. Any other outcome would be administratively and economically untenable. Simply put, a district court must have some mechanism to end the infinite loop this Court currently confronts. Without such a mechanism, no upper bound exists as to the number of retrials to which Plaintiffs are entitled here. Each "retrial would . . . inevitably lead[] to questions about whether Plaintiffs are then entitled to a fourth bite at the apple (or a fifth, or a sixth, ...)." ECF 343 at 12.

In this Court's view, no single litigant has the right to continuously monopolize a district court's docket in this manner. See, e.g., Gulf Oil Co. v. Bill's Farm Center, Inc., 449 F.2d 778, 779 (8th Cir. 1971); Coghlan v. Starkey, 852 F.2d 806, 815 n.17 (5th Cir. 1988). And because no other clear mechanism exists to avoid such monopolization, the undersigned is persuaded that a district court's well-established authority to "manage [its] own docket" is the ideal tool to do so. Precluding a retrial on futility grounds is not only a "a reasonable response to the problems and needs confronting the court's fair administration of justice," but also does not run "contrary to any express grant of or limitation on the district court's power contained in a rule or statute." Dietz, 579 U.S. at 45. If anything, the very purpose of the power is to dispel cases, like here, that will

"only lead to a waste of judicial resources." <u>Baker v. Dir., U.S. Parole Comm'n</u>, 916 F.2d 725, 726 (D.C. Cir. 1990).

Admittedly, existing futility jurisprudence focuses on the frivolousness of a complaint, rather than the impasse this Court now faces.  Yet, in this Court's view, the logic applies in equal force.  In each instance, a district court concludes that no future jury will resolve the case in a plaintiff's favor.  <u>See</u> <u>Martinez-Rivera v. Sanchez Ramos</u>, 498 F.3d 3 (1st Cir. 2007); <u>see also</u> <u>Roberts v. Ferman</u>, 826 F.3d 117, 122-24 (3d Cir. 2016) (affirming district court's inherent authority to dismiss a plaintiff's post-trial motion).  And assuming that determination is reasonable—<u>i.e.</u>, not an abuse of a judge's discretion—in both instances it makes little sense for a plaintiff to have free reign to continue commanding the resources and attention of a district court.

To be clear, Plaintiffs' prolonged and persistent efforts here have been admirable, to say the least.  Plaintiffs' counsel has skillfully and forcefully litigated this case.  This Court in no way suggests anything to the contrary.

Nonetheless, two separate juries have resoundingly rebuffed Plaintiffs' attempts.[3]  Perhaps more importantly, Plaintiffs "cannot demonstrate that they could do anything different in a third trial (or a fourth trial, or a fifth trial ...) that would result in a different outcome."  ECF 343-1 at 12.  As Defendants succinctly explain, "Plaintiffs presented virtually the same case-in-chief in the second trial as in the first trial, with the same witnesses providing virtually the same testimony using virtually the same exhibits."  <u>Id</u>.  And in view of those similarities, this Court now has "even

---

[3] Of course, Defendants have also failed to unanimously persuade each respective jury.  But this Court, along with the Third Circuit, has repeatedly made clear that "[t]he burden lies with Plaintiffs to prove that they are employees." <u>Razak</u>, 951 at 143.

**App. 15**

less reason to expect that a third trial would have a different outcome than the first two trials, as Plaintiffs are now tethered to yet another transcript of their sworn testimony." Id.

Accordingly, the Court fully expects any future trial to simply be a replay of each past attempt. That, in turn, forces the Court to further conclude that any such future proceedings here would be entirely "futile" and thus a waste of resources for all parties involved. Green, 313 F. App'x at 336. Not because the next jury will definitively side with Defendants, but instead because it is "crystal clear" that—despite the herculean efforts of Plaintiffs' counsel—the next jury will not side with Plaintiffs. Id. In other words, we are, at best, in store for another hung jury.

iv.    The Court Has Considered All Possible Paths Forward

The Court recognizes that dismissing this case on futility grounds may be construed as a "drastic" measure. But it does not reach this decision lightly. To the contrary, the Court so concludes only after (1) considering all possible paths forward, and (2) weighing the limitations on a district court's inherent authority, as set forth in other legal contexts.

