No. 24-2638

---
---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

ALI RAZAK, *et al.*
Plaintiffs-Appellants,

v.

UBER TECHNOLOGIES, INC., *et al.*
Defendants-Appellees.

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

---

**BRIEF FOR THE ACTING SECRETARY OF LABOR AS**
***AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

SEEMA NANDA
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

RACHEL GOLDBERG
Counsel for Appellate Litigation

MELISSA ANN MURPHY
Senior Attorney

U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, NW
Room N-2716
Washington, DC  20210
(202) 693-5555
murphy.melissa@dol.gov

---
---

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF THE SECRETARY OF LABOR ....................................1

STATEMENT OF THE ISSUE ...........................................................2

STATEMENT OF THE CASE AND BACKGROUND ...........................2

    A.    Initial Grant of Summary Judgment to Uber and Reversal and Remand by this Court ............................................................3

    B.    The Department's 2024 Rule ...........................................4

    C.    District Court Proceedings on Remand and Current Appeal ...............5

ARGUMENT .....................................................................................9

I.    THE RELATIONSHIP BETWEEN COMPLIANCE WITH LEGAL OBLIGATIONS AND "CONTROL" UNDER THE FLSA'S ECONOMIC REALITY TEST..........................................................................9

    A.    Relevant Case Law ..........................................................9

    B.    The Department's 2024 Classification Rule .......................12

II.    THE DISTRICT COURT ERRED IN ITS ASSESSMENT OF UBER'S COMPLIANCE WITH LEGAL OBLIGATIONS.......................14

    A.    The District Court Misapplied the 2024 Classification Rule When Analyzing Uber's Compliance with Legal Obligations. ...................................................15

        1.    The district court relied on only a portion of the relevant regulatory provision and furthermore failed to properly consider that portion ................................16

2.    The district court failed to assess Uber's actions that went beyond compliance with legal obligations..................................18

B.    The District Court Did Not Properly Consider that Compliance with Legal Obligations Is Only One Aspect of One Factor in a Multifactor Analysis. ...........................................................................................24

CONCLUSION ..................................................................................................28

CERTIFICATE OF COMPLIANCE ....................................................................29

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Badon v. Berry's Reliable Res., LLC*,
    2022 WL 2111341 (E.D. La. June 10, 2022)...................................... 11

*Chao v. First Nat'l Lending Corp.*,
    516 F. Supp. 2d 895 (N.D. Ohio 2006)................................. 10

*Collado v. J. & G. Transp., Inc.*,
    2015 WL 1757638 (S.D. Fla. Apr. 17, 2015) ...................................... 11

*Crouch v. Guardian Angel Nursing, Inc.*,
    2009 WL 3737887 (M.D. Tenn. Nov. 4, 2009) ................................. 10

*Donovan v. DialAmerica Mktg., Inc.*,
    757 F.2d 1376 (3d Cir. 1985)........................................................ 3, 4, 26

*Ferguson v. Texas Farm Bureau*,
    2021 WL 2349340 (W.D. Tex. May 19, 2021) ........................... 11, 20

*Gayle v. Harry's Nurses Registry, Inc.*,
    2009 WL 605790 (E.D.N.Y. Mar. 9, 2009)...................................... 10

*Hart v. Rick's Cabaret Int'l, Inc.*,
    967 F. Supp. 2d 901 (S.D.N.Y. 2013)........................................... 11, 20

*Hopkins v. Cornerstone America*,
    545 F.3d 338 (5th Cir. 2008)....................................................... 10, 26

*Iontchev v. AAA Cab Serv., Inc.*,
    685 F. App'x 548 (9th Cir. 2017) ..................................................... 10

*Matson v. 7455, Inc.*,
    2000 WL 1132110 (D. Or. 2000)....................................................... 11

*Parrish v. Premier Directional Drilling, L.P.*,
    917 F.3d 369 (5th Cir. 2019)............................................................ 10

Cases – Continued:

*Pulido v. Desert Platinum Props., LLC*,
  2024 WL 3936386 (D. Ariz. Aug. 26, 2024)......................................................... 10

*Razak v. Uber Techs., Inc.*,
  951 F.3d 137, *amended*, 979 F.3d 192 (3d Cir. 2020)...................................Passim

*Razak v. Uber Techs., Inc.*,
  2018 WL 1744467 (E.D. Pa. Apr. 11, 2018) .......................................................... 3

*Razak v. Uber Techs., Inc.*,
  2024 WL 2831805 (E.D. Pa. June 4, 2024)................................................5, 25, 27

*Razak v. Uber Techs., Inc.*,
  2024 WL 3584324 (E.D. Pa. July 30, 2024)..................................................Passim

*Scantland v. Jeffry Knight, Inc.*,
  721 F.3d 1308 (11th Cir. 2013)............................................................................ 10

*Schultz v. Mistletoe Express Serv., Inc.*,
  434 F.2d 1267 (10th Cir. 1970)........................................................................... 10

Statutes

29 U.S.C. 204 ........................................................................................................ 1
29 U.S.C. 206(a) ................................................................................................... 1
29 U.S.C. 207(a) ................................................................................................... 1
29 U.S.C. 211(a) ................................................................................................... 1
29 U.S.C. 216(c) ................................................................................................... 1
29 U.S.C. 217 ........................................................................................................ 1

