**No. 24-2638**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD,
*Plaintiffs - Appellants,*

v.

UBER TECHNOLOGIES, INC. and GEGEN LLC,
*Defendants - Appellees.*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 2:16-cv-00573-MMB

**BRIEF OF DEFENDANTS - APPELLEES
UBER TECHNOLOGIES, INC. AND GEGEN LLC**

Paul C. Lantis (PA 309240)
  PLantis@littler.com
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102-1321
(267) 402-3073

Andrew M. Spurchise (NY 5360847)
  ASpurchise@littler.com
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY 10022
(212) 583-2684

Robert W. Pritchard (PA 76979)
  RPritchard@littler.com
Christian A. Angotti (PA 322881)
  CAngotti@littler.com
LITTLER MENDELSON, P.C.
One PPG Place, Suite 2400
Pittsburgh, PA 15222
(412) 201-7628

*Counsel for Defendants - Appellees*

# **TABLE OF CONTENTS**

**Page**

I.   COUNTERSTATEMENT OF THE CASE ...................................................1

　A.   Appellants' Transportation Businesses ................................1

　B.   Procedural History........................................................................1

II.   SUMMARY OF THE ARGUMENT ............................................................4

　A.   The District Court Properly Recognized that the Tests for Determining a Worker's Status Under the PMWA and WPCL Are Aligned with the FLSA Test. ...........................................................4

　B.   The District Court Properly Dismissed Appellants' Claims as Futile...........................................................................................5

　C.   The District Court Properly Granted Uber's Motion for Judgment as a Matter of Law. ...............................................................5

　D.   The District Court Properly Assigned Appellants the Burden of Proof. ...........................................................................................6

III.   ARGUMENT........................................................................................................6

　A.   The Tests for Determining a Worker's Status Under the PMWA and WPCL Are Aligned with the FLSA Test. .....................................6

　　1.   The law of the case doctrine prohibits Appellants from relitigating the standard for determining a worker's status under the PMWA and WPCL. ...................................................7

　　2.   Appellants waived their right to argue that Pennsylvania law imposes a different test for employee classification. ..........8

　　3.   Pennsylvania law is aligned with the FLSA with respect to the test to apply in ascertaining a worker's status. ...............9

　　　a.   The PMWA's definition of "employee" tracks the FLSA's definition in all material respects.......................9

b.      Courts routinely apply the FLSA's economic realities test to PMWA and WPCL claims. ................... 12

c.      Cases cited by Appellants involved clear differences between the text of the federal and state laws. ........................................................................ 13

d.      Different laws in New Jersey and California are not relevant to applicable test in Pennsylvania. ............ 17

e.      The Pennsylvania General Assembly did not "intend" to adopt an "ABC" test. .................................. 19

4.     This Court should not certify the issue to the Pennsylvania Supreme Court. ................................... 21

a.      Certification is prohibited by Rule 3341 of the Pennsylvania Rules of Appellate Procedure ................. 21

b.      Appellants' policy arguments should be directed to the General Assembly, not the Court. ........................... 23

B.     The District Court Properly Dismissed Appellants' Claims Once It Became "Foreseeable" They Could Not Prevail. .................. 24

1.     The District Court has inherent authority to dismiss an action with prejudice in appropriate cases. .............................. 25

2.     The District Court need not find "improper conduct" before dismissing an action. ...................................................... 27

3.     The District Court appropriately concluded that further trials would be futile. ................................................................. 29

4.     The District Court appropriately considered less drastic measures. ................................................................................... 31

a.      A third trial is not a viable alternative to dismissal when that dismissal is justified based upon the futility of a third trial. ..................................................... 32

b.    A Rule 52 proceeding is not a viable alternative to dismissal, and it would have yielded the same result. ..............................................................33

C.    The District Court Properly Granted Uber's Motion for Judgment as a Matter of Law Pursuant to Rule 50(b)........................37

1.    The "degree of control" factor favors independent contractor status. ......................................................39

a.    Most proffered examples of alleged "control" involved compliance with legal requirements. ..............41

b.    Appellants' other examples of "control" involved reasonable parameters and expectations.......................46

2.    The "opportunity for profit or loss" factor favors independent contractor status..................................................50

3.    The "investment" factor favors independent contractor status..........................................................................54

4.    The "special skill" factor favors independent contractor status..........................................................................56

5.    The "degree of permanence" factor favors independent contractor status. ......................................................58

6.    The "integral part" factor favors independent contractor status..........................................................................60

D.    Appellants Had the Burden of Proof. ...............................................62

1.    Appellants had the burden of proving employment status under the FLSA. .......................................................62

2.    Appellants had the burden of proving employment status under the PMWA. ...................................................63

IV.    CONCLUSION..............................................................................................64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Alberty-Vélez v. Corp. de Puerto Rico Para La Difusión Pública*,
  361 F.3d 1 (1st Cir. 2004).................................................................38

*Ohio v. American Express Co.*,
  585 U.S. 529 (2018).................................................................60

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946).................................................................63

*Bayada Nurses, Inc. v. Commonwealth, Dep't of Labor & Industry*,
  8 A.3d 866, 882 (Pa. 2010).................................................15

*Beazer E., Inc. v. Mead Corp.*,
  525 F.3d 255 (3d Cir. 2008) .................................................9

*Bellevue Drug Co. v. CaremarksPCS*,
  582 F.3d 432 (3d Cir. 2009) .................................................7

*Brennan v. Sand Products, Inc.*,
  371 F.Supp. 236 (W.D. Okla. 1973).......................................51

*Brown & Root Braun, Inc. v. Bogan Inc.*,
  54 F.App'x 542 (3d Cir. 2002) .............................................22

*Carpenter v. Pepperidge Farm, Inc.*,
  2023 U.S. Dist. LEXIS 121210 (E.D. Pa. July 14, 2023),
  *aff'd* 2024 U.S. App. LEXIS 11409 (3d Cir. May 10, 2024) .....................*passim*

*Carr v. Flowers Foods, Inc.*,
  2019 U.S. Dist. LEXIS 77541 (E.D. Pa. May 7, 2019).....................12

*Casey v. Planned Parenthood of Se. Pa.*,
  14 F.3d 848 (3d Cir. 1994) ...................................................7

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)...............................................................25

*Chao v. Mid-Atl. Installation Servs., Inc.*,
  16 F.App'x 104 (4th Cir. 2001) .................................................................42, 46

*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988) .........................................................................................7

*Coulter v. Bissoon*,
  2017 U.S. Dist. LEXIS 103585 (W.D. Pa. July 5, 2017) ...............................25

*Crump v. HF3 Constr., Inc.*,
  2016 U.S. Dist. LEXIS 164027 (E.D. Pa. Nov. 29, 2016) ..............................12

*Dawson v. Smith*,
  2020 U.S. Dist. LEXIS 1050 (D. Del. Jan. 3, 2020) .......................................25

*DeMarco v. FarmaceuticalRX, LLC*,
  2023 U.S. Dist. LEXIS 40216 (W.D. Pa. Mar. 7, 2023) .................................12

*Dep't of Labor & Industry v. Stuber*,
  822 A.2d 870 (Pa. Commw. Ct. 2003),
  *aff'd* 859 A.2d 1253 (Pa. 2004) ...............................................................*passim*

*Derolf v. Risinger Bros. Transfer, Inc.*,
  259 F.Supp.3d 876 (C.D. Ill. 2017) ................................................................58

*Dietz v. Bouldin*,
  579 U.S. 40 (2016) ..........................................................................................25

*Donovan v. DialAmerica Marketing, Inc.*,
  757 F.2d 1376 (3d Cir. 1985) ...................................................................*passim*

*Drippe v. Tobelinski*,
  604 F.3d 778 (3d Cir. 2010) ...........................................................................33

*Eash v. Riggins Trucking Inc.*,
  757 F.2d 557 (3d Cir. 1985) ...........................................................................27

*Espinoza v. Atlas R.R. Constr., LLC*,
  657 F.App'x 101 (3d Cir. 2016) ................................................................14, 17

*Estate of Accurso v. Infra-Red Servs., Inc.*,
  805 F.App'x 95 (3d Cir. 2020) ........................................................................13

*Freund v. Hi-Tech Satellite, Inc.*,
185 F.App'x 782 (11th Cir. 2006) ................................................51, 53

*Commonwealth v. Garrison*,
386 A.2d 971 (Pa. 1978) ..........................................................11, 14

*GN Netcom, Inc. v. Plantronics, Inc.*,
930 F.3d 76 (3d Cir. 2019) ...............................................................34

*Goldberg v. Warren Bros. Roads Co.*,
207 F.Supp. 99 (D. Me. 1962) .........................................................51

*Goldberg v. Whitaker House Co-op., Inc.*,
366 U.S. 28 (1961) ...........................................................................59

*Green v. Concord Baptist Church*,
313 F.App'x 335 (1st Cir. 2009) .......................................................29

*Green v. Golla Ctr. for Plastic Surgery, P.C.*,
2019 U.S. Dist. LEXIS 36997 (W.D. Pa. Mar. 7, 2019) ...................55

*Hart v. Rick's Cabaret Int'l, Inc.*,
967 F.Supp.2d 901 (S.D.N.Y. 2013) ................................................41

*Heimbach v. Amazon.com, Inc.*,
255 A.3d 191 (Pa. 2021) ...............................................14, 15, 16, 20

*Heimbach v. Amazon.com, Inc.*,
942 F.3d 297 (6th Cir. 2019) ...........................................................21

*Iontchev v. AAA Cab Serv., Inc.*,
685 F.App'x 548 (9th Cir. 2017) ......................................................42

*Katz v. Feldman*,
2019 U.S. Dist. LEXIS 8845 (D. Del. Jan. 18, 2019) .......................25

*Landis v. North Am. Co.*,
299 U.S. 248 (1936) .........................................................................25

*Lee v. Krieg*,
227 F.App'x 146 (3d Cir. 2007) ........................................................25

*Link v. Wabash R. Co.*,
    370 U.S. 626 (1962) ................................................................26, 28

*Lorillard v. Pons*,
    434 U.S. 575 (1978) .........................................................................35

*Lowman v. Unemployment Comp. Board of Review*,
    235 A.3d 278 (Pa. 2020) ................................................................16

*Martin v. Selker Bros.*,
    949 F.2d 1286 (3d Cir. 1991) .......................................................35

*Moreau v. Air France*,
    356 F.3d 942 (9th Cir. 2003) .......................................................41

*In re NFL Players' Concussion Injury Litig.*,
    962 F.3d 94 (3d Cir. 2020) ...........................................................27

*In re Nutraquest, Inc.*,
    434 F.3d 639 (3d Cir. 2006) .........................................................27

*Parrish v. Premier Directional Drilling, L.P.*,
    917 F.3d 369 (5th Cir. 2019) .......................................................41

*Pendleton v. JEVS Human Servs.*,
    463 F.Supp.3d 548 (E.D. Pa. 2020) ...................................12, 41, 59

*Prevot v. Prevot*,
    59 F.3d 556 (6th Cir. 1995) ..........................................................26

*Raiczyk v. Ocean Cnty. Veterinary Hosp.*,
    377 F.3d 266 (3d Cir. 2004) .........................................................38

*Razak v. Uber Techs., Inc.*,
    951 F.3d 137 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020) ........................2

*Safarian v. Am. DG Energy, Inc.*,
    729 F.App'x 168 (3d Cir. 2018) ...................................................55

*Saleem v. Corp. Transp. Group, Ltd.*,
    854 F.3d 131 (2d Cir. 2017) .........................................42, 47, 51, 61

*Scantland v. Jeffrey Knight, Inc.*,
   721 F.3d 1308 (11th Cir. 2013) ...........................................................43

*Singh v. Uber Techs., Inc.*,
   67 F.4th 550 (3d Cir. 2023) ..................................................................9

*Smith v. Effluent Retrieval Servs., Inc.*,
   2016 U.S. Dist. LEXIS 145994 (E.D. Pa. Oct. 21, 2016) ...................51

*Speeney v. Rutgers*,
   369 F.App'x 357 (3d Cir. 2010) ............................................................7

*Talarico v. Pub. Partnerships, LLC*,
   837 F.App'x 81 (3d Cir. 2020) ......................................................12, 13

*Thibault v. Bellsouth Telecomms., Inc.*,
   612 F.3d 843 (5th Cir. 2010) ...............................................................51

*UA Theatre Circuit, Inc. v. Twp. of Warrington*,
   316 F.3d 392 (3d Cir. 2003) ................................................................56

*Verma v. 3001 Castor, Inc.*,
   937 F.3d 221 (3d Cir. 2019) ........................................................*passim*

*Walsh v. Alpha & Omega USA, Inc.*,
   39 F.4th 1078 (8th Cir. 2022) ..............................................................53

*Ward v. Flagship Credit Acceptance, LLC*,
   2020 U.S. Dist. LEXIS 209981 (E.D. Pa. Nov. 10, 2020) ................25

*Williams v. Jani-King of Phila. Inc.*,
   837 F.3d 314 (3d Cir. 2016) .....................................................21, 38, 41

*Yu v. McGrath*,
   597 F.App'x 62 (3d Cir. 2014) ............................................................38