As the Court sees it, there are essentially two strands of constraints guiding a district court's use of its inherent authority. First are the factors to be considered when sua sponte dismissing a case under Rule 41(b). Second is the standard for sua sponte dismissal on futility grounds—namely that it must be "crystal clear that the plaintiff cannot prevail and that [further proceedings] would be futile." Green, 313 F. App'x at 336. While this case, of course, does not require sua sponte dismissal because Defendants have actually moved for such relief, the principles underlying these existing constraints serve as useful guideposts for our novel situation.

The Rule 41(b) analysis, for instance, calls for a Court to consider potentially "less drastic" alternatives to dismissal. Thompson, 782 F.2d at 831. The Court has undoubtedly done so here.

Indeed, the Court has not only <u>considered</u> every possible alternative to resolve this case; it has actually <u>attempted</u> those alternatives to no avail.

As just one example, Plaintiffs' latest post-trial motion asks this Court to adopt "Plaintiffs' Proposed Findings of Facts and Conclusions of Law." ECF 344 at 1. The proposal itself is not unreasonable, as it at least theoretically presents a path to resolving this case without another trial. Importantly though, Plaintiffs' request—in addition to perhaps serving as an admission that another trial here would be fruitless[4]—ignores that this Court went through a very similar exercise with the Parties before the first trial.

Under the Court's supervision, the Parties traded several drafts of proposed "stipulated facts" that, if agreed upon, might have enabled this Court to forgo the first trial entirely. <u>See, e.g.</u>, ECFs 189-190, 194, 224-25. Yet, those comprehensive efforts were in vain. The Parties remained worlds apart throughout the exercise, failing altogether to reach a consensus or to jointly propose a set of undisputed facts.[5] ECF 225. For that reason, any effort to try once more at this late stage would be futile. And that futility, again, means the Court must resort to more "drastic" measures.

Similarly, <u>during</u> each trial, the Court took a number of less forceful actions to avoid the result it now implements. Most notably, the Court pressed and probed each jury beyond the Court's typical practices, doing so in the hopes of reaching a resolution on the merits. Specifically, after learning of the deadlock at each trial, the Court—over the Parties' objections—provided each jury with a non-traditional supplemental questionnaire regarding each individual economic reality factor. As the Court explained to the Parties at trial, the Court's hope in providing these

---

[4] Indeed, in requesting such relief, Plaintiffs expressly note that a "second hung jury was foreseeable." ECF 344-1 at 29.

[5] While the Court encouraged these efforts, this result was not altogether surprising in view of the Third Circuit's comments that "[a]lthough both parties argue that there are no genuine disputes regarding control, the facts adduced show otherwise." <u>Razak</u>, 951 F.3d at 146.

**App. 17**

supplemental verdict sheets—in addition to potentially spurring a jury decision on the ultimate issue—was that the jury's more granular answers might have enabled the Court to glean sufficient insights so as to "mold" a verdict.  ECF 275 at 252-54; see also McSparran v. Hanigan, 225 F. Supp. 628, 643-44 (E.D. Pa. 1963), aff'd sub nom. McSparran v. Subers, 356 F.2d 983 (3d Cir. 1966).

Again, to no avail.  Each "supplemental verdict form" was plagued by both incompleteness and potentially contradictory answers.  ECFs 269, 338.  Tellingly, at the second trial, this Court instructed the jury to mark a factor only if the jury was unanimous as to their views on that factor's weight.  ECF 338.  The jury left the vast majority of the factors—including the "highly relevant" right-to-control factor—blank for each Plaintiff.  The pervasiveness of this indecision not only precluded the Court from fashioning a verdict, it has also reinforced the notion that a third trial will lead to the same outcome.

Likewise, during this second trial, the Court went so far as to permit the jury to ask questions of individual witnesses, again in the hopes this procedure would provide the jury with added clarity.  See, e.g., United States v. Hernandez, 176 F.3d 719, 723 n.2 (3d Cir. 1999).  But here too, this extraordinary step did nothing to resolve the ensuing deadlock.

> v.   The Remaining Considerations Favor Dismissal

Three of the four remaining Rule 41(b) factors—i.e., "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants," Thompson, 782 F.2d at 831—also weigh in favor of dismissal here.