Code of Federal Regulations

29 C.F.R. 795.110(b)(4).................................................................................Passim

Federal Rules

Federal Rule of Appellate Procedure 29(a) ........................................................... 1
Federal Rule of Civil Procedure 50(b)...........................................................Passim

Other Authorities

52 Pa. Code § 1051.8(a)-(c) ...................................................................... 21

52 Pa. Code § 1057.10(e)......................................................................... 21

Department of Labor, Wage and Hour Division,
  Employee or Independent Contractor Classification under the Fair Labor
  Standards Act,
  89 Fed. Reg. 1,638 (Jan. 10, 2024) ................................................. Passim

## INTEREST OF THE SECRETARY OF LABOR

Pursuant to Federal Rule of Appellate Procedure 29(a), the Acting Secretary of Labor Julie A. Su submits this brief as *amicus curiae* in support of the Plaintiffs-Appellants. The Secretary of Labor administers and enforces the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. 204, 211(a), 216(c), 217. The FLSA requires covered employers to pay non-exempt employees at least a minimum wage for all hours worked and at least one and one-half times the employee's regular rate of pay for all hours worked over 40 in a workweek. 29 U.S.C. 206(a), 207(a). Only employees are protected by the FLSA's minimum wage and overtime pay provisions; these provisions do not apply to workers who are independent contractors.

The Department of Labor ("Department") issued an interpretive rule that provides guidance on the multifactor economic reality analysis used by courts to determine whether a worker is an employee or independent contractor under the FLSA. "Employee or Independent Contractor Classification under the Fair Labor Standards Act," 89 Fed. Reg. 1,638 (Jan. 10, 2024) ("2024 Classification Rule"). The rule's analysis of one of the factors, the control factor, includes a provision that considers whether an employer's actions were taken solely to comply with specific, applicable laws or regulations, in which case the actions are not indicative of control and therefore not relevant to determine the worker's classification—or

1

whether the employer's actions go beyond compliance with such laws or regulations and serve the employer's own compliance methods, safety, quality control, or contractual or customer service standards, in which case the actions may be indicative of control and relevant to the analysis. 89 Fed. Reg. at 1,743 (29 C.F.R. 795.110(b)(4)).

As described below, the district court erred in its application of this provision of the Department's 2024 Classification Rule.

## STATEMENT OF THE ISSUE

Whether the district court erred when considering the provision of the Department's 2024 Classification Rule that addresses how to evaluate an employer's compliance with applicable laws and regulations as part of an FLSA economic reality analysis used in determining whether a worker is an employee or independent contractor by failing to consider the full text of the provision, misapplying the provision, and placing too much emphasis on this single provision in conducting the analysis.

## STATEMENT OF THE CASE AND BACKGROUND

Plaintiffs-Appellants worked as drivers for UberBLACK in Philadelphia. They filed an action against Defendants-Appellees Uber Technologies, Inc. and a related company (collectively "Uber") alleging that Uber wrongfully classified them as independent contractors instead of employees and violated the FLSA and

Pennsylvania state law by failing to pay wages due them.

**A.    Initial Grant of Summary Judgment to Uber and Reversal and Remand by this Court**

In 2018, the district court granted summary judgment to Uber, ruling that the drivers were not employees under the FLSA. *Razak v. Uber Techs., Inc.*, Civil Action No. 16-573, 2018 WL 1744467 (E.D. Pa. Apr. 11, 2018). The district court applied this Court's multifactor economic reality analysis for determining employee or independent contractor status under the FLSA as set forth in *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376 (3d Cir. 1985). *Razak*, 2018 WL 1744467 at *8-9, 14-19. The district court found that four of the factors (control, opportunity for profit or loss, investment, and relationship permanence) weighed strongly or heavily in favor of independent contractor status and that two of the factors (special skills and integrality of service) weighed slightly in favor of employee status. *Id.* at *14-19.

In 2020, this Court vacated the grant of summary judgment. *Razak v. Uber Techs., Inc.*, 951 F.3d 137, *amended*, 979 F.3d 192 (3d Cir. 2020). This Court found that there were "genuine disputes of material facts" for the control, opportunity for profit or loss, investment, permanence, and integral factors. 951 F.3d at 145-47. This Court added that no further factfinding was necessary for the skills factor because there were not enough facts "to overcome the presumption that driving is not a special skill" and that the skills factor "certainly weighs in

favor of finding that Plaintiffs are employees." *Id.* at 147.  This Court remanded,

concluding that "these material factual disputes must be resolved." *Id.* at 148.