**Statutes**

43 P.S. § 333.103 .................................................................................10, 11

43 P.S. § 333.105 .......................................................................................20

29 U.S.C. §§ 206-07...................................................................................62

29 U.S.C. § 213 ....................................................................62, 63

New Jersey Wage and Hour Law....................................................17, 18

New Jersey Wage Payment Law.....................................................17, 18

Pennsylvania Wage Payment and Collection Law ...........................*passim*

Pub.L. 89-601 (Sept. 23, 1966).............................................................19

**Other Authorities**

29 C.F.R. § 795.110 ........................................................................42, 54

86 Fed. Reg. 1168 (Jan. 7, 2021) .....................................................42, 43

89 Fed. Reg. 1638 (Jan. 10, 2024) ...................................20, 42, 58, 61

52 Pa. Code § 1011.9 .............................................................................44

52 Pa. Code § 1017.3 .............................................................................44

52 Pa. Code § 1017.7 .............................................................................45

52 Pa. Code § 1021.11 .....................................................................44, 45

52 Pa. Code § 1021.12 ...........................................................................45

52 Pa. Code § 1021.16 ...........................................................................45

52 Pa. Code § 1051.8 .............................................................................44

52 Pa. Code § 1053.22 ...........................................................................45

52 Pa. Code § 1055.3 .............................................................................44

52 Pa. Code § 1055.4 .............................................................................44

52 Pa. Code § 1055.6 .............................................................................45

52 Pa. Code § 1057.4 .............................................................................44

52 Pa. Code § 1057.5 .............................................................................44

52 Pa. Code § 1057.10 .....................................................................44, 45

3d Cir. L.A.R. 110.1 ................................................................................. 21

Fed.R.Civ.P. 1 ......................................................................................... 26

Fed.R.Civ.P. 38 ....................................................................................... 34

Fed.R.Civ.P. 39 ....................................................................................... 35

Fed.R.Civ.P. 50 ........................................................................ 33, 34, 37, 38

Fed.R.Civ.P. 52 ............................................................................... *passim*

Fed.R.Civ.P. 58 .................................................................................. 34, 36

Pa.R.App.P. 3341 ............................................................................... 21, 22

## I.   COUNTERSTATEMENT OF THE CASE

### A.   Appellants' Transportation Businesses

Appellants formed and operated their own luxury black car transportation businesses. Appellants generated revenue for their businesses in a variety of ways, including advertising online, obtaining referrals from other limousine services, developing relationships with hotels to provide guest transportation, negotiating special rates for regular customers, investing in multiple vehicles and leasing them to others, and engaging drivers and helpers. In addition, Appellants chose to contract with Uber Technologies, Inc. to obtain access to Uber's proprietary technology platform (the "Uber App") so that they could receive requests from individuals who used the Uber App to request black car transportation services. Appellants had discretion to operate their businesses as they saw fit, including making decisions about: (a) whether, when, where, and how often to utilize the Uber App; (b) whether to accept trip requests they received on the Uber App (and, if accepted, whether to cancel them); and (c) the extent to which they would generate revenue for their businesses from sources outside the Uber App.

### B.   Procedural History

Appellants commenced this action on January 6, 2016. (ECF 1). In their complaint, Appellants alleged that they were misclassified as "independent contractors" and that they should have been classified as Uber's "employees"

under the Fair Labor Standards Act (FLSA), Pennsylvania Minimum Wage Act (PMWA), and Pennsylvania Wage Payment and Collection Law (WPCL). (*Id.*).

On April 11, 2018, the District Court granted Uber's motion for summary judgment. (A67-104). The District Court determined the majority of the "economic realities" factors used to ascertain a worker's status (as well as the "totality of the circumstances") favored independent contractor status. (*Id.* at A80-81, citing *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376 (3d Cir. 1985)). Among others, those circumstances included that Appellants could hire sub-contractors, work for competitors, and determine their own hours. (*Id.* at A92-104). The District Court concluded, "[Appellants] have not brought to the record sufficient proof to meet their burden of showing that they are employees." (*Id.* at A104).

This Court reversed, finding that genuine disputes of material fact precluded summary judgment. (A108, *Razak v. Uber Techs., Inc.*, 951 F.3d 137 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020)). This Court explained, "where there are genuine questions of material fact that need resolution, these questions must go to a fact-finder." (A121-122, A129-130). On remand, Appellants presented their evidence to a fact-finder. Twice.

After the first trial, the jury announced they were deadlocked. Then, at Appellants' urging (*e.g.*, ECF 262, Appellants' Brief Regarding Jury Deliberations), the District Court gave the jury a supplemental verdict form with

instructions to vote (without requiring unanimity) on each of the "economic realities" factors. A clear six-to-two majority found that Appellants were independent contractors. (A524-529, Supplemental Verdict Form).

The second trial similarly ended with a hung jury. After the jury announced they were deadlocked, the District Court provided them with a different supplemental verdict form, asking them to try to reach unanimous agreement on as many of the "economic realities" factors as possible. While the jury was not able to reach unanimity as to most factors, they unanimously found that five factors "somewhat" favored independent contractor status and that nine were neutral (thus favoring Uber considering that Appellants bore the burden of proof), while finding that only two factors "somewhat" favored employee status. (A1074-1080, Supplemental Verdict Form).

Uber filed a post-trial motion for judgment as a matter of law. (ECF 342). Uber also filed a motion for mistrial, asking the District Court to exercise its inherent authority to dismiss the action with prejudice. (ECF 343). The District Court granted both motions and dismissed the action with prejudice. (A4). This appeal followed.

## II.    SUMMARY OF THE ARGUMENT

### A.    The District Court Properly Recognized that the Tests for Determining a Worker's Status Under the PMWA and WPCL Are Aligned with the FLSA Test.

Appellants argue that their PMWA and WPCL claims should be subject to the so-called "ABC" test (or some other test materially different from the FLSA's "economic realities" test). Appellants are mistaken.

First, Appellants' argument is foreclosed by the law of the case and waiver. In the prior appeal, this Court held (with Appellants' acquiescence) that the FLSA's economic realities test guides the analysis of Appellants' claims under Pennsylvania law.

Second, the PMWA contains the same definition of "employee" found in the FLSA, and courts have long applied a multi-factor test similar to the FLSA test under the WPCL. Appellants' argument that their state law claims should be subject to the "ABC" test ignores the history of the PMWA and WPCL, as well as established principles of statutory construction.

Third, Appellants' request that this Court petition the Pennsylvania Supreme Court to accept certification of the issue of what test applies to their PMWA and WPCL claims is improper. Appellants' request would require this Court to disregard the Pennsylvania Rules of Appellate Procedure, which only allow certification on questions of law that the petitioning court has not previously

decided. This Court already decided (both in this case and elsewhere) what test applies to PMWA and WPCL claims.

### B. The District Court Properly Dismissed Appellants' Claims as Futile.

Appellants' second argument is that the District Court lacked authority to dismiss the action once it recognized that further proceedings would not result in a different outcome. Appellants are wrong. The District Court's inherent authority to manage its docket extends to its power to dismiss claims, and a finding of "improper conduct" is not a prerequisite to dismissing a civil action. The District Court was in the best position to ascertain that further retrials would be futile; indeed, even Appellants conceded that a hung jury in the second trial was "foreseeable." The District Court appropriately considered less drastic measures before exercising its inherent authority to manage its docket and dismiss the action.

### C. The District Court Properly Granted Uber's Motion for Judgment as a Matter of Law.

Appellants' third argument is that they (and not Uber) should have been granted judgment as a matter of law. Appellants are mistaken. The District Court carefully considered the evidence presented at the second trial and applied the correct legal test for ascertaining a worker's status. Based on the evidence presented at the second trial, a reasonable jury would not have had a legally sufficient evidentiary basis to find for Appellants.

**D.    The District Court Properly Assigned Appellants the Burden of Proof.**

Appellants' final argument is that the District Court should have assigned to Uber the burden of proving that Appellants were properly classified as independent contractors. Appellants cite *no authority* for this baseless position. As the plaintiffs in this civil action, Appellants carried the burden to prove—by a preponderance of the evidence and to a unanimous jury—that they were Uber's employees under the FLSA, PMWA, and WPCL. Plaintiffs failed to meet their burden. Twice.

## III.   ARGUMENT

**A.    The Tests for Determining a Worker's Status Under the PMWA and WPCL Are Aligned with the FLSA Test.**

Appellants argue that the PMWA and WPCL apply a "different standard" than the FLSA in determining a worker's status. (Appellants' Brief, Doc. 19, at 3). In the alternative, Appellants ask this Court to certify to the Pennsylvania Supreme Court the question of what test should be applied to determine a worker's status under the PMWA and WPCL. (*Id.*). Appellants' argument is without merit, and this Court should deny their request to certify the issue to the Pennsylvania Supreme Court.

1. **The law of the case doctrine prohibits Appellants from relitigating the standard for determining a worker's status under the PMWA and WPCL.**

The law of the case doctrine compels rejection of Appellants' argument that the tests for determining a worker's status under the PMWA and WPCL are materially different from the FLSA test. The doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Speeney v. Rutgers*, 369 F.App'x 357, 359 (3d Cir. 2010) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). The doctrine helps "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Bellevue Drug Co. v. CaremarksPCS*, 582 F.3d 432, 439 (3d Cir. 2009) (quoting *Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 856 (3d Cir. 1994)).

In the prior appeal, this Court applied the FLSA's economic realities test to its assessment of Appellants' state law claims, holding that "Pennsylvania state courts have looked to federal law regarding the FLSA for guidance in applying the PMWA." (A116). This Court's ruling that the FLSA's economic realities test guides the assessment of a worker's status under Pennsylvania law has long been the law of the case. It is too late for Appellants to relitigate an issue this Court already resolved.

7

### 2.    Appellants waived their right to argue that Pennsylvania law imposes a different test for employee classification.

As Uber explained in its motion for summary judgment, the tests for ascertaining a worker's status under the PMWA and WPCL are aligned with the FLSA test. (ECF 114-2 at 5 n.2). In response, Appellants conceded that "the test presently utilized in the Third Circuit for assessing whether UberBlack drivers are Uber's employees is termed the 'economic realities' test." (ECF 117 at 4). Appellants observed, however, that a few *other* state courts (not in Pennsylvania) utilized the "ABC" test in their states, and they encouraged the District Court to apply the "ABC" test to their Pennsylvania claims. (*Id*. at 6). The District Court declined Appellants' invitation, holding that "Pennsylvania courts look to federal case law [regarding the FLSA] and the tests employed by the federal courts to determine if a defendant is an employer under the PMWA." (A79-80).

In their first appeal, Appellants waived their argument that Pennsylvania law imposes a different standard for determining a worker's status, conceding that "[i]n applying the state laws [specifically, the PMWA and WPCL], Pennsylvania courts consider cases addressing the FLSA's definition of employee to be persuasive authority." (Appellants' Brief in Case 18-1944, at 21). Appellants even acquiesced to the District Court's determination that "Pennsylvania law ... mirrors the FLSA's definition of who is an employee." (*Id.* at 15). Critically, Appellants did not ask this Court to apply the "ABC" test to their Pennsylvania law claims during their

first appeal. Appellants' waiver of this issue in their first appeal precludes them from pursuing it in their second appeal. *See Singh v. Uber Techs., Inc.*, 67 F.4th 550, 563 (3d Cir. 2023) ("where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand"); *cf. Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 263 (3d Cir. 2008) ("any issue that could have been but was not raised on appeal is waived").

### 3. Pennsylvania law is aligned with the FLSA with respect to the test to apply in ascertaining a worker's status.

Even if the law of the case and waiver did not preclude Appellants from asking this Court to apply the "ABC" test to their state law claims, Appellants' argument fails on the merits. Consistent with longstanding principles of statutory interpretation and well-settled precedent, the District Court correctly held that the FLSA's economic realities test guides the assessment of Appellants' state law claims.

### a. The PMWA's definition of "employee" tracks the FLSA's definition in all material respects.

In an *amicus* brief, the former Attorney General of the Commonwealth of Pennsylvania insists that "the language of the PMWA is 'materially distinct' from that of the FLSA." (Pa. AG Brief, Doc. 30, at 13). The former Attorney General is wrong. The PMWA's definitions of "employee" and "employer" are aligned with the FLSA's definitions in all material respects.

The Commonwealth Court recognized long ago that the definition of "employee" in the PMWA is "virtually identical" to the FLSA definition. *Dep't of Labor & Industry v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd* 859 A.2d 1253 (Pa. 2004). The former Attorney General insists, however, that the PMWA and FLSA materially differ in their definitions of "employee." (Pa. AG Brief at 10-11). A side-by-side comparison of the two definitions belies this argument:

| FLSA<br>29 U.S.C. § 203(e) | PMWA<br>43 P.S. § 333.103(h) |
|---|---|
| (1) Except as provided in paragraphs (2), (3), and (4), the term "employee" means **any individual employed by an employer**.<br>(2) In the case of an individual employed by a public agency, such term means....<br>(3) ... such term does not include any individual employed by an employer engaged in agriculture ....<br>(4) ... "employee" does not include any individual who volunteers to perform services for a public agency .... | "Employe[e]" includes **any individual employed by an employer**. |

At their core, the FLSA and PMWA both define the term "employee" identically, as "any individual employed by an employer." The only difference is that the FLSA includes certain exceptions (*e.g.*, work for a public agency or in agriculture) which are not relevant here.