After nearly nine years of litigation, both the public and Defendants deserve finality.  While UberBLACK no longer operates in Philadelphia—again, precluding Plaintiffs' request for declaratory relief here—Uber (and potentially other litigants) eagerly await a resolution.  Were

**App. 18**

this case to continue indefinitely, Uber would remain in limbo as to how it must conduct its affairs, both in Philadelphia and elsewhere.  The prospect of that indeterminate limbo not only favors expeditious resolution, but also makes clear the Court's decision today does not prejudice Defendants (to the extent this factor is applicable at all here).

Docket management also clearly favors dismissal.  The Court has devoted significant time and attention to this case over the past eight-plus years, necessarily at the expense of other litigants. As this case now presents the prospect of an endless loop of deadlocked juries, swift resolution is warranted.

To be sure, the final remaining Rule 41(b) factor—"public policy favoring disposition of cases on their merits," id.—cuts the other way.  As just noted, however, the value of that factor is somewhat illusory here, as the Court remains convinced that only deadlock will ensue.

Thus, in sum, this situation appears to be the perfect amalgamation of the different instances where district courts have typically exercised their inherent authority to dismiss an action.  The intractable impasse renders all further proceedings futile (and thus wasteful), which in turn undermines the notion that other "less drastic" measure might aid in the resolution of this case.

Accordingly, the Court draws on its inherent authority to dismiss this case with prejudice. In so ruling, the Court recognizes the novel nature of its decision, and therefore welcomes and expects the Third Circuit's review and guidance.  If nothing else, this case presents the Third Circuit with an opportunity to explore the outer boundaries of a district court's inherent power, and perhaps to fashion a test regarding the futility of endless civil retrials.  Cf United States v. Wright, 913 F.3d 364, 367 (3d Cir. 2019) (requiring a third trial in the criminal context, but noting that "[m]ost cases concerning a court's inherent authority [to dismiss an action] have arisen in the

**App. 19**

civil context"); see also id. at 387 (McKee, J., concurring in the judgment) (noting that "a District Court can step in at some point and bar a retrial" and that "there could come a point where successive prosecutions become so onerous and burdensome that additional trials rise to the level of a Due Process violation which a trial court is clearly empowered to prevent").

### B. Defendants' Rule 50(b) Motion

To that end, although this Court remains steadfast that any further proceedings here would be futile, in the alternative, the Court grants Defendants' motion for relief under Rule 50(b).  See ECF 342.

In so doing, the Court recognizes that it previously rejected such relief for both Parties following the first trial.  Razak, 2024 WL 2831805, at *1.

The Court's views regarding Plaintiffs' latest motion remain unchanged.  As already noted, Plaintiffs' case-in-chief was essentially identical at both trials.  That interchangeability, in turn, precludes Plaintiffs' Rule 50 motion for the same reasons this Court already articulated in its prior opinion.  See id. at *14-17.

Defendants' two efforts do not suffer from the same flaw.  At the second trial, Defendants spent significantly more time highlighting the comprehensive set of requirements that local regulators—such as the PPA—imposed on black car drivers.  See e.g., ECF 330-2 at 10 (arguing "nearly all of the [requirements] that [Plaintiffs] referenced align with the requirements of the Philadelphia Parking Authority."); see also ECF 330-3 at 47; ECF 330-4 at 135-145

With the benefit of further consideration, the Court now concludes it may have underestimated the import of those PPA requirements during (and following) the first trial.

As the Department of Labor has made clear, "[a]ctions taken by the potential employer for the sole purpose of complying with a specific, applicable Federal, State, Tribal, or local law or

**App. 20**

regulation are not indicative of control" for the purposes of a misclassification claim.  29 C.F.R. § 795.110(b)(4).  Upon further reflection and a thorough re-review of the second trial record, the Court is now hard-pressed to find an example of a requirement imposed by Uber that was not already required by the PPA in some form.