### B.    The Department's 2024 Rule

In January 2024, the Department issued the 2024 Classification Rule, which

provides an analysis for determining whether a worker is an employee or

independent contractor under the FLSA.  The 2024 Classification Rule is aligned

with the longtime analysis generally applied by the Circuit Courts of Appeals,

including this Circuit.  The rule provides a multifactor economic reality analysis in

which no one factor is dispositive, and the six factors to be considered are very

similar to the *DialAmerica* factors.[1]

Regarding the control factor, the 2024 Classification Rule addresses, among

other things, the degree to which an employer's actions to comply with applicable

laws and regulations indicate control of the employee:

> Actions taken by the potential employer for the sole purpose of complying
> with a specific, applicable Federal, State, Tribal, or local law or regulation
> are not indicative of control.  Actions taken by the potential employer that
> go beyond compliance with a specific, applicable Federal, State, Tribal, or
> local law or regulation and instead serve the potential employer's own
> compliance methods, safety, quality control, or contractual or customer
> service standards may be indicative of control.

---

[1] The Department's rule is being described here because it was issued following
this Court's remand, but prior to the jury trials held on remand.

89 Fed. Reg. at 1,743 (29 C.F.R. 795.110(b)(4)).  The rule explains that actions taken to comply with applicable laws and regulations are only one consideration under the control factor, which considers the employer's control over the performance of the work and the economic aspects of the working relationship, including, for example, whether the employer sets the worker's schedule, supervises the performance of the work, or explicitly limits the worker's ability to work for others.  89 Fed. Reg. at 1,695.  And, of course, control is only one of several factors in the economic reality analysis when determining classification status.  *Id.*

### C.    District Court Proceedings on Remand and Current Appeal

On remand following this Court's reversal of summary judgment to Uber, the district court held a jury trial in March 2024 to determine whether the drivers were employees of Uber.  2024 WL 2831805, at *1 (E.D. Pa. June 4, 2024).  The jury could not unanimously agree on whether the drivers had proven that they were Uber's employees.  *Id*.  Both parties sought judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("FRCP") 50(b).  The district court ruled that the facts and the reasonable inferences from those facts "could support a reasonable jury finding for either Party here, thus precluding [FRCP 50(b)] relief for both."  *Id.* at *14-17.

The district court then held a second jury trial during which, according to the district court, the parties generally presented similar evidence and pursued similar strategies as they had in the first trial except that Uber "significantly increased [its] focus on the wide-ranging set of local regulations that governed black car drivers in Philadelphia." 2024 WL 3584324, at *2 (E.D. Pa. July 30, 2024). The second jury deadlocked too. *Id.* Uber filed another FRCP 50(b) motion, and in this motion, Uber "highlight[ed] the various restrictions and requirements imposed on black car drivers" by the Philadelphia Parking Authority ("PPA") and argued that many of "'the rules imposed by Uber on Plaintiffs and other drivers were required by law and thus could not constitute'" control as a matter of law. *Id.* (quoting Uber's motion). Uber also filed a motion asking the court "to 'declare a mistrial and, in the exercise of its inherent authority to manage its docket, dismiss this action with prejudice.'" *Id.* at *3 (quoting Uber's motion). The drivers requested several forms of post-trial relief, including judgment as a matter of law pursuant to FRCP 50(b). *Id.* at *2.

The district court ruled for Uber and dismissed the case on two alternative grounds. First, the district court stated that "the case law makes clear that a district court may dismiss an action where further proceedings are futile and where it is beyond all hope that a plaintiff might eventually succeed," and it concluded that such inherent authority applied to this case where the futility flowed from "an

6

obvious stalemate." 2024 WL 3584324, at *5-6 (citations and internal quotation marks omitted). Second, the district court granted Uber's FRCP 50(b) motion. *Id.* at *9. The district court acknowledged that it had "rejected such relief for both Parties following the first trial." *Id.* The district court explained that, although the drivers' "case-in-chief was essentially identical at both trials," at the second trial Uber "spent significantly more time highlighting the comprehensive set of requirements that local regulators—such as the PPA—imposed on black car drivers." *Id.* "With the benefit of further consideration," the district court concluded that "it may have underestimated the import of those PPA requirements during (and following) the first trial." *Id.*

Citing a portion of the 2024 Classification Rule's guidance on the degree to which an employer's actions to comply with legal obligations indicate control of the employee, the district court stated that "[u]pon further reflection and a thorough re-review of the second trial record, [it] is now hard-pressed to find an example of a requirement imposed by Uber that was not already required by the PPA in some form." *Id.* The district court had previously credited the drivers' argument that Uber had a long list of infractions which could result in discipline against a driver, but Uber's "focus on the breadth of PPA requirements at the second trial has made clear the vast majority of Uber's internal 'infractions' were in fact already covered under PPA rules." *Id.*

7

The district court decided that it "must set aside many of the working condition requirements that Uber conveyed to drivers" because these requirements "are impermissible considerations when assessing a defendant['s] right to control under the economic reality test."  2024 WL 3584324, at *10 (internal quotation marks omitted).  In other words, these requirements were not "'internal' Uber restrictions," but instead "were in actuality Uber's attempts to comply with local law."  *Id*.  The district court added that "because [it] must remove the vast majority of 'Uber's' quality control measures from the economic reality equation, the calculus changes significantly."  *Id*.  The district court "had previously framed the reasonableness of the jury's deadlock here as flowing from the tension between" the "worker flexibility inherent to app-based ridesharing platforms" and "those platform's attempts at quality control and standardization," but was "no longer convinced that was correct."  *Id*.  The district court concluded that "[t]he pervasiveness of PPA requirements—as highlighted by [Uber] at the second trial— entirely undercuts the relevance of this latter prong," and that "a proper read of the record here is instead that (1) Plaintiffs had complete autonomy over their schedules, and (2) the PPA, rather than Uber, set … most of [the] rules governing Plaintiffs' working environment."  *Id*.