Similarly, the former Attorney General argues that the PMWA and FLSA differ in their definitions of "employer." (Pa. AG Brief at 10). Once again, a comparison of the two definitions refutes that argument:

| FLSA 29 U.S.C. § 203(d) | PMWA 43 P.S. § 333.103(g) |
| --- | --- |
| "Employer" includes any **person** [defined in section (a) as "an **individual, partnership, association, corporation, business trust**, legal representative, or any organized **group of persons**"] **acting directly or indirectly in the interest of an employer in relation to an employee** and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization. | "Employer" includes any **individual, partnership, association, corporation, business trust, or any person or group of persons acting, directly or indirectly, in the interest of an employer in relation to any employe[e]**. |

The FLSA and PMWA definitions of "employer" are virtually identical (with the only difference being that the FLSA includes an exception for labor organizations).

Where, as here, state law tracks the language of a preexisting federal statute in all material respects, federal authority guides the meaning of the state law. *Commonwealth v. Garrison*, 386 A.2d 971, 976 n.5 (Pa. 1978) ("Because the federal statute is identical in all material respects to the Pennsylvania … statute, this Court looks to federal decisions for guidance in interpreting [the Pennsylvania statute]."); *Stuber*, 822 A.2d at 873 (applying the FLSA's economic realities test to the plaintiff's PMWA claim due to the "virtually identical" definitions).

### b.    Courts routinely apply the FLSA's economic realities test to PMWA and WPCL claims.

This Court was correct when it held, in the prior appeal, that the FLSA's economic realities test guides the PMWA and WPCL. There is no proper basis to upend that decision now. Unsurprisingly, Appellants do not identify any authority applying their proposed "ABC" test (or other variant) to the PMWA or WPCL. Courts have uniformly applied the FLSA's economic realities test to claims under the PMWA—including in this case. (A116-17, applying economic realities test because "Pennsylvania state courts have looked to federal law regarding the FLSA for guidance in applying the PMWA"). *See*, *e.g.*, *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019) (holding that Pennsylvania courts use the same test under the PMWA as the FLSA); *Talarico v. Pub. Partnerships, LLC*, 837 F.App'x 81, 84 n.1 (3d Cir. 2020) (same); *DeMarco v. FarmaceuticalRX, LLC*, 2023 U.S. Dist. LEXIS 40216, at *6 (W.D. Pa. Mar. 7, 2023) (same); *Pendleton v. JEVS Human Servs.*, 463 F.Supp.3d 548, 559 n.22 (E.D. Pa. 2020) (same); *Crump v. HF3 Constr., Inc.*, 2016 U.S. Dist. LEXIS 164027, at *7 (E.D. Pa. Nov. 29, 2016) (same); *Carr v. Flowers Foods, Inc.*, 2019 U.S. Dist. LEXIS 77541, at *42 (E.D. Pa. May 7, 2019) (same).

As for the WPCL (which does not define "employee"), Appellants conceded (correctly) that "Pennsylvania courts have looked to the Workers' Compensation Act" for the appropriate standard to be used in determining a worker's status. (ECF

151, Appellants' Motion re Jury Instructions, at 9 n.7). Because the Workers' Compensation Act embodies a similar multi-factor classification test to the FLSA's economic realities test, courts have consistently applied the same basic analysis in evaluating WPCL claims. *See*, *e.g.*, *Talarico*, 837 F.App'x at 84 n.1 ("Our analysis with respect to the FLSA thus also applies to whether [defendant] is a joint employer under the … Pennsylvania Wage Payment and Collection Law."); *Carpenter v. Pepperidge Farm, Inc.*, 2023 U.S. Dist. LEXIS 121210, at *8 (E.D. Pa. July 14, 2023) ("although the employee/independent contractor analysis under the [FLSA] 'differs somewhat' from the WPCL analysis, FLSA cases are 'informative' in this area") (quoting *Estate of Accurso v. Infra-Red Servs., Inc.*, 805 F.App'x 95, 101 n.3 (3d Cir. 2020)), *aff'd* 2024 U.S. App. LEXIS 11409 (3d Cir. May 10, 2024).

### c.    Cases cited by Appellants involved clear differences between the text of the federal and state laws.

In an attempt to persuade this Court that the PMWA and WPCL deviate from the FLSA with respect to the standard for determining a worker's status, Appellants point to a few decisions in distinguishable contexts where the text of the Pennsylvania law expressly deviated from federal law. (Appellants' Brief at 9, 14, 16, 18-19). Those cases support only the unremarkable proposition that federal law and state law sometimes diverge. None of them call into question the principle that when the text of a Pennsylvania law "substantially parallels" its federal

13

counterpart, the federal standard guides the analysis. *Espinoza v. Atlas R.R. Constr., LLC*, 657 F.App'x 101, 110 (3d Cir. 2016); *Garrison*, 386 A.2d at 976 n.5.

For example, Appellants and their *amici* cite a case in which the Pennsylvania Supreme Court held that time undergoing security screening constitutes "hours worked" under the PMWA, even though such activity is not compensable under the FLSA. *Heimbach v. Amazon.com, Inc.*, 255 A.3d 191 (Pa. 2021). The *Heimbach* Court explained that post-shift security screenings are not compensable under the FLSA because when Congress enacted the Portal-to-Portal Act of 1947, it excluded such "postliminary" activities from compensability. *Id.* at 202. Since Pennsylvania did not incorporate the Portal Act into the PMWA (and, instead, because the definition of "hours worked" under the PMWA mirrors the pre-Portal Act federal definition), the analysis of compensable "hours worked" under Pennsylvania law would not be guided by the Portal Act. *Id.* Here, in contrast to *Heimbach*, the General Assembly incorporated the FLSA's definition of "employee" directly into the PMWA, indicating its intent to align with the FLSA on that issue.

Similarly, in *Chevalier v. General Nutrition Centers, Inc.*, the Pennsylvania Supreme Court concluded that overtime regulations adopted by the Pennsylvania Department of Labor & Industry (PADOL) did not authorize so-called "fluctuating

workweek" compensation arrangements, which are allowed under the FLSA. 220 A.3d 1038, 1059 (Pa. 2019). In a "fluctuating workweek" arrangement, the additional overtime premium for salaried nonexempt employees is calculated at 0.5 times the regular rate instead of 1.5 times the regular rate. The *Chevalier* Court explained that the PADOL's regulations expressly incorporated FLSA regulations authorizing a "0.5 multiplier" for only two types of employees (day rate employees and job rate employees), but not for a third type of employee (salaried employees). *Id.* The *Chevalier* decision merely reflects the principle of *expressio unius est exclusio alterius* in action—*i.e.*, the adoption of two out of three FLSA regulations signaled an intent to reject the third. This case is different. The PADOL has not even attempted to define what it means to be an "employee" or an "employer." Why would it? The PMWA itself defines "employee" using the same language as the FLSA, and the term thus has the same meaning under both statutes.

Likewise, in *Bayada Nurses, Inc. v. Commonwealth, Department of Labor & Industry*, the Pennsylvania Supreme Court relied upon the fact that the definition of "domestic services" found in the PMWA regulations was narrower than the FLSA definition. 8 A.3d 866, 882 (Pa. 2010) (finding the exemption set forth in the Pennsylvania regulation to be "materially distinct" from, and "more narrow" than, the FLSA regulation). As in *Heimbach* and *Chevalier*, the *Bayada Nurses* Court identified a material distinction between the text of the PMWA regulation and its

federal counterpart. Here, in contrast, no such distinction appears with respect to who qualifies as an "employee."

Appellants' reliance on *Lowman v. Unemployment Comp. Board of Review* is similarly misplaced. *Lowman* did not have anything to do with the PMWA or WPCL. In *Lowman*, the Pennsylvania Supreme Court merely considered whether a claimant who is otherwise entitled to unemployment compensation benefits due to a separation from employment becomes ineligible for those benefits as a result of becoming "self-employed" under the Unemployment Compensation Law. 235 A.3d 278 (Pa. 2020). But the Unemployment Compensation Law—unlike the PMWA or WPCL—has always supplied its own two-part classification test. *See id.* at 282-83. Notably, the Unemployment Compensation Law existed when this Court (in the prior appeal and in *Carpenter*) and the Pennsylvania Supreme Court (in *Stuber*) approved using a multi-factor economic realities test aligned with the FLSA standard for assessing PMWA and WPCL claims. In short, *Lowman* has no bearing on a worker's status under the PMWA or WPCL.

In short, each case cited by Appellants and their *amici* involved a material difference between the text of the Pennsylvania law and the text of its federal counterpart. To be sure, the PMWA and FLSA do not "mirror each other in **all** respects" and they need not "**always** be interpreted similarly." *Heimbach*, 255 A.3d at 202 n.11 (emphasis added). In this case, however, the relevant text

16

(defining the terms "employee" and "employer") is identical. Thus, "it is proper to give deference to federal interpretation of" the FLSA and apply the economic realities test to claims brought under the PMWA. *Stuber*, 822 A.2d at 873; *Espinoza*, 657 F.App'x at 105 ("When the PMWA substantially parallels the FLSA, Pennsylvania and federal courts have used FLSA law for interpretative guidance."). Quite simply, there is no principled basis for this Court to deviate from the FLSA's standard (or revisit its prior decisions) when ascertaining a worker's status under the PMWA or WPCL.

> **d.    Different laws in New Jersey and California are not relevant to applicable test in Pennsylvania.**

Appellants observe that courts in New Jersey and California have interpreted certain of their wage and hour statutes as using the "ABC" test to ascertain a worker's status. (Appellants' Brief at 9, 14, 17, 20, citing *Hargrove v. Sleepy's, LLC* in New Jersey and *Dynamex Operations W., Inc. v. Superior Court* in California). These examples are inapposite.

In *Hargrove*, the regulations implementing the New Jersey Wage and Hour Law (NJWHL) "expressly provide that the distinction between an employee and an independent contractor shall be resolved by reference to the 'ABC' test." 106 A.3d 449, 458-59 (N.J. 2015). Moreover, the New Jersey Department of Labor (NJDOL) had a "long-standing practice" of applying the NJWHL's "ABC" test to claims arising under the New Jersey Wage Payment Law (NJWPL). *Id.* at 463.

Thus, it was no surprise when the New Jersey Supreme Court applied the NJDOL's "ABC" test to the worker's NJWHL and NJWPL claims. *Id.* (finding "no good reason to depart from the standard adopted by the [NJDOL]"). Here, in contrast, there are no regulations under the PMWA or WPCL purporting to set forth the test for determining worker classification. Moreover, the PADOL does not have any history (much less a "long-standing practice") of applying the "ABC" test in PMWA or WPCL matters. In fact, the former Attorney General concedes that the PADOL "did not oppose [using] the economic reality test" under the PMWA in *Stuber* (or at any time in the more than two decades since *Stuber*). (Pa. AG Brief at 17 n.8).

*Dynamex* is similarly distinguishable. In that case, the California Supreme Court concluded that California long ago adopted a "suffer or permit" standard that "predated the enactment of the FLSA" and, thus, was "not intended to embrace the federal economic reality test" that developed many years later. 416 P.3d 1, 35 (Cal. 2018) (finding that the "ABC" test was "most consistent with the history and purpose of the suffer or permit to work standard in California's wage orders" as they existed prior to the FLSA); *id.* at 25 (recounting history of "suffer or permit" standard being incorporated into state wage orders beginning in 1916). In contrast, when the Pennsylvania legislature enacted the PMWA in 1968, it copied the definition of "employee" directly from the existing FLSA definition.

### e.    The Pennsylvania General Assembly did not "intend" to adopt an "ABC" test.

Appellants and the former Attorney General distort the history of the PMWA, speculating that the General Assembly "believed the FLSA failed to adequately protect employees" and falsely suggesting that the General Assembly "intended" to adopt the "ABC" test instead of the FLSA's economic realities test when it enacted the PMWA in 1968. (Appellants' Brief at 19-21; Pa. AG Brief at 11-13). In fact, when the General Assembly enacted the PMWA, it was so satisfied with the protections afforded by the FLSA that it *excluded* employees who were already covered by the FLSA from the PMWA's scope. H.B. 534 (Act 1968-5) (ECF 213-1) at Section 3(h). Instead, the General Assembly merely sought to extend those *same* FLSA protections to "employees" who were excluded from coverage under the FLSA by provisions such as the "small business" exception.[1]

At the same time, the General Assembly copied *verbatim* the FLSA's core definition of "employee" ("any individual employed by an employer"), making clear that even the PMWA had its limits. The General Assembly was evidently satisfied that only "employees"—as that term was understood in 1968 based on decades of federal interpretation of the materially identical FLSA definition—

---

[1] At the time of the PMWA's enactment in 1968, the FLSA excluded small businesses from coverage. Pub.L. 89-601 (Sept. 23, 1966) at Sec. 102(c) (ECF 213-2) (establishing $500,000 sales volume test so small businesses would not be covered by FLSA).

would be covered by the PMWA. *See* 89 Fed. Reg. 1638, 1642, 1669 (Jan. 10, 2024) (noting that Department of Labor and courts "remained remarkably consistent" in applying the "economic realities" test "since the 1940s").