For instance, at both trials, Plaintiffs highlighted a long list of "infractions" within an internal Uber presentation that, if committed, might result in discipline.  ECF 277 at 35; ECF 330-4 at 8.  The Court credited this list in previously denying Defendants' Rule 50 motion.  Razak, 2024 WL 2831805, at *16.  Yet, Defendants' focus on the breadth of PPA requirements at the second trial has made clear the vast majority of Uber's internal "infractions" were in fact already covered under PPA rules.[6]

Moreover, upon revisiting the "additional" requirements imposed by Uber that this Court previously credited, id., the Court is no longer convinced they reflect the type of "control" relevant to the economic reality inquiry.  As one such example, the Court previously credited Uber's secondary background check.  Id. In hindsight, however, this sort of ex-ante, perfunctory requirement had little effect on the reality of the Parties' working relationship.  It was merely a prerequisite for Plaintiffs to "get in the door" at Uber, rather than an actual form of control that may have influenced Plaintiffs' conduct while working.[7]

---

[6] Further, to the extent any daylight does exist, those difference are marginal.  For example, Uber's list of "infractions" list out several specific instances of poor driver etiquette. While the PPA's rules matched a few of those infractions verbatim, the PPA's rules also clearly articulated a blanket requirement as to the etiquette and respect drivers owed to all passengers.  ECF 342-1 at 10-11.

[7] A similar sentiment applies to Uber's potentially more stringent vehicle requirements, which this Court previously credited.  Id.  While Uber's list of appropriate black cars may have been slightly more selective than what the PPA required, that selectivity has little bearing on Uber's right to control Plaintiffs.  True, one might argue that this additional requirement provided Uber with additional ammo to deactivate a driver.  Yet, the Court fails to see how requiring a Plaintiff to drive a slightly nicer vehicle actually bears on the ultimate inquiry as to whether a Plaintiff was actually "in business for himself."

**App. 21**

Accordingly, in conducting its Rule 50 analysis, the Court must set aside many of the working condition requirements that Uber conveyed to drivers.  That is not because the Court wishes to "weigh the evidence" itself.  It is instead because these regulations are impermissible considerations when assessing a defendants' "right to control" under the economic reality test. While the Court previously viewed these requirement as "internal" Uber restrictions, they were in actuality Uber's attempts to comply with local law.

And because this Court must remove the vast majority of "Uber's" quality control measures from the economic reality equation, the calculus changes significantly.  While this Court had previously framed the reasonableness of the jury's deadlock here as flowing from the tension between "(1) the worker flexibility inherent to app-based ridesharing platforms, and (2) those platform's attempts at quality control and standardization," Razak, 2024 WL 2831805, at *15, the Court is no longer convinced that was correct.  The pervasiveness of PPA requirements—as highlighted by Defendants at the second trial—entirely undercuts the relevance of this latter prong. As such, a proper read of the record here is instead that (1) Plaintiffs had complete autonomy over their schedules, and (2) the PPA, rather than Uber, set the most of rules governing Plaintiffs' working environment.  With that set of facts, the Court is not at all convinced a reasonable jury could find for Plaintiffs.

And although there are, of course, several other factors that might affect a jury's economic reality determination, this "highly relevant" right-to-control factor is at the core of this case. Moreover, even if this Court were to look to those other factors, several undisputed facts nonetheless counsel in favor of this Court taking the case away from the jury.

On "opportunity for profit or loss," Plaintiffs do not dispute that each individual Plaintiff could and did seek alternative transportation opportunities to enhance their profits.  ECF 342-1 at

**App. 22**

13 (citing to relevant portions of record).  Although Plaintiffs contest the degree and extent of Uber's pushback to those arrangements, Plaintiffs do not challenge the fact that (1) each individual Plaintiff engaged in such opportunities, and (2) Plaintiffs often did so during, or in close proximity, to being online on the Uber app.  See ECF 349 at 9-11, 16 (noting that "Plaintiffs could have, and occasionally did, perform rides outside of Uber").

On "investment in equipment or materials," Plaintiffs do not dispute they owned the vehicles they used for providing UberBLACK rides, and that Plaintiffs could use those same vehicles in pursuit of non-Uber related business.  See id. at 12-13, 16.

On "degree of permanence," Plaintiffs do not dispute they could work as much or as little as desired, and this flexibility extended to Plaintiffs' right to take long hiatuses without providing notice to Uber (and without consequence upon return).  See id. at 15; see also ECF 330-5 at 11-13, 118, 248.