The district court acknowledged that, in addition to control, "there are, of course, several other factors that might affect a jury's economic reality

determination." 2024 WL 3584324, at *10 (internal quotation marks omitted).
The district court explained that "even if this Court were to look to those other
factors, several undisputed facts nonetheless counsel in favor of this Court taking
the case away from the jury." *Id*. The district court very briefly discussed the
opportunity for profit or loss, investment, degree of permanence, and skill factors.
*Id*. The district court concluded that "these undisputed facts—when colored by
[its] revised conclusions regarding the right to control factor—only further cement
the notion that no reasonable jury could find for Plaintiffs here." *Id.* at *11
(internal quotation marks omitted). Thus, "in the event [its] primary ruling as to
futility does not withstand scrutiny on appeal," the district court "alternatively"
ruled that Uber is "entitled to relief under [FRCP 50(b)]." *Id*.

## ARGUMENT

### I.   The Relationship Between Compliance with Legal Obligations and "Control" Under the FLSA's Economic Reality Test

#### A.   Relevant Case Law

Control exerted by the employer to comply with legal obligations may be
relevant under the control factor of the economic reality analysis, depending on
how the employer implements such compliance. As the Department recognized in
the preamble to the 2024 Classification Rule, the "case law is not uniform on this
issue." 89 Fed. Reg. at 1,693.

Some federal appellate courts have rejected employers' arguments that

9

because they were exerting control over workers only to comply with legal obligations imposed by the government, their actions could not be viewed as evidence of control. *Hopkins v. Cornerstone America,* 545 F.3d 338, 343 (5th Cir. 2008); *Schultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1271 (10th Cir. 1970); *cf. Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316 (11th Cir. 2013) (the "economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control"). Multiple district court decisions have reached similar conclusions. *E.g., Pulido v. Desert Platinum Props., LLC*, No. CV-22-01704-PHX-DWL, 2024 WL 3936386, at *5 (D. Ariz. Aug. 26, 2024); *Crouch v. Guardian Angel Nursing, Inc.*, No. 3:07-cv-00541, 2009 WL 3737887, at *20 (M.D. Tenn. Nov. 4, 2009); *Gayle v. Harry's Nurses Registry, Inc.*, No. CV-07-4672(CPS)(MDG), 2009 WL 605790, at *7 (E.D.N.Y. Mar. 9, 2009); *Chao v. First Nat'l Lending Corp.,* 516 F. Supp. 2d 895, 900 (N.D. Ohio 2006).

Other federal appellate courts have viewed employer requirements on workers in order to comply with applicable legal obligations as not indicative of control. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 382 (5th Cir. 2019); *Iontchev v. AAA Cab Serv., Inc.*, 685 F. App'x 548, 550 (9th Cir. 2017). Some district courts have reached this same conclusion. *E.g., Collado v. J. & G. Transp., Inc.*, No. 14–80467–CIV, 2015 WL 1757638, at *5 (S.D. Fla. Apr. 17,

2015); *Matson v. 7455, Inc.*, No. CV 98–788–HA, 2000 WL 1132110, at \*4 (D. Or. 2000).

Still other courts have recognized that where the employer goes beyond compliance with specific legal requirements and exerts control to serve its own purposes—such as establishing preferred compliance methods, quality control measures, or standards to meet contractual or customer service needs, this may indicate control. *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 916 (S.D.N.Y. 2013) ("[W]here a club implements regulations to assure compliance with law, those regulations are not evidence of the club's control over its dancers," but where the majority of the rules are aimed at "achiev[ing] [the employer's] business ends" rather than "providing a safe and law-abiding venue," the rules "compellingly indicate" control); *Ferguson v. Texas Farm Bureau*, No. 6:17-CV-00111-ADA-JCM, 2021 WL 2349340, at \*4 (W.D. Tex. May 19, 2021) (ruling that "the exercise of requisite control should not be indicative one way or another if regulations demand it" but where the employer took actions beyond what the regulations required, the employer was "in control of Plaintiffs" and this weighed in favor of their classification as employees); *Badon v. Berry's Reliable Res., LLC*, Nos. 19-12317 c/w 20-584 & 21-596, 2022 WL 2111341, at \*3-4 (E.D. La. June 10, 2022) (concluding that home care workers were employees despite employer's argument that it was simply implementing state regulatory requirements in part

11

because the employer hired, supervised,  directed, and set the rate of pay for the
home care workers to both ensure compliance with state requirements as well as
enforce the employer's own internal standards).