The rhetoric of Appellants and the former Attorney General notwithstanding, the history of the PMWA is replete with examples of efforts to *align* state law with the FLSA. In 1998, for example, the PADOL's Deputy Chief Counsel expressed an intent to interpret the PMWA "on the same plane as federal law" wherever possible. (ECF 213-5 at 6). In 2012, the General Assembly amended the PMWA to clarify that state law was aligned with the FLSA with respect to the right of healthcare employers to use so-called "8/80" overtime plans. *See* Act of July 5, 2012 (P.L. 987 No. 109), codified at 43 P.S. § 333.105(b)(8). In 2020, the PADOL updated its PMWA regulations describing the duties of an exempt employee "to be more consistent [with] the ... FLSA's regulations." 50 Pa. Bulletin 5460 (Oct. 3, 2020) (ECF 213-7).

While the PMWA and FLSA are not identical in *all* respects (as *Heimbach*, *Chevalier*, and *Bayada* attest), they are aligned with respect to the definitions of "employee" and "employer." Consistent with longstanding principles of statutory construction, as well as this Court's prior rulings (including in this case), the Court should hold that the applicable tests for evaluating a worker's status under the PMWA and WPCL are aligned with the FLSA economic realities test.

> **4.      This Court should not certify the issue to the Pennsylvania Supreme Court.**

Implicitly acknowledging the futility of trying to convince *this* Court to deviate from its prior rulings regarding the applicable tests for determining a worker's status under the PMWA and WPCL, Appellants and their *amici* urge the Court to petition the Pennsylvania Supreme Court to accept certification of the issue. Certification would be improper.

> **a.      Certification is prohibited by Rule 3341 of the Pennsylvania Rules of Appellate Procedure.**

Pursuant to Local Appellate Rule 110.1, any certification to the Pennsylvania Supreme Court must be made "in accordance with the procedures of that court." 3d Cir. L.A.R. 110.1. The Pennsylvania Rules of Appellate Procedure permit certification ***only*** when "the question of law is one that the petitioning court has not previously decided." Pa.R.App.P. 3341(c); *cf. Heimbach v. Amazon.com, Inc.*, 942 F.3d 297, 301 (6th Cir. 2019) (noting that petition for certification to Pennsylvania Supreme Court was allowed, in part, because petitioning court had "not previously decided" the question).

This Court previously decided the question of what standard applies to determine a worker's status under the PMWA and WPCL. (A116-117, this Court in the prior appeal applying economic realities test to PMWA); *Verma*, 937 F.3d at 229 (same); *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 320 (3d Cir. 2016)

(applying ten-factor test to WPCL); *Carpenter*, 2024 U.S. App. LEXIS 11409, at *3 (same); *see also* Appellants' Brief at 18 & n.3 (conceding this Court previously held that FLSA's economic realities test applied to their PMWA claims and that WPCL test "parallels" FLSA test). Since this Court previously decided what test applies to determine a worker's status under the PMWA and WPCL, Rule 3341(c) precludes certification.

In addition, Appellants have not demonstrated any "special and important reasons" for the Pennsylvania Supreme Court to accept certification of this question of law. Pa.R.App.P. 3341(c). As discussed above, the question presented is not "unsettled" and there are not "conflicting decisions in other courts." *Id.* Indeed, the former Attorney General admits that "the Pennsylvania Supreme Court long ago held that the economic reality test would guide PMWA claims." (Pa. AG Brief at 16). The persistence of Appellants (and their *amici*) in urging this Court to facilitate a *change* to Pennsylvania law is not a sufficient basis on which to further delay disposition of this action via an improper certification to the Pennsylvania Supreme Court. *See Brown & Root Braun, Inc. v. Bogan Inc.*, 54 F.App'x 542, 547 n.2 (3d Cir. 2002) (certification procedure not designed to allow party to persuade state court to change current law).

**b.** **Appellants' policy arguments should be directed to the General Assembly, not the Court.**

Appellants and their *amici* repeatedly invoke public policy considerations in their attempt to persuade this Court to upend decades of precedent applying the FLSA's economic realities test to Pennsylvania wage and hour law, arguing that independent contractor classification is a "significant and pervasive problem" and that the "ABC" test "affords greater protection to workers." (Appellants' Brief at 19-21; Pa. AG Brief at 2-4, 18; *see* Plaintiffs' Lawyers' Brief, Doc. 37, at 1 (arguing that independent contractor classification harms low- and mid-income workers)). These arguments are being directed to the wrong branch of government.

It is notable that Appellants' *amici* seek to bolster their policy arguments by citing the Final Report of the PADOL's Joint Task Force on Misclassification of Employees. (Pa. AG Brief at 2 n.2; Plaintiffs' Lawyers' Brief at 7 n.8). In that report, the PADOL acknowledged that ***legislation*** would be needed to change the applicable standard. (Report at 13, recommending that "the Pennsylvania General Assembly adopt a single, multi-factor test ... to clearly delineate the difference between 'employee' and 'independent contractor'"; *id.* at 15, recommending that "the General Assembly adopt a single, multi-factor test"). The Task Force concluded its report by emphasizing that "**legislation is needed** to ... provide a

statewide test for independent contractors." (*Id.* at 25, emphasis added).[2] Instead of trying to change well-established Pennsylvania law through a judicial decision, Appellants and their *amici* should take note of the guidance provided by the Task Force, which recognizes that the proper way to pursue their policy objectives is to *petition the legislature*.

### B.    The District Court Properly Dismissed Appellants' Claims Once It Became "Foreseeable" They Could Not Prevail.

The District Court appropriately invoked its inherent authority—and acted within its discretion—in holding that Appellants were not entitled to command even more of its time and resources so that Appellants could try, for the third time, to meet their burden of proof. (*See* Appellants' Brief at 21, conceding that the district court's exercise of its inherent authority is subject to "abuse-of-discretion review"). Any suggestion that Appellants must be given a "third bite at the apple" (or fourth, or fifth) is simply wrong. Having presided over this matter since its inception in 2016 and through both jury trials in 2024, the District Court was well positioned to reach the informed conclusion that Appellants could never meet their burden of proving by a preponderance of the evidence, and to a unanimous jury, that they were Uber's employees.

---

[2] *Cf.* Pa. AG Brief at 28 (citing Christopher Hallock, Hearing on Worker Misclassification (testifying about need for "legislative action")); *id.* at 9 (citing John Schmitt, Econ. Pol'y Inst. (opining that "[p]olicymakers ... should act")).

### 1. The District Court has inherent authority to dismiss an action with prejudice in appropriate cases.

"Every Court has the inherent authority to manage the cases on its docket 'with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.'" *Katz v. Feldman*, 2019 U.S. Dist. LEXIS 8845, at *3 (D. Del. Jan. 18, 2019) (quoting *Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936)); *see Coulter v. Bissoon*, 2017 U.S. Dist. LEXIS 103585, at *6 (W.D. Pa. July 5, 2017) (same); *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases"); *Ward v. Flagship Credit Acceptance, LLC*, 2020 U.S. Dist. LEXIS 209981, at *4 (E.D. Pa. Nov. 10, 2020) (same).

So long as the District Court appropriately considered the potential effectiveness of "less drastic" measures, it had "broad discretion in deciding whether to dismiss an action with prejudice ... pursuant to its inherent authority to manage its docket." *Lee v. Krieg*, 227 F.App'x 146, 148 (3d Cir. 2007); *see also Dawson v. Smith*, 2020 U.S. Dist. LEXIS 1050, at *16 (D. Del. Jan. 3, 2020) ("A court has the inherent authority 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases,' including the authority to control who may appear before the court."); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43

(1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962) (inherent authority of a district court extends to the power to dismiss)).

The U.S. District Court for the Eastern District of Pennsylvania is burdened with more than 8,500 active pending civil cases (an increase of nearly 24% in just one year), in addition to its substantial criminal docket.[3] No one civil litigant has an absolute entitlement to command a court's time and resources in pursuit of an unending series of trials after failing—on multiple occasions—to persuade a jury that they met their burden of proof. Certainly, Appellants are not entitled to an infinite number of retrials, as such privilege would be fundamentally unfair to other litigants, witnesses, jurors, and the judiciary as a whole. It would also enable one action to stand in the way of a district court's efforts to "secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1.

The question is not whether the Federal Rules of Civil Procedure ***permit*** the District Court to dismiss an action following two hung juries where there is no reason to believe that another trial could yield a different result. The question is whether they ***prohibit*** the District Court from doing so. They do not. A district court's inherent authority flows from "ancient origin in law and equity" and enables the court to bring litigation "to a just and equitable conclusion." *Prevot v.*

---

[3] Table C—U.S. District Courts-Civil Judicial Business (Dec. 31, 2024), available at https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables (U.S. District Courts—Civil Cases Filed, Terminated, and Pending) (rev. Mar. 24, 2025).

*Prevot*, 59 F.3d 556, 565 (6th Cir. 1995); *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 561 (3d Cir. 1985). The District Court's holding that dismissal was appropriate should be affirmed because it did not "rest on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re NFL Players' Concussion Injury Litig.*, 962 F.3d 94, 101 (3d Cir. 2020) (quoting *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006)).

### 2. The District Court need not find "improper conduct" before dismissing an action.

Appellants rely on this Court's fractured opinion in *United States v. Wright*, a criminal case in which a 2-1 majority reversed a district court's decision barring the government from retrying a criminal prosecution after two hung juries. 913 F.3d 364 (3d Cir. 2019). Appellants argue that *Wright* stands for the proposition that a district court can "only" exercise its inherent authority to dismiss an action upon a showing of "improper conduct" by the prosecuting party. (Appellants' Brief at 22). Appellants are wrong.

Critically, *Wright* was a ***criminal*** prosecution, and the decision about whether to dismiss that action following two hung juries implicated separation of powers considerations that are not present here. 913 F.3d at 373-74. The *Wright* majority emphasized that because the Executive Branch has broad prosecutorial discretion, allowing a district court to dismiss an indictment following two hung juries "intrudes on the Executive's domain" and "violates the separation of

powers." *Id.* (noting that a court's power to preclude a prosecution "is limited by … the Executive's law-enforcement and prosecutorial prerogative"). In contrast, the majority recognized a district court's ability to "dismiss a *civil* case … as part of a court's inherent power to manage its own affairs." *Id.* at 374 n.11 (quoting *Link*, 370 U.S. at 629-31). Tellingly, Uber is not aware of any case interpreting *Wright* to require district courts to give a *civil* plaintiff a third bite (or unlimited bites) at the apple.

Notably, all three judges on the *Wright* panel recognized the right of a district court to bar a retrial *even in a criminal case*. The only disagreement was where to draw the line. Judge Shwartz wrote that dismissal may be appropriate where there is "prosecutorial misconduct and prejudice." *Id.* at 372. Judge Nygaard expressed that a district court has "inherent power" to dismiss an indictment after serial hung juries, even in a criminal case. *Id.* at 375 (noting that the government "was twice given a full and fair opportunity to present its case"). Judge McKee "agree[d] with Judge Nygaard ... that a District Court can step in at some point and bar a retrial" (disagreeing only about whether the district court's authority allowed dismissal "on this record"). *Id.* at 387, 390. Since a panel majority agreed that a district court is authorized to dismiss a *criminal* action upon a sufficient showing

of futility, then surely a district judge may dismiss a *civil* action upon a showing of futility.[4]

### 3. The District Court appropriately concluded that further trials would be futile.

When considering whether to grant Appellants a third bite at the apple, the question is not how many civil trials must be granted to a litigant before the court declares that enough is enough. There is no "magic number" and Uber is not asking this Court to endorse a "two strikes and you're out" rule applicable in all civil cases. Rather, the controlling question should be whether the district court has any reason to believe yet another jury trial would yield a different result compared to the prior trials. If the answer is no, then the district court should be permitted to exercise its inherent authority to dismiss the action. *Cf. Green v. Concord Baptist Church*, 313 F.App'x 335, 336 (1st Cir. 2009) (dismissal may be appropriate where it is "crystal clear that the plaintiff cannot prevail") (quotation omitted). Having witnessed the first two trials, the District Court was in the best position to assess the situation and in the exercise of its informed discretion conclude that another trial would not yield a different outcome.

---

[4] Appellants also cite *Poulis v. State Farm Fire & Cas. Co.* (Appellants' Brief at 22), but *Poulis* is even less helpful to Appellants, as it only considered whether the district court appropriately ordered dismissal as a *sanction* under the facts of that case. 747 F.2d 863, 868 (3d Cir. 1984). *Poulis* did not foreclose the possibility that a district court could exercise its inherent authority to dismiss an action for other reasons, such as futility.

Appellants falsely claim that the District Court improperly drew a "negative inference" from the two hung juries. (Appellants' Brief at 22-23). To the contrary, the District Court carefully described its exhaustive efforts to facilitate a verdict during both trials. (A16-18). Ultimately, the District Court correctly recognized this case was (and would forever remain) on Penrose stairs. The District Court rigorously evaluated the course of proceedings in the two trials juxtaposed with the case history and evidence, finding it "crystal clear" that Appellants could never persuade a unanimous jury that they met their burden of proving that they should have been classified as employees. (*Id.*).