On "special skills," Plaintiffs routinely stressed at trial that the introduction of UberX to the Philadelphia market undermined the ability of UberBLACK drivers to succeed.  ECF 343-1 at 13.  In highlighting that fact, however, Plaintiffs have seemingly implicitly admitted the skills necessary to be an UberBLACK driver were differentiated from those skills necessary to be an UberX driver.  So while the Third Circuit has indicated there may be a "presumption that driving is not a special skill," Razak, 951 F.3d at 147, Plaintiffs' own trial strategy casts significant doubt on the notion that being a UberBLACK requires nothing more than "driving."

In sum, these undisputed facts—when colored by the Court's revised conclusions regarding the "right to control" factor—only further cement the notion that no reasonable jury could find for Plaintiffs here.[8]  As such, in the event this Court's primary ruling as to futility does not withstand

---

[8] In so concluding, the Court notes that on "integrality," the record remains sufficiently mixed as to whether Uber is (1) a technology company that supports drivers' transportation businesses or

scrutiny on appeal, the Court alternatively concludes that Defendants are entitled to relief under Rule 50(b).

### C.  Remaining Outstanding Motions

In view of the Court's foregoing rulings, it briefly addresses the Parties' remaining requests for relief.

On Plaintiffs' objections to the jury pool at the second trial, Defendants are correct that a successful prima facie claim would require Plaintiffs to show "the group alleged to be excluded is a 'distinctive group' in the community," but that Philadelphia County residents do not constitute a "distinctive group."  ECF 341 at 2.  Without more, "a person's geographic location [does not] place that person in a distinct group."  United States v. Green, 435 F.3d 1265, 1272 (10th Cir. 2006).

On Plaintiffs' request for this Court to resolve this case under Rules 52 and 58, this Court has repeatedly held that—absent Defendants' waiver or a joint stipulation as to material facts—Defendants are "entitled to a jury trial here under the Seventh Amendment."  Razak, 2024 WL 2831805, at *17.  Because Defendants have remained steadfast in asserting their right to a jury trial, here too, Plaintiffs' request for relief fails.

On Defendants' motion to dismiss Plaintiffs' newly added cause of action for declaratory relief, the Court reiterates that because UberBLACK no longer exists in Philadelphia, Plaintiffs cannot "allege facts from which it appears there is a substantial likelihood that [they] will suffer injury in the future.'"  Lattaker, 269 F. App'x. at 233.

---

(2) a transportation company that uses drivers, such that a reasonable jury could not rely on this factor alone to accurately capture the economic realities of the relationship.

**App. 24**

On Plaintiffs' request for interlocutory appeal, although the Court's ruling today will ultimately enable the Parties to immediately seek appellate review, it is simply not due to Plaintiffs' asserted bases for interlocutory review.  This Court has squarely and repeatedly rejected Plaintiffs' contentions that Pennsylvania law requires different misclassification tests than those used here. Razak, 2024 WL 2831805, at *8-14.[9]  Likewise, the Court has repeatedly made clear that Rule 52 does not present a viable path to resolution here, as, again, Defendants possess the right to a jury trial.  Id. at 17.  Simply because Plaintiffs continue to argue the opposite does not mean they have a right to interlocutory review.

Lastly, Plaintiffs' request for a new trial fails for the same reasons the Court has inherent authority to dismiss this case.  Because this Court concludes that any new trial would result in deadlock, it would be futile and wasteful to grant Plaintiffs' request here.

## V.   CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' motion for a mistrial and its corresponding request for this Court to exercise its inherent authority to manage its docket by dismissing this action with prejudice.  In the alternative, this Court **GRANTS** Defendants' motion for post-trial relief under Rule 50(b).   Accordingly,  this  case  is  **DISMISSED WITH PREJUDICE**.  An appropriate **ORDER** follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 16\16-573 Razak v Uber Technologies\16cv573 memorandum 7.30.24.docx

---

[9] Moreover, the Court notes that while Plaintiffs have long requested this Court look to California law to guide this Court's misclassification analysis, the California Supreme Court recently upheld a law expressly articulating that "a driver for an app-based transportation or delivery company, such as Uber Technologies, Inc. (Uber), Lyft, Inc. (Lyft), or DoorDash, Inc., is an independent contractor and not an employee of the company . . ." under circumstances clearly met here. Castellanos v. State, 2024 WL 3530208, at *1 (Cal. July 25, 2024).

**App. 25**