### B.    The Department's 2024 Classification Rule

The Department's 2024 Classification Rule provides guidance on this issue
in two respects.  First, the Department explains that "actions taken by the potential
employer for the sole purpose of complying with a specific, applicable Federal,
State, Tribal, or local law or regulation are not indicative of control."  29 C.F.R.
795.110(b)(4).  Additionally, the Department explains that "actions taken by the
potential employer that *go beyond* compliance with a specific, applicable Federal,
State, Tribal, or local law or regulation and instead serve the potential employer's
own compliance methods, safety, quality control, or contractual or customer
service standards *may be indicative of control*."  *Id.* (emphases added).

As the Department explains, when the employer imposes requirements on
workers that go beyond specific legal obligations, the workers are not doing the
entrepreneurial tasks that suggest that they are responsible for complying with the
requirements that apply to the work or services they are performing such that they
are assuming the risk of noncompliance—a typical and expected risk that workers
in business for themselves assume.  89 Fed. Reg. at 1,694.  For example, when an
employer, rather than a worker, imposes safety or customer service obligations

beyond what is required by specific and applicable laws or regulations, it may be evidence that the worker is not in fact in business for themselves and instead is economically dependent on the employer for work. *Id.*

As the Department emphasizes, the facts and circumstances of each case must be assessed, and the manner in which the employer chooses to implement compliance with legal obligations will be highly relevant to the analysis. For example, it is not indicative of control if an employer requires everyone who enters a construction site to wear a hard hat as required by city ordinance. However, if the employer chooses a specific time and location for its own weekly safety briefings that are not specifically required by law and requires all workers to attend, that may be probative of control. Similarly, it is not probative of control if an employer requires workers to provide proof of insurance required by state law, but if the employer mandates what insurance carrier workers must use, that may be probative of control. *Id.* at 1,694-95.

Thus, the 2024 Classification Rule makes clear that while actions taken solely to comply with specific, applicable legal requirements may not be relevant to control, such compliance must be closely scrutinized because actions taken by an employer that serve the employer's own interests or needs (e.g., quality control or customer service standards) may be indicative of control. Moreover, whether an employer's actions are for the sole purpose of legal compliance or go beyond

13

compliance does not determine whether the control factor favors employee or independent contractor status, as there are other facts relevant to control to consider, as well as other factors that together determine the overall outcome whether the worker is an employee or independent contractor. 89 Fed. Reg. at 1,695.

## II. The District Court Erred in Its Assessment of Uber's Compliance with Legal Obligations.

In concluding that the similarity between Uber's requirements and the PPA regulations was virtually dispositive of the determination of the workers' classification under the economic reality analysis, the district court's approach was unduly narrow and without sufficient analysis. Specifically, the district court failed to analyze—as the 2024 Classification Rule intends and plainly states— whether Uber's requirements were in place for the sole purpose of compliance with the PPA requirements or whether Uber's requirements went beyond compliance with those PPA requirements and instead served Uber's own compliance methods, quality control, or customer service standards. Additionally, the district court failed to consider other relevant aspects of control, as well as other factors in the economic reality analysis, thus disregarding the analysis's ultimate inquiry of economic dependence.

A.    **The District Court Misapplied the 2024 Classification Rule When Analyzing Uber's Compliance with Legal Obligations.**

The district court misapplied the Department's rule in two ways.  First, instead of analyzing whether Uber's extensive "quality control measures" and "working condition requirements" (as characterized by the district court) were imposed on drivers solely because of specific PPA regulations, the district court made a broad, summary conclusion that failed to cite even one specific PPA regulation.  Second, the district court failed to grapple with the rule's further guidance that actions that go beyond compliance with a specific legal obligation and instead serve the employer's own compliance methods, safety, quality control, or contractual or customer service standards may be indicative of control.  The Department's rule calls for a careful analysis of whether actions are taken for the sole purpose of complying with a specific legal obligation; if they are, then those actions "are not indicative of control."  However, if those actions go beyond the legal obligation and serve other purposes for the employer, they "may be indicative of control."  The district court's superficial analysis thus disregarded proper consideration of whether Uber's actions indicate control and led to its flawed conclusion that "no reasonable jury" could find in favor of the workers in this case, 2024 WL 3584324, at *10, 11.

    1.   ***The district court relied on only a portion of the relevant regulatory provision and furthermore failed to properly consider that portion***.

The district court vaguely explained that "local regulators," namely the PPA, "imposed" a "comprehensive set of requirements" on drivers. 2024 WL 3584324, at *9. In reaching its conclusion that Uber's "quality control measures" and the "working condition requirements that Uber conveyed to drivers" had to be "set aside" and "remove[d] … from the economic reality equation," because "the PPA, rather than Uber, set … most of [the] rules governing Plaintiffs' working environment," *id.* at *10, the court failed to apply the full analysis of the provision it relied on from the 2024 Classification Rule.