Not only did Appellants fail to persuade two different juries that they could meet their burden of proof, but they failed to explain to the District Court (or to this Court on appeal) what they would do differently in a third trial (or fourth, or fifth) that might lead to a different outcome. Indeed, Appellants even conceded that the hung jury in the second trial was "foreseeable." (ECF 344-1, at 26). That was not surprising. As the District Court recognized, "[Appellants] presented virtually the same case-in-chief in the second trial as in the first trial, with the same witnesses providing virtually the same testimony using virtually the same exhibits." (A15). If anything, there is even less reason to expect that a third trial

would have a different outcome than the first two trials, as Appellants are now tethered to another transcript of their sworn testimony.[5]

Curiously, Appellants argue that the lack of a unanimous verdict *in favor of Uber* is evidence that their continued efforts are not in vain. (Appellants' Brief at 22-23). Appellants are wrong. The Constitution, the operative statutes, and the Federal Rules of Civil Procedure do not impose any obligation on the defendant to persuade a unanimous jury that the plaintiffs *did not* meet their burden of proof. It is the opposite. A plaintiff in a civil case must persuade a unanimous jury that they *did* meet their burden of proof. Here, Appellants did not come close, in either trial. It has become "crystal clear" that Appellants cannot convince a unanimous jury of the merits of their claims. Dismissal was appropriate.

### 4. The District Court appropriately considered less drastic measures.

Before dismissing the action, the District Court considered—and even implemented—a number of less drastic options in an attempt to resolve the case. (A17-18, noting it "pressed and probed each jury beyond the [District Court's] typical practices," "provided each jury with a non-traditional supplemental

---

[5] During the second trial, Appellants occasionally attempted to testify in a manner inconsistent with their testimony from the first trial, to no avail. *See* A805, Tr. 170:21-171:17, 172:5-20 (Cherdoud); A829-30, 53:4-22 (Cherdoud); A893, Tr. 119:18-120:10 (Sabani); A911-12, Tr. 192:17-193:3 (Sabani); A931-32, Tr. 272:1-273:1 (Razak); A933-34, Tr. 278:1-14, 280:3-22, 282:9-25, 283:3-23 (Razak); A937-38, Tr. 6:11-25, 10:14-11:9 (Razak); A951, Tr. 62:21-63:4 (Razak).

questionnaire," and even took the "extraordinary step" of allowing jurors to question witnesses). Ultimately, however, the District Court properly concluded that there was no "less drastic" measure than dismissal to address its conundrum. (A19).

On appeal, Appellants insist that there were "two options other than dismissal." (Appellants' Brief at 24). First, Appellants argue that the District Court "could have simply held a third trial." (*Id.*). Second, Appellants propose that the District Court should have "determined [Appellants'] employment status through a Rule 52 proceeding." (*Id*. at 24-25). The fact that Appellants could only identify two ***manifestly unworkable*** alternatives to dismissal is itself evidence that no "less drastic" measures existed and that the District Court was within its discretion to dismiss the action.

a.    **A third trial is not a viable alternative to dismissal when that dismissal is justified based upon the futility of a third trial.**

For reasons the District Court explained in detail, it had no reason to expect that a third trial would have a different outcome than the first two trials. (A15-18, finding that the "pervasiveness of ... indecision" after the second trial "reinforced the notion that a third trial will lead to the same outcome"). Any retrial would inevitably consume a significant amount of the District Court's limited resources, with no realistic hope of yielding a different outcome, and would unavoidably lead

to questions about whether Appellants would be entitled to a fourth bite at the apple (or fifth, or sixth). (A14).

Having presided over the case for nearly a decade—including through both trials—the District Court was undoubtedly in the best position to determine that further trials would be pointless. *Drippe v. Tobelinski*, 604 F.3d 778, 783 (3d Cir. 2010) ("we accord district courts great deference with regard to matters of case management"). This Court should defer to the District Court's well-reasoned conclusion that "this case now presents the prospect of an endless loop of deadlocked juries." (A19). Having determined that a third trial would not yield a different outcome, the District Court acted within its discretion in determining that another trial was not an appropriate alternative to dismissal—it would just prolong the inevitable.

> **b.    A Rule 52 proceeding is not a viable alternative to dismissal, and it would have yielded the same result.**

Appellants' suggestion that the District Court could have determined their status as employees or independent contractors "through a Rule 52 proceeding" is certainly curious. After all, the District Court granted Uber's motion for judgment as a matter of law under Rule 50(b), finding that "no reasonable jury could find for Plaintiffs" based on the evidence presented at the second trial. (A23). Accordingly, even if it would have been proper for the District Court to convert the second trial into a Rule 52 proceeding and decide Appellants' classification (it was not), then

surely the District Court would have found that Appellants were independent contractors. (A20-24). Any alleged error in the procedural mechanism the District Court used to issue its judgment was therefore harmless. *See GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 88 (3d Cir. 2019) (error is harmless "if it is highly probable that the error did not affect the outcome of the case").

Are Appellants asking this Court to treat the District Court's opinion as findings and conclusions under Rule 52, in the same way this Court treated the district court's summary judgment decision in *DialAmerica*? (Appellants' Brief at 25). Or are they asking the Court to remand the case so that the District Court can issue findings and conclusions under Rule 52 (and a judgment under Rule 58) in the first instance? Either way, in consideration of the District Court's detailed opinion granting Uber's motion for judgment as a matter of law under Rule 50(b), the outcome of such a request would be preordained—findings and conclusions under Rule 52 favoring independent contractor status, and judgment in favor of Uber under Rule 58.

Unfortunately for Appellants (or, perhaps, fortunately), the District Court was not authorized to convene a non-jury Rule 52 proceeding in this case. "The right of trial by jury as declared by the Seventh Amendment to the Constitution ... is preserved to the parties inviolate." Fed.R.Civ.P. 38. Once a jury trial has been demanded, as here, a trial by jury must take place unless: (a) all parties stipulate; or

(b) there is no federal right to a jury trial. Fed.R.Civ.P. 39. Uber did not stipulate to waive its right to a jury trial, and there is a right to a jury trial in a private action under the FLSA. *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Thus, Rule 52 was not a viable option.

The cases upon which Appellants rely undermine their argument. First, Appellants cite *DialAmerica* for the proposition that "courts—not jurors ... decide whether a worker is an employee or independent contractor under the FLSA." (Appellants' Brief at 25). In *DialAmerica*, however, the parties **agreed** that "the court would determine whether the workers in question were 'employees' under the FLSA." 757 F.2d at 1381 n.2. No such agreement existed here.

Second, Appellants cite *Martin v. Selker Bros.*, 949 F.2d 1286 (3d Cir. 1991), as an example of the Third Circuit endorsing the right of a district court to make "findings of fact" in support of its "conclusions of law" regarding a worker's status. (Appellants' Brief at 25-26). *Martin* is inapposite, as it was an injunction proceeding brought by the Secretary of Labor, and there is no indication that any party requested a jury trial as to any claim or defense. 949 F.2d at 1290.

Third, Appellants cite *Verma* for the proposition that a worker's status is a "mixed question of fact and law." (Appellants' Brief at 26). Appellants overlook *Verma*'s holding that when "one or more genuine issues of fact concerning the relevant economic relations ... preclude a trial court from drawing a conclusion as a

matter of law on the 'employee' or 'independent contractor' issue [, ...] the issue would go to trial, **with the jury resolving it** through either special interrogatories or by deciding the classification issue." 937 F.3d at 229 (emphasis added).

Finally, Appellants cite *Carpenter* for the proposition that "judges, not jurors, should decide a worker's employment status under the WPCL." (Appellants' Brief at 26). That is not what this Court said in *Carpenter*. Rather, the Court merely affirmed the district court's order granting summary judgment to the defendant, because *in that particular case*, the "undisputed facts ... with all reasonable inferences ... drawn in Plaintiffs' favor, le[d] to the conclusion that Plaintiffs are independent contractors as a matter of law." *Carpenter*, 2024 U.S. App. LEXIS 11409, at *4.

In short, none of the cases cited by Appellants support their proposition that the District Court had the authority to convert the trial proceedings to a Rule 52 hearing, issue its own findings and conclusions, and enter judgment under Rule 58. And even if the District Court had such authority, there is no reason to think that the result would be different, given that the District Court issued an alternative holding granting judgment as a matter of law to Uber. Quite simply, Appellants failed to identify *any* viable alternative to dismissal.

**C.    The District Court Properly Granted Uber's Motion for Judgment as a Matter of Law Pursuant to Rule 50(b).**

The District Court properly concluded that no reasonable jury could find that Appellants were Uber's employees based on the evidence presented at the second trial. On appeal, Appellants not only contend that the District Court erred in granting Uber's motion for judgment as a matter of law; they boldly assert that the District Court should have granted *their* motion for judgment as a matter of law instead. As detailed below, however, Appellants' arguments are constructed out of misstatements of governing legal principles and self-serving distortions of (and omissions from) the trial record. This Court should affirm the District Court's judgment granting Uber's motion for judgment as a matter of law and denying Appellants' cross-motion for judgment as a matter of law.

This Court considers six non-exhaustive "economic realities" factors to ascertain a worker's status under the FLSA and PMWA: (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the worker's opportunity for profit or loss; (3) the worker's investment in equipment or materials required for the task; (4) whether the service rendered required a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. (A116-17, citing *DialAmerica*, 757 F.2d at 1382). The determination of a worker's status under the WPCL, while framed as a ten-factor

assessment, largely tracks the FLSA's "economic realities" test. *Williams*, 837 F.3d at 320.

"[A] court may decide the employee/independent contractor question as a matter of law if the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion." *Alberty-Vélez v. Corp. de Puerto Rico Para La Difusión Pública*, 361 F.3d 1, 7 (1st Cir. 2004); *see also Yu v. McGrath*, 597 F.App'x 62, 66 (3d Cir. 2014) (affirming summary judgment where "no reasonable jury" could conclude that the plaintiff was an employee).

The District Court's grant of Uber's motion for judgment as a matter of law is subject to plenary review, and this Court may review the entire record from the second trial to confirm for itself that no reasonable jury could have found that Appellants were Uber's employees. (Appellants' Brief at 27-28); *see also Raiczyk v. Ocean Cnty. Veterinary Hosp.*, 377 F.3d 266, 269, 271 (3d Cir. 2004) (affirming Rule 50(b) judgment "[i]n light of the entire record in th[e] case").[6]

---

[6] While space limitations preclude a complete recital of all evidence supporting the District Court's conclusion that no reasonable jury could find that Appellants were Uber's employees, Uber endeavors to present herein the most pertinent record citations in response to Appellants' arguments. Suffice it to say that the District Court properly evaluated the trial record through the lens of the applicable tests and rightly concluded that no reasonable jury could find that Appellants were Uber's employees based on the evidence presented at trial. (*See also* ECF 342-1 (Uber's Rule 50(b) motion for judgment as a matter of law including citations to the trial record), ECF 330-1 (Uber's Rule 50(a) motion including additional citations to the trial record)).

1.    **The "degree of control" factor favors independent contractor status.**

It is undisputed that Appellants formed and operated their own luxury black car transportation businesses.[7] It is undisputed that each Appellant entered into an agreement with Uber giving them "complete discretion" to operate their independent businesses in their own discretion, including the right to provide transportation services at any time to any third party separate and apart from the Uber App. (A1188, Technology Services Agreement; A820, Tr. 13:20-14:5 (Cherdoud); A945, Tr. 40:13-21 (Razak)). Moreover, Uber could not "direct or control" Appellants in connection with their provision of transportation services. (A1188, Technology Services Agreement).

Appellants had the sole right to determine whether, when, where, and for how long to utilize the Uber App.[8] Appellants could engage in other activities

---

[7] Ali Razak and his brother founded Luxe Limousine Services, Inc. (A920, Tr. 227:23-228:7 (Razak); A931-33, Tr. 269:20-270:15, 273:10-277:14 (Razak); A1671-72 (Luxe Articles of Incorporation); A1677-79 (Luxe PUC application, stating "We are planning to use 2-6 vehicles in our business")). Kenan Sabani founded Freemo Limo, LLC. (A884, Tr. 83:24-84:3, 84:18-19 (Sabani); A904-05, Tr. 163:5-19, 165:10-14, 168:12-20 (Sabani); A1912-13 (Freemo's Certification of Organization); A1914 (IRS letter to Sabani providing Freemo's EIN)). Khaldoun Cherdoud founded Milano Limo, Inc. (A792, Tr. 119:6-10, 119:21-120:6 (Cherdoud); A802, Tr. 157:5-158:13 (Cherdoud); A804, Tr. 168:11-14 (Cherdoud); A1988-89 (Milano Articles of Incorporation); A1985 (Milano Notice of Corporate Registration)).