Referring generally to the requirements that these "local regulators" imposed on drivers, the district court concluded that it "may have underestimated the import" of those PPA requirements. 2024 WL 3584324, at *9. The district court then referenced only the first part of the Department's regulatory provision, stating that "[a]ctions taken by the potential employer for the sole purpose of complying with a specific, applicable Federal, State, Tribal, or local law or regulation are not indicative of control" for the purposes of a classification analysis. *Id.* (citing 29 C.F.R. 795.110(b)(4)). The district court failed to acknowledge, let alone analyze, the rest of the provision, which makes clear that "actions taken by the potential employer that go beyond compliance with a specific, applicable Federal, State,

Tribal, or local law or regulation and instead serve the potential employer's own compliance methods, safety, quality control, or contractual or customer service standards may be indicative of control" despite explicitly characterizing these actions as "quality control measures" and "working condition requirements." *See* 2024 WL 3584324, at *10; 29 C.F.R. 795.110(b)(4). Rather, the court simply concluded that it was "hard-pressed to find an example of a requirement imposed by Uber that was not already required by the PPA *in some form*." 2024 WL 3584324, at *9 (emphasis added). This statement illustrates the tension between what the Department's rule plainly means—an analysis of whether an employer requirement is in place for the *sole* purpose of compliance with a *specific*, applicable legal obligation—and the court's vague conclusion that Uber's broad exercise of control was due to the PPA regulations "in some form."

Additionally, the district court deemed the differences between the PPA requirements and Uber's requirements to be "marginal." 2024 WL 3584324, at *9 n.6. The court provided an example of such "marginal" differences by explaining that although Uber's infractions included "several specific instances of poor driver etiquette," the PPA rules "also clearly articulated a blanket requirement as to the etiquette and respect drivers owed to all passengers." *Id.* But the court failed to actually examine whether Uber's very specific requirements matched PPA's specific requirements; such a comparison is crucial to determining if the

employer's requirements are for the sole purpose of complying with specific legal obligations. Thus, the district court's dismissal of the differences between the PPA requirements and Uber's demands on its workers as "marginal" is not the inquiry contemplated by the regulatory provision, nor in any event did the district court explain its conclusion. Although the court conceded that the PPA's rules matched only "a few" of Uber's specific requirements "verbatim" and relied upon a PPA "blanket requirement" in order to sweep in Uber's various requirements, *id.*, this reliance on an open-ended "blanket" requirement to encompass a broad range of employer-mandated requirements is not consistent with the rule's guidance that employer actions taken to comply with legal obligations are not relevant to the control analysis only if the actions' "sole purpose" is compliance with a "specific" legal obligation.

### 2. *The district court failed to assess Uber's actions that went beyond compliance with legal obligations.*

The district court failed to grapple with the regulatory provision's further guidance that actions that go beyond compliance with a specific legal obligation and instead serve the employer's own compliance methods, safety, quality control, or contractual or customer service standards may be indicative of control. While the district court summarily stated that "the vast majority" of infractions under Uber's policy were "already covered" by the PPA rules, the court provided very little specificity to support its broad pronouncement. 2024 WL 3584324, at *9.

18

The district court noted that Plaintiffs had highlighted a "long list of 'infractions' within an internal Uber presentation" that could result in Uber disciplining the drivers. *Id.* Critically, however, the district court did not address or explain why it disagreed with Plaintiffs' assertion that "Uber terminated drivers for more than 60 different infractions, 42 of which were specific to Uber's platform and exceeded local regulations." Pls.' FRCP 50(b) Mot. [ECF 344, July 1, 2024] at 11; *see* Pls.' Br. at 34. Examples of infractions listed by Plaintiffs that were specific to Uber's platform and had no analogue in the PPA's requirements were items such as "Inactivity on Uber App," "Uber profile missing documents," "Exceeding Uber's maximum cancellation rate," or "Falling below Uber's minimum average driver rating." ECF 344 at 12; Pls.' Br. at 34-35. The list of infractions that Plaintiffs referenced from an internal Uber document explained how drivers could be deactivated from Uber's platform for "[s]pecific types of negative feedback Uber tracks for each partner." App. 1471. This document underscored how the infractions met Uber's quality control and customer service needs, explaining that "[d]eactivating the accounts of the [drivers] who provide consistently poor experiences ensures that Uber continues to be known for quality. Making sure riders don't have bad experiences, we make sure there is more demand for … services." *Id.* at 1470. The list included in this document contained other types of infractions that were also not part of the PPA requirements,

including drivers asking for a rating and manipulating surge pricing. *Id.* at 1476. Another trial exhibit referenced by Plaintiffs was a communication from Uber to drivers stating that it was against Uber's policy for drivers to give personal business cards to riders and that drivers would be "deactivated permanently if they are caught doing this even once." App. 1298. This too was not a PPA requirement, and in fact, a PPA booklet for drivers advised them to hand out their business cards. App. 1653.

The district court's disregard for the additional requirements that Uber imposed was flatly inconsistent with the Department's rule—particularly because the "infractions" that went beyond the PPA's requirements appeared to serve Uber's own quality control and customer service needs. *See Rick's Cabaret*, 967 F. Supp. 2d at 916-18 (recognizing that the employer's requirements that went beyond legal compliance and instead helped achieve its business goal to be perceived as an "upscale club" were indicative of control and relevant to the economic reality analysis); *Ferguson*, 2021 WL 2349340, at *4 (similar analysis recognizing employer actions that went beyond insurance industry regulations and served employer's own business purposes).