[8] A807, Tr. 179:2-4 (Cherdoud); A894, Tr. 124:13-125:3 (Sabani); A938, Tr. 11:10-13 (Razak).

while online on the Uber App, including activities in support of their independent transportation businesses.[9] Appellants could (and in fact did) reject trip requests obtained on the Uber App.[10] Appellants could (and in fact did) cancel individual rides after accepting a trip request.[11]

Ignoring the foregoing evidence of lack of control that overwhelmed the trial record, Appellants and the former Acting Secretary of Labor, as *amicus curiae*, instead purport to identify examples of Uber exercising *some* control over drivers. (Appellants' Brief at 30-43; Sec'y of Lab. Brief, Doc. 32, at 16-28). Those examples, however, reflect, at most: (a) standards consistent with legal requirements; and/or (b) reasonable parameters and expectations for the performance of contracted services. None of them rise to the type of "control" over

---

[9] A830, Tr. 54:7-55:10 (Cherdoud); A944, Tr. 36:1-6 (Razak); A1853 (Razak's Candy Crush data showing him playing games while rejecting trip requests); A1854 (Razak's Trip Data); A939, Tr. 14:1-20, 15:12-18 (Razak).

[10] A813-14, Tr. 202:3-9, 202:24-205:9, 206:14-208:23 (Cherdoud); A845, Tr. 115:23-116:14 (Torres); A850, Tr. 134:12-16 (Murray); A882, 76:2-8 (Murray); A894-95, 124:23-25, 125:4-9 (Sabani); A942, Tr. 26:21-24, 28:7-16 (Razak); A2147 (Cherdoud Trip Total Graph showing 994 trip request rejections).

[11] A793, Tr. 123:19-25 (Cherdoud); A882, Tr. 76:9-11 (Murray); A895-96, Tr. 125:1-3, 131:9-132:7 (Sabani); A922, Tr. 234:25-235:3 (Razak); A943-44, Tr. 32:10-13, 33:7-15 (Razak).

the time, place, and/or manner in which a driver accomplishes their tasks in a manner sufficient to tilt the "degree of control" factor toward employment status.[12]

### a. Most proffered examples of alleged "control" involved compliance with legal requirements.

A requirement imposed by an alleged employer that is consistent with a legal requirement that already regulates the worker's activities does not constitute the type of "control" over the worker that is relevant to the economic realities test. *Pendleton*, 463 F.Supp.3d at 553-56, 561-63; *see Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 382 (5th Cir. 2019) (requiring safety training and drug testing at drilling site "is not the type of control that counsels in favor of employee status" where requirements are "consistent with the Occupational Safety and Health Act"); *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2003) (control exercised to "ensure compliance with various safety and security regulations" is "qualitatively different" from control indicative of employee status); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901, 916 (S.D.N.Y. 2013)

---

[12] The former Acting Secretary also argues that the District Court devoted too much of its opinion to the "control" factor relative to the other factors. (Sec'y of Lab. Brief at 8-9, 27-28). To the contrary, the District Court was right to focus on the "control" factor, which was "at the core of this case." (A22 (factor is "highly relevant")). *See Williams*, 837 F.3d at 320 (factor is "paramount" or "dominant"). In any event, the District Court appropriately considered the other factors before concluding that "no reasonable jury could find for [Appellants]." (A23)).

("where a club implements regulations to assure compliance with law, those regulations are not evidence of the club's control").[13]

Notwithstanding this clear precedent, the former Acting Secretary now contends that requirements intended to comply with legal obligations *can* be viewed as evidence of control. (Sec'y of Lab. Brief at 9-10). That argument contradicts the Department of Labor's own prior statements. In its 2024 rulemaking, the Department made clear that "[a]ctions taken by the potential employer for the sole purpose of complying with a specific, applicable Federal, State, Tribal, or local law or regulation are **not** indicative of control." 29 C.F.R. § 795.110(b)(4) (emphasis added). This perspective aligned "with **existing** judicial precedent and the Department's **longstanding** guidance." 89 Fed. Reg. 1638, 1639 (Jan. 10, 2024) (emphasis added). Rejecting the suggestion that the rule represented a "departure[] from judicial precedent," the Department explained that the rule "is well-supported by the [existing] case law." *Id.* at 1655 (confirming rule would "align ... with the analysis presently applied by courts"); *see* 86 Fed. Reg.

---

[13] *See also Iontchev v. AAA Cab Serv., Inc.*, 685 F.App'x 548, 550 (9th Cir. 2017) (affirming drivers were independent contractors where "disciplinary policy primarily enforced the [a]irport's rules and regulations governing the [d]rivers' cab operations and conduct"); *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F.App'x 104, 106 (4th Cir. 2001) (rejecting argument that "backcharging" workers for "failing to comply with various local regulations" demonstrates "the type of control characteristic of an employment relationship"); *Saleem v. Corp. Transp. Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017) (drivers found to be independent contractors despite restrictions imposed by Taxi & Limousine Commission).

1168, 1247 (Jan. 7, 2021) (prior independent contractor rule, based on then-existing precedent, held that "[r]equiring the individual to comply with specific legal obligations ... does not constitute control that makes the individual more or less likely to be an employee"). For years, the Department emphasized that compliance with legal obligations is not indicative of control. For the former Acting Secretary to suggest otherwise proves disingenuous.

Appellants and their *amici* also insist that *Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013), supports their contention that actions taken by an alleged employer that are consistent with legal compliance are indicative of control. (Appellants' Brief at 37-38; Sec'y of Lab. Brief at 10). In *Scantland*, however, there was substantial evidence of control that had nothing to do with legal compliance. 721 F.3d at 1313-14 (workers were required to report at specific times, were assigned routes, and were prohibited from working for others). In a discussion distinguishing *Scantland*, the Department re-emphasized that "[i]f the reason for a requirement applies equally to individuals who are in business for themselves and those who are employees [such as in the case of legal compliance], imposing the requirement is not probative." 86 Fed. Reg. 1168, 1183 (Jan. 7, 2021); *see id.* (expecting all workers to "comply with the law" is "not probative of whether the worker is an employee or independent contractor"). In short, *Scantland* is inapposite.

As the District Court correctly recognized, many of the so-called "infractions" identified by Appellants were consistent with legal requirements, and thus could not constitute "control." (A1643-70, regulations of the Philadelphia Parking Authority (PPA)). For example, the PPA required black car drivers to operate with a Certificate of Public Convenience, meaning each driver needed to affiliate with a company like Gegen or get their own certificate. (A969, Tr. 136:15-23 (Dobbs)).[14] The PPA and/or federal and state laws also required that black car drivers:

- Follow certain dress codes (52 Pa. Code §§ 1021.11(b), 1057.10(d); A999, Tr. 256:6-12 (Holtzman-Conston); A1644, Limousine Regulations Overview ("Limo Regulations"); A1656, Limousine Driver Certification Handbook ("Limo Handbook"));

- Maintain hygiene standards (52 Pa. Code §§ 1021.11(b), 1057.10(d); A999, Tr. 256:13-15 (Holtzman-Conston); A1644 (Limo Regulations); A1658 (Limo Handbook));

- Undergo background checks (52 Pa. Code §§ 1011.9, 1051.8(c), 1057.4, 1057.5; A995, Tr. 240:8-25 (Holtzman-Conston); A1643 (Limo Regulations));

- Drive a particular type of car (52 Pa. Code §§ 1017.3, 1055.3, 1055.4, 1057.10(a); A999-1000, Tr. 256:23-257:13 (Holtzman-Conston); A1646 (Limo Regulations); A1659-61 (Limo Handbook));

---

[14] Contrary to Appellants' assertion (Appellants' Brief at 31), drivers were not "regimented" under Gegen. (A996, Tr. 241:17-25 (Holtzman-Conston), noting that affiliating with Gegen "was one choice" but that drivers "could affiliate with any company they wanted" and still receive trip requests on the Uber App).

- Accept service animals in their cars (52 Pa. Code §§ 1017.7, 1021.16, 1055.6; A868, Tr. 17:18-18:4 (Murray); A1667 (Limo Handbook));

- Refrain from soliciting trips off the street (52 Pa. Code § 1053.22(b); A868, Tr. 19:17-20:4 (Murray));

- Adhere to waiting lot requirements at airports (A879, Tr. 64:21-24 (Murray); A1002, Tr. 267:6-268:22 (Holtzman-Conston));

- Refrain from driving under the influence of drugs or alcohol (52 Pa. Code §§ 1021.11(i), 1057.10(e); A1644 and A1648 (Limo Regulations));

- Drive only in areas where they are validly licensed (52 Pa. Code §§ 1021.12, 1057.11; A875-76, Tr. 48:25-49:11 (Murray));

- Abide by the maximum hours cap for both 24-hour and weekly periods (52 Pa. Code § 1021.12(b); A1644 (Limo Regulations));

- Use the most direct route when driving passengers (52 Pa. Code § 1021.11(f); A999, Tr. 254:25-255:2; A1645 (Limo Regulations)); and

- Refrain from insisting upon gratuities (52 Pa. Code § 1021.11(d); A1646 (Limo Regulations)).

Appellants' attempt to identify 42 "infractions" that "exceeded local regulations" cannot withstand a review of the trial record. (Appellants' Brief at 34-38). For example, Appellants list "[p]roviding inaccurate information to Uber," "[n]ot wearing a suit and tie," and having a "smelly" vehicle as prohibitions unique to Uber—but the PPA had specific rules addressing each of those topics. (*See* A1643 and A1647 (requirements on accurate and up-to-date personal information); A1656 (suit and tie requirement), A1658 ("smelling clean is required at all times"); A1657 ("passenger area shall be odor free")). Other purported Uber-specific

45

requirements on Appellants' list were also consistent with state or local laws, such as the prohibition on street hails (*see* A1599, Driver Deactivation Policy (drivers cannot "[a]ccept[] illegal street hails"); A868, Tr. 19:17-20:4 (Murray)) and the restriction on carrying firearms (*see* A1599-60, Driver Deactivation Policy (limiting the carrying of firearms "[t]o the extent permitted by applicable law")). The District Court was correct when it concluded that "the vast majority of Uber's internal 'infractions' were in fact already covered under PPA rules." (A21).

### b. Appellants' other examples of "control" involved reasonable parameters and expectations.

Appellants also proffer a few examples of Uber exercising purported "control" that allegedly "go beyond" legal compliance. In each case, however, Uber was merely setting reasonable parameters and expectations for the performance of the contracted services. As this Court previously explained, "[e]very job, whether performed by an employee or by an independent contractor, has parameters and expectations." *Carpenter*, 2024 U.S. App. LEXIS 11409, at *5-6. Merely setting "parameters and expectations" for the performance of a job is not itself evidence of control. In contrast, "while a client can set the parameters and expectations it has for an independent contractor's performance, only an employer can both set parameters and expectations ***and direct the time, place, and manner*** in which an employee accomplishes them." *Id.* (emphasis added); *see also Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 F.App'x 104, 106 (4th Cir. 2001)

("specifications and quality control inhere in any subcontractor relationship"); *Saleem*, 854 F.3d at 136 (concluding that drivers were independent contractors despite "manuals setting out certain standards of conduct" including dress codes, cleanliness requirements, and prohibitions on harassing customers).

None of Appellants' examples of purported "control" that went beyond legal compliance involved Uber directing the time, place, and manner in which they provided transportation services. For example, Appellants assert that Uber could have deactivated their accounts for "substandard service." (Appellants' Brief at 32-34). Certainly, a contracting party should be entitled to end a relationship with an independent contractor who is providing substandard service without converting the contractor into an employee. In any event, Appellants' argument is a red herring; they were never subject to permanent account deactivation due to alleged "substandard service." (*See* A814, Tr. 205:17-25 (Cherdoud); A911, Tr. 192:12-14 (Sabani); A913, Tr. 198:22-199:15 (Sabani); A943-45, Tr. 31:17-32:2, 34:6-15 (Razak)).

Appellants also contend that they were subject to account deactivation for calling riders in advance to ask for their destination, maintaining excessive cancellation rates, and soliciting trips outside the Uber App. (Appellants' Brief at 34-35, 40-41). The trial record belies Appellants' complaints. Indeed, Appellants regularly engaged in these practices without facing deactivation. (*See*, *e.g.*, A2133-

36 (Razak Trip Totals Chart), A2138-41 (Sabani Trip Totals Chart), A2143-46 (Cherdoud Trip Totals Chart) (collectively showing hundreds of cancellations); A796, Tr. 133:20-22 (Cherdoud gave rides outside the Uber App); A821-22, Tr. 19:14-23:6 (Cherdoud solicited rides by parking near hotels and speaking with doormen); A907, Tr. 173:25-174:25 (Sabani independently provided rides for a client who he met through the Uber App); A943-44, Tr. 32:17-34:9 (Razak called riders to ask for their destination)).[15]

Appellants also maintain that Uber used "surge pricing" to "lure" them into areas of high rider demand. (Appellants' Brief at 39-40). Of course, the use of "surge pricing" is compelling evidence of a ***lack*** of control. Uber used enhanced pricing as an incentive precisely because it could not compel drivers when or where to drive. (A882, Tr. 75:12-76:1 (Murray); A971, Tr. 142:3-12 (Dobbs)). When Uber communicated surge pricing information to drivers, the drivers had complete discretion to go to the surge location or to ignore the communication. (A868, Tr. 20:10-13 (Murray); A971, Tr. 143:5-8 (Dobbs). Drivers were not required to drive in areas of high demand. (A940, Tr. 17:6-16 (Razak)). Indeed,

---

[15] Contrary to Appellants' assertions, drivers in Philadelphia were not subject to a maximum cancellation rate. (A998-99, Tr. 252:20-253:8 (Holtzman-Conston); A1006, Tr. 282:3-16 (Holtzman-Conston)). Indeed, Razak canceled approximately 22 percent of his trips between 2014 and 2018, without consequence. (A2133-36 (Razak Trip Totals Chart); A2137 (Razak Trip Totals Graph); A972, Tr. 146:9-22 (in one month, Razak canceled more trips than he completed) (Dobbs)).