Moreover, as the Department's rule explains, "the manner in which the employer chooses to implement [specific legal] obligations will be highly relevant to the analysis." 89 Fed. Reg. at 1,694. Here, the district court did not identify the

20

legal requirements it was assessing, nor did it assess how Uber chose to implement them.  The district court's error is evident in the way it framed its discussion.  It stated that it "must remove the vast majority of Uber's *quality control* measures from the economic reality equation" because the PPA "set [] *most* of the rules governing Plaintiffs' working environment."  2024 WL 3584324, at *10 (emphasis added).  By characterizing Uber's requirements as "quality control" measures yet nonetheless removing those actions from its analysis, the district court overlooked the Department's guidance to evaluate whether Uber implemented those requirements for the sole purpose of complying with specific legal obligations or to further Uber's own quality control measures.

Additionally, the district court broadly stated, without scrutiny, that it must "set aside many of the working condition requirements that Uber conveyed to drivers" because these "impermissible considerations" were "in actuality Uber's attempts to comply with local law."  2024 WL 3584324, at *10.  Effectively, the court declared that Uber's chosen means of complying with the law, i.e., choosing to monitor drivers' actions and to undertake disciplinary measures that could lead to termination, were required by the PPA's rules even though the PPA did not require such measures.  *See*, *e.g.*, 52 Pa. Code §§ 1051.8(a)-(c), 1057.10(e) (outlining requirements for businesses certified to provide black car/limousine service in Philadelphia, which include conducting annual criminal and driver

history checks, ensuring that all drivers have PPA certificates, and a "zero tolerance policy" for driving while under the influence of drugs or alcohol, but do not require continuous monitoring and discipline of drivers).  The district court's statement directly contradicts the Department's rule.  The Department has emphasized that control exerted by an employer "to achieve" compliance with legal obligations "may be relevant to the underlying analysis of whether the worker is economically dependent on the employer, particularly where the employer dictates and enforces the manner and circumstances of compliance."  89 Fed. Reg. at 1,694.  The court did not assess how Uber chose to implement such obligations, and thus failed to evaluate whether these were implemented in a manner that was indicative of control.

Likewise, the district court referenced Uber's "secondary background check" without detail and dismissed it as "perfunctory," 2024 WL 3584324, at *9, rather than evaluating whether this requirement may be a relevant form of control used to implement Uber's own compliance or quality control standards.  The 2024 Classification Rule explicitly highlights a background check example, noting that while a "criminal background check" may not be probative of control, a more extensive background check may be probative.  89 Fed. Reg. at 1,694.  The use of the term "secondary" itself indicates that Uber's requirement may be more extensive than what was required by a specific legal obligation and should have

been assessed by the court.  The district court similarly and erroneously dismissed Uber's "potentially more stringent" vehicle requirements—even though the court acknowledged that these requirements "may have been slightly more selective than what the PPA required"—as not being evidence relevant to the economic reality analysis, 2024 WL 3584324, at *9 n.7.  On the contrary, mandating what kind of vehicle a driver must use clearly has potential impacts on both the control and investment factors of the analysis.

In sum, the district court's analysis reflected a fundamental misunderstanding of the 2024 Classification Rule despite relying heavily on it. The district court ignored the plain language of the regulatory provision stating that the employer's requirements on the workers must be for the sole purpose of complying with specific legal obligations for the imposition of those requirements not to be indicative of control.  Moreover, it failed to grapple with the rule's further guidance that actions which serve the employer's own compliance methods, safety, quality control, or contractual or customer service standards (beyond what is required by legal obligations) may be indicative of control.  Thus, the district court erred in its interpretation and application of the 2024 rule's language concerning legal compliance as it relates to the control factor.

**B.** **The District Court Did Not Properly Consider that Compliance with Legal Obligations Is Only One Aspect of One Factor in a Multifactor Analysis.**

The district court further erred by failing to consider the full evidence of control when it ultimately determined that no reasonable jury could find that the control factor favored employee status for the drivers.  The degree to which an employer controls workers solely to comply with legal obligations is only one relevant consideration of control.  89 Fed. Reg. at 1,695.  Accordingly, any other actions taken by the employer (as well as actions that go beyond compliance with specific and applicable regulations, as discussed above) must still be considered when evaluating control.  Yet, after "remov[ing] the vast majority of Uber's quality control measures" from consideration, the district court largely ended its evaluation of control and rested on what it viewed as the "worker flexibility inherent to app-based ridesharing platforms" and the drivers' "complete autonomy over their schedules."  2024 WL 3584324, at *10 (internal quotations marks omitted).  The district court should have instead considered the full evidence of Uber's control over the drivers.

For example, this Court previously noted in this case that:  Uber routed a ride request to the closest driver and gave that driver 15 seconds to accept the request and deemed it rejected if the driver did not respond; if the driver ignored three trip requests in a row, Uber automatically put the driver offline so that the

driver could not accept additional requests; Uber did not permit a driver to know the rider's destination before accepting the ride; Uber set the financial terms of all fares, including charging and collecting from the rider, threatening drivers with deactivation if they solicited payment of fares on their own, taking a portion of the fare, and then distributing payment to the driver; Uber logged off drivers for six hours if they reached Uber's 12-hour driving limit; and Uber imposed a rating system on the drivers and deactivated drivers who fell short of a 4.7 rating. *Razak*, 951 F.3d at 140-41, 146. Indeed, in rejecting Uber's arguments following the first trial that the control factor favored independent contractor status, the district court emphasized Uber's "rating system for drivers" and concluded that Uber "heavily monitored those ratings and consistently warned drivers with low ratings about the potential for deactivation." 2024 WL 2831805, at *15.