Cherdoud actively avoided locations with surge pricing. (A809, Tr. 186:15-21, 187:5-21; A810, Tr. 189:13-15 (admitting that his "strategy to get trips was to go away from areas where there was high demand")).

Appellants also charge that Uber "surveilled" them. (Appellants' Brief at 39-40). Appellants' argument distorts the record. To be sure, Uber needed to collect GPS data when Appellants were online on the Uber App so that the technology could function properly to match a rider with a driver. (A987, Tr. 207:8-208:1 (Dobbs)). And certain data (*e.g.*, when and where a trip started and ended) was collected so that Uber could provide trip summaries to drivers and receipts to riders. (A971, Tr. 143:21-144:5 (Dobbs)). None of this amounts to "surveillance" of drivers. The trial record confirms that Uber did not actively monitor drivers' locations. (A987, Tr. 207:1-7, 207:8-208:1 (Dobbs); A993, Tr. 230:10-15 (Dobbs); *see* A1005, Tr. 280:12-20 ("We're not monitoring where the drivers are at any moment, we're not monitoring where the riders are at any moment.") (Holtzman-Conston); A882, 74:18-75:3 (Murray)). Indeed, when asked whether Uber had ever deactivated him for providing independent trips to riders he met through the Uber App, Sabani responded, "Uber didn't know … how would they know?" (A913, Tr. 199:9-15).

Appellants further assert that Uber controlled where they worked. (Appellants' Brief at 40). Not so. Certain geographical limits were imposed as a

matter of local law (*e.g.*, drivers needed a PPA limo license to drive in Philadelphia County). (A875-76, Tr. 48:25-49:11 (Murray)). Other than that, Appellants provide only a single example of alleged geographic control, a case in which a small group of drivers was temporarily restricted from using the Uber App at the airport on one occasion because they violated their agreements with Uber by "spoofing" their location to avoid the airport queue (thereby cheating other drivers). (A880, Tr. 65:24-66:13 (Murray); A1003, Tr. 270:7-11 (Holtzman-Conston)).[16] The trial made plain that in the ordinary course, Appellants were free to choose where to drive. (*See* A808, Tr. 181:3-14 (Cherdoud); A810-11, Tr. 189:9-190:7, 195:8-196:20 (Cherdoud); A882, Tr. 75:20-76:1 (Murray); A894-97, 124:20-22, 126:8-16, 131:9-132:7 (Sabani); A939, Tr. 14:1-20, 15:12-18 (Razak)).

### 2. The "opportunity for profit or loss" factor favors independent contractor status.

Appellants argue that the second factor favors employment status because they had "little opportunity for profit or loss based on managerial skill." (Appellants' Brief at 43-47). Appellants misconstrue this factor as being limited to their opportunity for profit or loss "as UberBLACK drivers." (*Id.* at 43). Appellants overlook that the factor broadly considers their ability to generate

---

[16] Appellants present this as evidence that Uber "used its surveillance system" to track drivers. (Appellants' Brief at 40). In fact, the incident came to Uber's attention only because *other drivers* reported the issue to Uber. (A880, Tr. 65:4-23 (Murray)).

revenue for their ***overall*** businesses; it is not limited to their opportunities with Uber. *See Saleem*, 854 F.3d at 144 ("By toggling back and forth between different car companies and personal clients, and by deciding how best to obtain business from [defendant]'s clients, drivers' profits increased through their initiative, judgment, or foresight—all attributes of the typical independent contractor"); *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 846 (5th Cir. 2010) (finding worker was independent contractor where he "did not work exclusively for the defendants"); *Freund v. Hi-Tech Satellite, Inc.*, 185 F.App'x 782, 783 (11th Cir. 2006) (affirming independent contractor status, noting plaintiff "could have accepted installation jobs from other companies").[17]

It is undisputed Appellants engaged in activities to grow their businesses—completely outside their relationship with Uber. For example, Cherdoud admitted to contracting with Sabani's company and soliciting private trips near hotels while simultaneously using the Uber App. (A794, Tr. 127:17-20; A796, Tr. 133:20-22, 134:12-22; A799, Tr. 148:8-11; A821-22, Tr. 18:2-20, 19:14-23:6; A825, Tr. 34:19-35:11; A830-32, Tr. 56:22-57:6, 64:6-8). Almost half of Cherdoud's income

---

[17] *See also Smith v. Effluent Retrieval Servs., Inc.*, 2016 U.S. Dist. LEXIS 145994, at *15 (E.D. Pa. Oct. 21, 2016) ("freedom to work elsewhere" favored independent contractor status); *Brennan v. Sand Products, Inc.*, 371 F.Supp. 236, 237 (W.D. Okla. 1973) (truck drivers were independent contractors where they used their own trucks and could work for other companies); *Goldberg v. Warren Bros. Roads Co.*, 207 F.Supp. 99, 100 (D. Me. 1962) (truck drivers were independent contractors where they were free to use their trucks elsewhere).

in 2016 came from rides sourced outside the Uber App. (A821, Tr. 18:17-20 (Cherdoud); A826-27, Tr. 39:12-41:7, 42:1-12 (Cherdoud); *see* A892, Tr. 115:15-18 (Sabani); A908, Tr. 180:1-4 (Sabani)). Similarly, Sabani provided up to two hundred trips outside the Uber App through his independent company. (A892, Tr. 115:7-14 (Sabani); A906, Tr. 172:3-17 (Sabani); A909, Tr. 183:24-184:8 (Sabani); A1941-42 (Email from Sabani)). Over the course of approximately two years, Sabani's company earned nearly $140,000 from private rides, unrelated to the Uber App. (A1946, Freemo Limo Sales Report; A909-10, Tr. 181:5-20, 185:16-22 (Sabani)). While contracting with Uber, both Razak and the company he founded with his brother provided services to customers sourced through Blacklane, a German limousine company. (A929, Tr. 261:13-262:7, 262:11-15 (Razak); A946-47, Tr. 44:17-45:4, 46:5-13, 47:1-10 (Razak); A1910 (Blacklane Email)).[18] Appellants' ability to generate profits for their businesses by identifying riders through their own marketing efforts (and relationships with other lead generation services) gave them complete control over the extent of their profits using the Uber App.

---

[18] As additional examples of Appellants using managerial skill to grow their businesses, *see* A821-22, Tr. 19:14-23:6 (Cherdoud); A825, Tr. 33:20-34:18 (Cherdoud); A827, Tr. 41:18-22 (Cherdoud); A892, Tr. 113:14-18 (Sabani); A906, 169:7-19, 171:6-11, 171:24-172:17 (Sabani); A901, Tr. 187:4-15 (Sabani); A1916-24 (Freemo's website); A1925-27 (Freemo's Yelp page); A1928-35 (Freemo's Facebook page).

Next, Appellants offer a litany of complaints about Uber setting fares, matching riders and drivers through its proprietary algorithm, and introducing UberX into the Philadelphia market. (Appellants' Brief at 43-47). It is undisputed, however, that nothing prevented Appellants from generating profits (or experiencing losses) based on the decisions they made in support of their businesses—including the extent to which they interacted with the Uber App. If Appellants were dissatisfied with the Uber App, they were free to (and frequently did) generate revenue elsewhere, through advertising and relationships with other lead-generation sources.

Finally, Appellants argue that a worker's ability to "hustle" or work more is not relevant to the second factor. (Appellants' Brief at 44). In fact, a worker's "initiative" and "hustle" can demonstrate managerial skill. *Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1084 (8th Cir. 2022) (worker's ability "to earn additional income through his own initiatives" favors independent contractor status); *Freund*, 185 F.App'x at 783 (affirming independent contractor status where worker could earn more money "by accepting more jobs"). Quite simply, Appellants could generate profits or incur losses based on the decisions *they* made in investing and operating their independent businesses, such as whether to seek riders from multiple sources or to pursue surge pricing opportunities, and deciding when and where to provide transportation services.

### 3. The "investment" factor favors independent contractor status.

Appellants insist that the "investment" factor favors employment status because "Uber has spent billions of dollars on its business ... making its investment exponentially greater than [Appellants'] business expenses." (Appellants' Brief at 47). Appellants misconstrue the third factor as being limited to a dollar-for-dollar comparison of the "relative investments" of the worker and the alleged employer. (*Id.*). Appellants are wrong.

The investment factor merely considers "whether any investments by a worker are capital or entrepreneurial in nature." 29 C.F.R. § 795.110(b)(2). As the Department of Labor explained, "[t]he worker's investments need not be equal to the potential employer's investments and should not be compared only in terms of the dollar values of investments or the sizes of the worker and the potential employer." *Id.* Instead, the focus should be on whether the worker is making investments in *their* business, "even if on a smaller scale," sufficient to suggest that the worker is operating independently, "which would indicate independent contractor status." *Id.* In other words, the fact that Appellants' investments (in their transportation businesses) were "on a smaller scale" than Uber's investment (in its technology business) is not relevant.

The District Court properly considered the kinds of investments made by Appellants relative to their own entrepreneurial efforts as transportation providers.

The trial was replete with examples of Appellants investing in their businesses, including:

- Vehicles (A803-04, Tr. 162:10-14, 163:19-24, 167:19-168:3 (Cherdoud); A879, Tr. 61:10-19 (Murray); A891, Tr. 112:20-23 (Sabani); A904, Tr. 163:1-4 (Sabani); A933-34, Tr. 280:3-18, 281:6-9, 281:21-282:8 (Razak); A942, Tr. 27:13-16 (Razak); A997, Tr. 245:11-14 (Holtzman-Conston); A2106 (Cherdoud Vehicle Purchase Order));

- Advertising (A910, Tr. 186:12-187:15 (Sabani); A1820-30 (Razak's 215 Tax Return; A1969-81 (Sabani 2016 Tax Return));

- Insurance (A791, Tr. 115:20-24 (Cherdoud); A831-32, Tr. 60:25-61:4 (Cherdoud); A851, Tr. 139:25-140:4 (Murray); A905, Tr. 161:13-16 (Sabani); A910, 185:2-5 (Sabani); A997, Tr. 247:8-15 (Holtzman-Conston); A1947-81 (Sabani's 2014, 2015 and 2016 Tax Returns));

- Maintenance and fuel (A831-32, Tr. 60:25-61:10 (Cherdoud); A903-04, Tr. 160:19-161:16 (Sabani); A952, Tr. 66:23-67:4 (Razak); A1820-41 (Razak's 2015 and 2016 Tax Returns)); and

- Labor (A849-50, Tr. 132:8-19, 133:13-24 (Murray); A908, Tr. 177:2-178:3 (Sabani); A1990-2015 (Milano Limo 214 Tax Return); A879, Tr. 61:10-19 (Murray); A906, Tr. 170:16-171:5 (Sabani); A908, Tr. 177:7-178:3 (Sabani); A929, Tr. 261:7-262:7 (Razak).

Clearly, Appellants made investments in support of their *transportation businesses* sufficient to demonstrate that they were operating independently. *Green v. Golla Ctr. for Plastic Surgery, P.C.*, 2019 U.S. Dist. LEXIS 36997, at *19 (W.D. Pa. Mar. 7, 2019) (fact that worker "supplied his own truck and many of his own tools" favored independent contractor status) (citing *Safarian v. Am. DG Energy, Inc.*, 729 F.App'x 168, 173-74 (3d Cir. 2018)).

In contrast, Uber invested in its *technology business*. (A967, Tr. 125:23-127:20 (Dobbs)). Uber hired thousands of technical experts, including software engineers and data scientists. (A967, Tr. 126:11-127:20 (Dobbs)). The fact that Uber invested more in its technology business than Appellants invested in their transportation businesses is immaterial to the "investment" factor.

### 4.    The "special skill" factor favors independent contractor status.

Appellants contend that this Court "already decided" that driving a black car does not involve a special skill. (Appellants' Brief at 47-48 & n.6, arguing that the determination that the "special skill" factor favors employment status is "law of the case"). Not so.

First, "the law of the case doctrine does not apply to *dicta*." *UA Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 397 n.4 (3d Cir. 2003). This Court's prior discussion of the fourth factor was *dicta*, as it was not essential to its ultimate conclusion that genuine disputes of material fact as to other factors precluded summary judgment. (A127). Moreover, this Court's prior statement on the fourth factor was based on the summary judgment record. In contrast, the District Court's decision was based upon the trial evidence, which Appellants concede was "vastly different from what the parties presented to the Court on summary judgment." (ECF 328, Appellants' Motion for Judgment as Matter of Law, at 21).