Thus, even if the district court properly did not consider certain actions that it believed Uber took to comply with applicable PPA requirements, Uber took numerous other actions unrelated to legal compliance indicating control over the drivers that the district court failed to consider and that contradict the one aspect that the district court did consider—drivers' autonomy over their schedules. By narrowing its evaluation of control to considering the import of the PPA requirements and the drivers' autonomy over their schedules, the district court failed to address other evidence of Uber's control. The district court's cursory

review stands in stark contrast to the broad and thorough inquiry into control that this Court undertook when this case was previously before it. *Razak*, 951 F.3d at 145-46; *see Hopkins*, 545 F.3d at 343-44 (fully considering the employer's actions that could constitute control and finding that the control factor favored employee status even though the employer contended that it "exerted little control beyond what insurance-industry regulations required").

Moreover, the district court's decision following the second trial to grant Uber's FRCP 50(b) motion that the drivers were independent contractors based almost entirely on its "revisiting" whether certain actions taken by Uber were to comply with PPA requirements, 2024 WL 3584324, at *9-10, runs counter to this Court's longstanding principles for determining employee status under the FLSA. As this Court explained in this case previously, "courts should examine the circumstances of the whole activity" and determine "whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service," and "neither the presence nor absence of any particular factor is dispositive." 951 F.3d at 143 (citing *DialAmerica*, 757 F.2d at 1382) (internal quotation marks omitted). The district court, however, concluded that the drivers' "complete autonomy over their schedules" and the PPA's setting "most of [the] rules governing [their] working environment" meant that a reasonable jury could not find for the drivers. 2024 WL 3584324, at *10. In other words, those

26

conclusions (which were deficient at least as to the analysis of the PPA rules, as discussed) determined the district court's decision and were dispositive here rather than being part of an evaluation of the totality of the economic realities of the drivers' relationship with Uber and whether they were economically dependent on Uber, as required by this Court.

Finally, the district court's assertion that, "even if [it] were to look to those other factors" in addition to control (which analysis the district court should have taken without any such equivocation), those factors would "only further cement" its ruling that the drivers were independent contractors, 2024 WL 3584324, at *10-11, does not hold water.  In denying the parties' FRCP 50(b) motions after the first trial, the district court determined that the factors other than control demonstrated a "pattern of contrasting evidence for each economic reality … factor" and "could support a reasonable jury finding" for either party.  2024 WL 2831805, at *16-17. The district court discussed, for example, the opportunity for profit or loss and degree of permanence factors and explained how the evidence relating to each factor could support either party.  *Id.* at *16.  Yet, after the second trial, the district court reached the opposite conclusion on these factors without identifying evidence that was different from the first trial and supported only by a brief discussion of a few facts that the drivers did not dispute as opposed to discussions of the totality of

the evidence.  2024 WL 3584324, at *10.[2]

In sum, the district court's analysis of the factors other than control failed to account for the totality of evidence relevant to those factors as required by this Court and was directly contrary to this Court's prior ruling on the special skills factor.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision granting FRCP 50(b) relief to Uber.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

RACHEL GOLDBERG
Counsel for Appellate Litigation

MELISSA ANN MURPHY
Senior Attorney

U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, NW
Room N-2716
Washington, DC  20210
(202) 693-5555
murphy.melissa@dol.gov

---

[2] Additionally, although this Court had already ruled that the special skills factor "certainly weighs in favor of finding that Plaintiffs are employees," 951 F.3d at 147, the district court nonetheless asserted that the drivers' "own trial strategy cast[] significant doubt on the notion that being [an Uber driver] requires nothing more than 'driving,'" meaning that this factor did not weigh in favor of employee status in the district court's view, 2024 WL 3584324, at *10.

## CERTIFICATIONS OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Local Appellate Rule 31.1(c), I certify that:

(1)  as a federal government attorney, I am exempt from the requirement to be a member of the bar of the United States Court of Appeals for the Third Circuit;

(2)  the foregoing brief was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font;

(3)  the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,398 words, excluding the items listed in Federal Rule of Appellate Procedure 32(f);

(4)  the text of the electronic brief is identical to the text in the paper copies of the brief being submitted; and

(5)  the electronic version of this brief has been virus scanned using Microsoft Defender Antivirus (last updated May 24, 2024), and no virus was detected.


/s/ Melissa Ann Murphy
MELISSA ANN MURPHY

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Melissa Ann Murphy
MELISSA ANN MURPHY
Senior Attorney
U.S. Department of Labor
Office of the Solicitor
Fair Labor Standards Division
200 Constitution Avenue, NW
Room N-2716
Washington, DC  20210
202-693-5559
murphy.melissa@dol.gov