As the trial demonstrated, Appellants were "commercially-licensed driver[s]" who provided a "higher-end" service. (A968, Tr. 132:4-25 (Dobbs); *see also* A804, Tr. 165:10-166:11, 166:19-20 (Cherdoud); A827, Tr. 44:15-22 (Cherdoud); A855, Tr. 154:17-23 (Appellants are "professional drivers") (Murray); A893, Tr. 120:11-17 (Sabani); A915-16, Tr. 208:21-209:1 (Razak); A930, Tr. 266:3-11 (Razak); A1650 (Limo Handbook) (must pass Driver Certification exam)). Appellants used their skills as professional drivers to determine how to generate the most profit for their businesses.[19] Appellants had "different strategies for how they pursued their businesses." (A882-83, Tr. 76:24-77:2 (Murray)). As one example of Appellants' skills causing them to make different decisions about how to operate their businesses: (a) one of Sabani's strategies was to *focus* on airport trips (A895, Tr. 126:8-16 (Sabani)); but (b) Razak found it preferable to *avoid* the airport. (A940, Tr. 18:5-7 (Razak)).

Second, this Court's prior decision was limited to whether "driving ... itself" constituted a special skill. (A127). The Department of Labor clarified, however, that the "special skill" factor: (a) asks whether the worker uses their skills in connection with businesslike initiative (such as "for marketing purposes, to generate new business, and to obtain work from multiple companies"); and

---

[19] As the District Court noted, Appellants repeatedly emphasized their special skills as black car drivers, distinguishing their services from mere "driving." (A23).

(b) considers the totality of the worker's work on the whole rather than isolating individual tasks. 89 Fed. Reg. 1638, 1711-15 (Jan. 10, 2024).

In *Derolf v. Risinger Bros. Transfer, Inc.*, the court held that driving a commercial vehicle was a special skill. 259 F.Supp.3d 876, 883 (C.D. Ill. 2017). Additionally, the court recognized that "driving ... in and of itself is not the only skill at issue here." *Id.* The court explained, "Plaintiffs clearly need to possess business acumen, diligence, and managerial skills as they are much more like businesspeople rather than merely drivers, even though they may drive the trucks themselves. They control what hauls they accept. They control what routes they take. They control when they work. The Court finds this [special skill] factor weighs in favor of Defendants." *Id*. The same is true here. Beyond driving, the trial was replete with examples of Appellants: (a) promoting their skills as luxury transportation providers (both as individual drivers as well as within their various companies) for marketing purposes and for seeking new business opportunities; and (b) utilizing their overall skills to make decisions about when, where, and how to use the Uber App (as well as other lead-generation sources) to generate revenue.

> ### 5. The "degree of permanence" factor favors independent contractor status.

Appellants claim that the "degree of permanence" factor favors employment status because their relationship with Uber lasted for several years. (Appellants' Brief at 48-49). Appellants' argument misconstrues this factor, which "turns on

two considerations: (1) whether the employee had a set term with the [alleged] employer, and (2) whether the [alleged] employee also took outside work." *Pendleton*, 463 F.Supp.3d at 568; *Verma*, 937 F.3d at 231-32 (permanence factor weighed in favor of independent contractor status where workers were "free to work at other venues"); *compare DialAmerica*, 757 F.2d at 1384-85 (workers "were not in a position to offer their services to many different businesses and organizations"); *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 29-32 (1961) (knitters had to remain in cooperative for "at least a year" and could not work for others).

As noted above, Appellants could (and did) provide transportation services outside their relationship with Uber.[20] They could unilaterally choose to stop providing their driving services through the Uber platform at any time, and they were free to leave the platform for months at a time and then subsequently reengage. (A938, Tr. 11:17-12:14 (Razak did not log on to the Uber App for two months)). They had complete control over their schedules, including when to work,

---

[20] For example, Cherdoud provided rides through privately sourced leads and through another company. (A794, Tr. 127:17-20; A796, Tr. 133:20-22, 134:12-22; A799, Tr. 148:8-11; A821-22, Tr. 18:2-20, 19:14-23:6; A825-27, Tr. 34:19-35:11, 39:12-41:7, 42:1-12; A830-32, Tr. 56:22-57:6, 64:6-8). Razak and his brother formed their own company *before* Razak used Uber. (A1671, Luxe Articles of Incorporation; A931, Tr. 269:2-19, 271:5-12). Sabani provided hundreds of trips through his limousine company outside the Uber App. (A892, Tr. 115:7-14; A906, Tr. 172:3-17; A909, Tr. 183:24-184:8; A1941-42, Email from Sabani).

how long to work, and whether to keep using the Uber App. The lack of permanence in the relationships between Appellants and Uber favors independent contractor status. That Appellants' relationship with Uber lasted several years is of no consequence (other than to demonstrate how satisfied Appellants were with their relationship with Uber).

### 6.    The "integral part" factor favors independent contractor status.

Appellants argue that the "integral part" factor favors employment status because "Uber depended on drivers." (Appellants' Brief at 49-51).[21] Once again, Appellants misconstrue this factor. Uber uses its technology platform to enable drivers and passengers to connect with each other. To be sure, the success of Uber's platform depends on riders *and* drivers choosing to use the Uber App. (A968, Tr. 130:10-23 (Dobbs)). In that sense, Appellants were no more "integral" to Uber's business than riders. But riders are not Uber's employees, and neither are drivers.[22]

---

[21] As with their "special skill" argument, Appellants misconstrue this Court's prior opinion to argue that the "integral part" factor has already been decided in their favor. But this Court did not resolve this factor in Appellants' favor, finding instead that it "could be a disputed material fact." (A127-28).

[22] Uber is an example of a "two-sided platform" that "offers ... services to two different groups"—the driver and the rider—"who both depend on the platform to intermediate between them." *Cf. Ohio v. American Express Co.*, 585 U.S. 529, 534 (2018) (explaining that credit card company is a "two-sided platform" that "cannot

The trial made plain that Appellants and Uber are in separate industries, such that Appellants' services were not an integral part of Uber's business. Uber is a technology company that offers services through a mobile application. (A967, Tr. 125:23-126:17 (Dobbs); A994, Tr. 234:15-235:2 ("Uber ... uses that technology ... to connect someone looking for a service with someone looking to provide a service.") (Holtzman-Conston); A956, Tr. 84:20-22 (Razak admitting Uber is a "technology compan[y]")). These facts distinguish this case from *DialAmerica*, where "the primary work of the defendant is locating phone numbers of various people and calling them to sell particular products," and "[t]he home researchers were engaged in the location of phone numbers." 757 F.2d at 1385. For purposes of the sixth "economic realities" factor, software engineers and data scientists are an integral part of Uber's technology business; drivers are not.

In any event, Appellants overlook that "neither the presence nor absence of any particular factor is dispositive." (A117). "[N]ot all workers who perform integral work are employees" and the "totality of the circumstances" must be considered "to determine the ultimate question." 89 Fed. Reg. 1638, 1710 (Jan. 10, 2024); *see Saleem*, 854 F.3d at 149 (concluding drivers were independent contractors with minimal analysis of "integral part" factor). The District Court

---

make a sale to one side of the platform without simultaneously making a sale to the other"). Riders and drivers are Uber's *customers*, not Uber's *employees*.

properly considered the totality of the circumstances when determining that no reasonable jury could find that Appellants were Uber's employees based on the evidence presented at the second trial.

### D.    Appellants Had the Burden of Proof.

Appellants and their *amici* contend that there should be a presumption of employment and that Uber should have been assigned the burden to prove that Appellants were independent contractors. (Appellants' Brief at 54-55 (making the argument under the FLSA); Pa. AG Brief at 16-24 (making the argument under the PMWA)). They are wrong. As the plaintiffs in this civil action, Appellants had the burden of proving they were Uber's employees.

### 1.    Appellants had the burden of proving employment status under the FLSA.

Subject to certain exemptions not relevant here, the FLSA requires a covered "employer" to pay its "employees" a minimum wage and overtime compensation. 29 U.S.C. §§ 206-07. An "employee" may bring an action against their "employer" for unpaid minimum wages or overtime compensation. *Id.* § 216(b). In such an action, the employer may assert one or more "exemptions" to the FLSA's minimum wage and overtime compensation requirements. *Id.* § 213 (establishing "exemptions" for certain categories of "employees" such as those employed in a bona fide executive, administrative, or professional capacity).

Appellants' argument rests on the false premise that independent contractor status is an "exemption" to the FLSA. (Appellants' Brief at 54-55). Appellants conflate a worker's status as an "employee" of an "employer" (a precondition to bringing a claim under the FLSA, and a status as to which the plaintiff bears the burden of proof) with an employer's right to invoke an "exemption" to minimum wage and/or overtime requirements as to a worker who has already established themselves to be an "employee." Notably, working as an "independent contractor" is not one of the exemptions listed in 29 U.S.C. § 213. Not surprisingly, Appellants do not cite any authority for the proposition that an employer bears the burden of disproving employment status under the FLSA.

The law of the case doctrine also precludes Appellants' argument that Uber bears the burden of proof under the FLSA. In the prior appeal, this Court correctly held that "[t]he burden lies with [Appellants] to prove that they are employees." (A117, citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), for the proposition that plaintiff bringing suit under FLSA has burden of proof).

### 2. Appellants had the burden of proving employment status under the PMWA.

In *Stuber*, the Commonwealth Court observed that the definition of "employee" in the PMWA was "virtually identical" to the FLSA definition and thus applied the FLSA's "economic realities" test to the plaintiff's PMWA claim. *Stuber*, 822 A.2d at 873. The former Attorney General insists, however, that *Stuber*

included an "attendant determination" that the PMWA creates a "rebuttable presumption" that a worker is an employee, thereby shifting the burden of proof to the defendant to prove independent contractor status. (Pa. AG Brief at 16). Not so. The burden of proof was never presented as a disputed issue in *Stuber*, as "both sides agree[d] .... that there is a presumption that the individual is an employee (a presumption the employer must rebut)." 822 A.2d at 872; *see* ECF 213-8 at p.3 (excerpt from Stuber's brief in which it stated it had the burden of proof under the PMWA). In short, the Commonwealth Court was merely parroting the (misguided) agreement of the parties in that appeal. Not surprisingly, in the more than two decades since *Stuber* was decided, Uber is not aware of any case citing *Stuber* for the proposition that the PMWA imposes a presumption of employment. It does not.

## IV.   CONCLUSION

This Court should affirm the judgment of the District Court.

Respectfully submitted,

Dated: March 24, 2025

*/s/ Robert W. Pritchard*
Robert W. Pritchard (PA 76979)
   RPritchard@littler.com
Christian A. Angotti (PA 322881)
   CAngotti@littler.com
LITTLER MENDELSON, P.C.
One PPG Place, Suite 2400
Pittsburgh, PA  15222
Telephone: (412) 201-7628
Facsimile: (412) 774-1957

Andrew M. Spurchise
    ASpurchise@littler.com
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY  10022
Telephone: (212) 583-2684
Facsimile: (212) 832-2719

Paul C. Lantis (PA 309240)
    PLantis@littler.com
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102-1321
Telephone: (267) 402-3073
Facsimile: (267) 402-3131

*Attorneys for Appellees Uber
Technologies, Inc. and Gegen LLC*

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

**I HEREBY CERTIFY** that I am a member of the Bar of the United States

Court of Appeals for the Third Circuit.

<u>*/s/Robert W. Pritchard*          </u>
Robert W. Pritchard

## <u>CERTIFICATE OF WORD COUNT</u>

**I HEREBY CERTIFY** that Defendant-Appellees' Brief contains 14,978 words in 14-point proportional font, as calculated by the word count feature of the word processing program, Microsoft Word, which was used to prepare this Brief.

*/s/Robert W. Pritchard*
Robert W. Pritchard

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March 24, 2025, I electronically filed the foregoing Brief of Defendants-Appellees with the Clerk of the United States Court of Appeals for the Third Circuit using the Court's CM/ECF system, which effected service on all counsel of record.

I hereby further certify that seven (7) true and correct hard copies of the foregoing Brief of Defendants-Appellees will be sent to the Office of the Clerk, United States Court of Appeals for the Third Circuit, 21400 U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106-1790 via Federal Express consistent with the Court's rules permitting service of hard copies within five (5) days of electronic filing.

I hereby further certify that a true and correct hard copy of the foregoing Brief of Defendants-Appellees will be served upon the Plaintiffs-Appellants via First Class U.S. mail consistent with the Court's rules permitting service of hard copies within five (5) days of electronic filing.

*/s/Robert W. Pritchard*
Robert W. Pritchard

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

**I HEREBY CERTIFY** that the electronic version of Defendants-Appellees'

Brief filed with the Court in PDF for viewing via CM/ECF is identical to the hard

copies that will be filed with the Court and served upon Plaintiffs-Appellants.

*/s/Robert W. Pritchard*
Robert W. Pritchard

## <u>CERTIFICATE OF VIRUS CHECK</u>

**I HEREBY CERTIFY** that a virus check was performed in the PDF file of

Defendants-Appellees' Brief filed with the Court via CM/ECF, using Windows

Defender, and that no virus was found.

*/s/Robert W. Pritchard*
Robert W. Pritchard
